**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| SJ PROPERTIES SUITES BUYCO EHF.,<br>Kringlunni 5<br>103 Reykjavík,<br>Iceland,<br><br>SJ-FASTEIGNIR, EHF.,<br>Kringlunni 5<br>103 Reykjavík,<br>Iceland,<br><br>and<br><br>ASKAR CAPITAL, HF.,<br>Sudurlandsbraut 12<br>108 Reykjavík,<br>Iceland<br><br>       Plaintiffs,<br><br>   v.<br><br>SPECIALTY FINANCE GROUP, LLC,<br>3284 Northside Parkway NW<br>Atlanta, Georgia 30327<br><br>       Defendant. | Case No. 10-CV-198 |

**PLAINTIFFS' AMENDED COMPLAINT**

SJ Properties Suites BuyCo ehf. ("BuyCo"), SJ-Fasteignir, ehf. ("Fasteignir"), and Askar Capital, hf. ("Askar") (collectively, the "Icelandic Entities") complain against Specialty Finance Group, LLC ("SFG") as follows:

## INTRODUCTION

This dispute revolves around the funding for a construction project of a 14-story

mixed-use development on the corner of Water Street and Juneau Street in downtown Milwaukee, Wisconsin (the "Project"). SFG provided a construction loan for the Project, but it failed to fully fund it. The Icelandic Entities advanced monies for the Project prior to SFG's loan, and continued to provide funding for the Project after the loan was signed. Shortly after the loan was executed, SFG alleged that there was an event of default due to cost overruns, and forced the Icelandic Entities to provide more and more emergency cash to the Project. When the Project eventually collapsed, SFG refused to allow the Icelandic Entities to continue making payments on the loan. SFG also refused to participate in the Wisconsin State Court receivership and failed to provide any monies to protect the Project, while the Icelandic Entities provided even more emergency funding to protect the Project. SFG has attempted to foreclose on the Project in a first position, despite the fact that it is not a Wisconsin mortgage banker, and despite the fact that there is a significant dispute over whether SFG's mortgage has priority over other interest holders. SFG is attempting to take advantage of the emergency funding provided by the Icelandic Entities.

## THE PARTIES

1.      Plaintiff BuyCo is an Icelandic private limited company. The entity is more properly denoted in Iceland as an einkahlutafélag, which is commonly abbreviated "ehf." An einkahlutafélag is a unique Icelandic limited liability business entity that is analogous to a United States corporation. BuyCo's principal office is located at Kringlunni 5, 103 Reykjavík, Iceland, ID number 690806-1420. BuyCo advanced funds for the Project, including loans.

2

2.      Plaintiff Fasteignir is an Icelandic private limited company.  The entity is more properly denoted in Iceland as an einkahlutafélag, which is commonly abbreviated "ehf."  Fasteignir's principal office is located at Kringlunni 5, 103 Reykjavík, Iceland, ID number 690806-1420.  Fasteignir advanced funds for the Project through loans.

3.      Plaintiff Askar is an Icelandic public limited company.  The entity is more properly denoted in Iceland as an hlutafélag, which is commonly abbreviated "hf."  An hlutafélag is a unique Icelandic limited liability business entity that is analogous to a United States corporation.  Askar's principal office is located at Sudurlandsbraut 12, 108 Reykjavík, Iceland.  Askar provided mezzanine financing for the Project.

4.      Defendant SFG is a Georgia limited liability company, whose principal office is located at 3284 Northside Parkway NW, Atlanta, Georgia 30327.  SFG is a wholly owned subsidiary of Silverton Bank, National Association, Atlanta, Georgia ("Silverton").  SFG holds a mortgage on the Project.

## JURISDICTION AND VENUE

5.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this matter because the matter in controversy exceeds $75,000.00, and the parties are of diverse citizenship.  Under 28 U.S.C. § 1332(a)(2), diversity of jurisdiction exists in an action between "citizens of a State and citizens or subjects of a foreign state."  All Plaintiffs are citizens and legal subjects of Iceland or Luxembourg.  The Defendant is a citizen and legal subject of the state of Georgia, United States.

    A.      Plaintiff BuyCo is an einkahlutafélag, or private limited company, incorporated and domiciled in the nation of Iceland, whose principal office is located at Kringlunni 5, 103 Reykjavík, Iceland.  It maintains no offices in the United

3

States and is a citizen of Iceland.  The corporate form einkahlutafélag is a unique Icelandic business entity that is analogous to a United States corporation.  BuyCo's principal place of business is in Reykjavík, Iceland.

    i.       BuyCo is wholly owned by Plainitff Fasteignir.

B.      Plaintiff Fasteignir is an Icelandic private limited company, which is more properly denoted in Icelandic as an einkahlutafélag, which is incorporated in, and domiciled in Iceland.   Fasteignir's principal office is located at Sudurlandsbraut 12, 108 Rekjavik, Iceland.   Again, the corporate form einkahlutafélag is analagous to a United States corporation.  Fasteignir is a holding company for real estate investment assets, with its principal place of business in Reykjavík, Iceland.

    i.       Fasteignir was a wholly owned subsidiary of Sjóvá-Almennar Tryggingar, hf., which is incorporated and domiciled in Iceland, with its principal place of business in Reykjavík, Iceland.

    ii.      Fasteignir is now a wholly owned subsidiary of SJ1 ehf., which is incorporated and domiciled in Iceland.  SJ1 ehf.'s principal office is located at Sudurlandsbraut 12, 108 Rekjavik, Iceland, with its principal place of business in Reykjavík, Iceland.

C.      Plaintiff Askar is an Icelandic public limited company, which is more properly denoted in Icelandic as an hlutafélag, which is incorporated in and domiciled in Iceland.  Askar's primary business is investment banking, and it serves as a financial advisor to banks and insurance holding companies. The corporate form hlutafélag is a unique Icelandic business entity that is analogous to a

4

United States corporation.  Its principal place of business is in Reykjavík, Iceland.  Askar's shareholders are all citizens of either Iceland or Luxembourg, as follows:

i.     Glitnir Banki, hf., is Askar's majority owner, holding a 53.3% interest. Glitnir Banki, hf.'s primary offices are at Sóltúni 26, 103 Reykjavík, Iceland, ID Number 550500-3530.  It is a citizen of Iceland, domiciled in Iceland, with its principal place of business in Reykjavík, Iceland.

ii.    Saga Capital Fjárfestingabanki, hf., holds an 18.1% ownership interest in Askar.  Its principal offices are at Hafnarstraeti 53, 600 Akureyri, Iceland, ID Number 660906-1260.  It is a citizen of Iceland, domiciled in Iceland, with its principal place of business in Akureyri, Iceland.

iii.   Glitnir Bank Luxembourg, S.A., is a Luxembourg chartered bank, that is a citizen of Luxembourg, domiciled in Luxembourg.  It owns a 10.8% interest in Askar, and its primary offices are located at 534 rue de Neudorf, L-2220 Luxembourg, ID Number B 106652, with its principal place of business in Luxembourg.

iv.    Milestone, hf., owns a 6.8% interest in Askar.  Its principal offices are located at Sudurlandsbraut 12, 108 Reykjavik, Iceland, ID Number 640388-1109.  It is a citizen of Iceland, domiciled in Iceland with its principal place of business in Reykjavík, Iceland.

v.     Askar Fasteignaráðgjöf, ehf., owns a 4.0% interest in Askar.  Its principal offices are located at Sudurlandsbraut 12, 108 Reykjavík,

5

Iceland, ID Number 441206-0110.  It is a citizen of Iceland, domiciled in Iceland, with its principal place of business in Reykjavík, Iceland.

vi.    Stapi Lifeyrissjóður, ehf., is a 3.4% owner of Askar.   Its principal offices are located at Strandgötu 3, 600 Akureyri, Iceland, ID Number 601092-2559.  It is a citizen of Iceland, domiciled in Iceland, with its principal place of business in Akureyri, Iceland.

vii.   Sjóvá-Almennar Tryggingar, hf., is a 1% owner of Askar.  Its principal offices are located at Kringlunni 5, 103 Reykjavík, Iceland, ID Number 701288-1739.  It is a citizen of Iceland, domiciled in Iceland, with its principal place of business in Reykjavík, Iceland.

viii.  All other registered shareholders have interests of less than 1% and are citizens of Iceland, domiciled in Iceland.  The following persons and entities are registered owners of shares as of the date of the filing of this amended complaint: Anna Margrét Wernersdóttir, Birkigrund 49, 200 Kópavagi, Iceland; Landsvirkjun, Háaleitisbraut 68, 103 Reykjavík, Iceland; Festa Lífeyrssjóður, Tajarnargötu 12, 230 Reykjanesbær, Iceland; Stafir Lífeyrissjóður, Stórhöfða 31, 110 Reykjavík, Iceland; and Lífeyrissjóður Vestfiðinga, Hafnarstræti 9-13, 400 Ísafirði, Iceland.  There is no trading of this stock outside of Iceland

6.    SFG is a Georgia limited liability company with its principal place of business in Atlanta, Georgia, and whose principal office is located at 3284 Northside Parkway NW, Atlanta, Georgia 30327.

I.     SFG's sole member is Silverton Bank, N.A., a national banking association whose principal place of business is located in Georgia. On May 1, 2009, Silverton Bank, N.A., was placed into receivership, and the Federal Deposit Insurance Company ("FDIC") was named receiver.

7.     Venue is proper in this District under 28 U.S.C. § 1391(a), because this action focuses on events surrounding the Project, which is located in Milwaukee, Wisconsin.

## FACTS COMMON TO ALL COUNTS

### *United States Banking Regulations*

8.     In the United States, the term "state bank" is a term of art that refers to a commercial bank that receives its charter, or permission to operate, from a state banking department.

9.     The Georgia Department of Banking and Finance regulates banks that are chartered by the State of Georgia.  The Georgia Department of Banking and Finance also has regulatory authority over certain mortgage brokers, lenders, processors, and mortgage loan originators conducting business in Georgia. The Georgia Department of Banking and Finance does not have regulatory authority over national banks.

10.    In the United States, banks that are federally chartered national banks or national associations receive charters, or permission to operate, from the Office of the Comptroller of the Currency (the "OCC"), and submit to its regulatory authority. National Banks and National Associations also must be members of the Federal Reserve System ("Federal Reserve") and the FDIC.

11.     The OCC was established in 1863 as a bureau of the U.S. Department of the Treasury. The OCC is headed by the Comptroller General, who is appointed by the President, with the advice and consent of the Senate.  The Comptroller General also serves as a director of the FDIC.  The OCC's staff of examiners conducts on-site reviews of national banks and provides sustained supervision of bank operations. The agency issues rules, legal interpretations, and corporate decisions concerning banking, bank investments, bank community development activities, and other aspects of bank operations.

12.     The Federal Reserve is the central bank of the United States. It has twelve regional Reserve Banks.  The Federal Reserve supervises all national banks, as well as certain state-chartered banks.  The term "member bank" is a statutory term of art, defined by 12 U.S.C. §§ 226 and 321, among other places, that means and includes any national bank or state bank which has become subject to the provisions of the Federal Reserve Act.  The term "non-member" bank is also a term of art that refers to a state-chartered bank that has opted not to join the Federal Reserve.  In general, non-member banks are less regulated than member banks.  For example, they are allowed to keep at least a portion of their reserves in interest-bearing securities. They are subject only to the laws of the states in which they are chartered.

13.     The FDIC is a United States government corporation created by the Banking Act of 1933 (also known as the Glass-Steagall Act) that was signed into law by President Franklin Roosevelt on June 16, 1933.  In addition to providing deposit insurance, it also manages banks in receiverships when banks fail, when requested to do so by the OCC.

8

14.   The FDIC and the OCC have established a series of commercial lending regulations.  Those regulatory obligations are intended to establish a balance that protects borrowers from unfair and unethical lending practices, imposes minimum standards for loans to protect banks, and safeguards the general public as a whole from the risks associated with both.

15.   Specifically, under 12 C.F.R. § 34.1, national banks and operating subsidiaries are required to comply with real estate lending standards and practices established by the FDIC and OCC, including, without limitation, the Interagency Guidelines for Real Estate Lending Policies, which addresses construction project loans.

16.   Under 12 C.F.R. § 365.1, state non-member banks are also requested to comply with real estate lending standard practices established by the FDIC and OCC, including, without limitation, the Interagency Guidelines for Real Estate Lending Policies.  Under 12 C.F.R. § 365.2, bank lending guidelines "should reflect" the Interagency Guidelines for Real Estate Lending Policies.

17.   The Interagency Guidelines for Real Estate Lending Policies require banks to establish internal loan to value limits, and require that they are within certain parameters. For commercial, multi-family, and non-residential construction loans, the loan to value limit is 80%.  These guidelines apply to individual loans and to portfolios as a whole.

18.   The Interagency Guidelines for Real Estate Lending Policies define loan to value ratio as the percentage or ratio that is derived at the time of loan origination by dividing an extension of credit by the total value of the property securing or being improved by the extension of credit, plus the amount of any readily marketable

9

collateral and other acceptable collateral that secures the extension of credit. Value means an opinion or estimate set forth in an appraisal or evaluation, whichever may be appropriate, of the market value of real property, prepared in accordance with the agency's appraisal regulations and guidance.

19.    The Interagency Guidelines for Real Estate Lending Policies contain exceptions and exclusions from the loan to value rules. These standards are intended to apply both to force lenders to obtain a minimum amount of collateral and to prevent lenders from requiring excessive collateral from borrowers.

20.    Under 12 U.S.C. § 371 and 12 C.F.R. § 34, national banks are also required to comply with the Comptroller of the Currency's Commercial Real Estate and Construction Lending Handbook (the "Comptroller's Handbook"). A portion of the Comptroller's Handbook contains the Interagency Guidelines for Real Estate Lending Policies. The Comptroller's Handbook also collects other published rules issued by the FDIC and the OCC that were promulgated to protect borrowers, lenders, and the general public, and establish an industry standard of care for real estate lending practices at national banks.

21.    One of the items specifically addressed in the Comptroller's Handbook is the need to protect the collateral from outside attacks. The Comptroller admonishes national banks to take every precaution to prevent mechanic's liens from being in the preferred position because many states have enacted statutes that place subcontractors in a preferred position if they visibly commenced work before the lender's mortgage is recorded. The same guidelines also admonish national banks to be mindful of state specific regulatory concerns that may result in compliance

risks (such as the loss of preferred position lien rights).  Finally, the Comptroller's Handbook also imposes an obligation to take certain specific steps with respect to monitoring the general contractor and architect's progress.  The Comptroller's Handbook also imposes an obligation for a bank to periodically schedule physical inspections of a construction project to evaluate the work performed against project design and budgeted costs.  There are no comparable rules established by the Georgia Department of Banking and Finance.

### History of Silverton Bank and SFG

22.   Georgia Banker's Bank was originally charted as a commercial bank with the State of Georgia.  In 1994, the bank changed its name to The Banker's Bank, but its charter remained with the State of Georgia.  In 2007, The Banker's Bank changed its name to Silverton Bank, N.A.  For purposes of this complaint, each iteration of The Banker's Bank and Silverton Bank, N.A., will simply be referred to as "Silverton."

23.   SFG is an unchartered Georgia limited liability company that was, and is, a wholly owned subsidiary of Silverton.  SFG was created to target the financing needs of the hospitality industry.

24.   As of March 28, 2007, Silverton was an insured state non-member bank.

25.   As of March 28, 2007, Silverton was required to comply with 12 U.S.C. §§ 365.1 and 365.2. These sections required compliance with the Interagency Guidelines for Real Estate Lending Policies.  Silverton was specifically required to comply with the remainder of the standards contained in the Comptroller's Handbook, and its real estate lending practices were governed by Georgia law.

11

### Background of the Project

26.    An entity known as DOC Milwaukee, LP, ("DOC Milwaukee") was formed on
       November 9, 2006, and  the partners executed an operating agreement on
       November 9, 2006.

27.    When DOC Milwaukee was formed, its partners were as follows:

       A.    DOC Milwaukee II, LLC, as the initial general partner;

       B.    Development Opportunity Corp., as limited partner;

       C.    EP Milwaukee, LLC, as limited partner; and

       D.    BuyCo as limited partner.

28.    The purpose of DOC Milwaukee was to acquire real property bearing the address
       1150 North Water Street, Milwaukee, Wisconsin, and to develop the Project, a 14-
       story, mixed-use building with a 120-room extended stay hotel, ground-level retail
       space, and luxury condominiums on the top four floors.

29.    DOC Milwaukee is the owner of the Project.

30.    EP Milwaukee, LLC, became the general partner of DOC Milwaukee on December
       16, 2008.

### SFG's Letter of Commitment to Issue a Loan for the Project

31.    On March 29, 2007, DOC Milwaukee received a loan commitment from SFG to fund
       a construction loan for the Project (the "Loan Commitment").

32.    Under the terms of the Loan Commitment, SFG was to fund a loan amount "Not to
       Exceed $20,900,000.00," provided that DOC Milwaukee provided equity
       contributions equal to 25% of the Project's cost, with a minimum equity contribution

of $6,993,302.00. The minimum equity contribution however, established a 33.4% loan to value ratio.

33. At the time the Loan Commitment was issued, the loan to value ratio exceeded the 20% loan to value ratio for commercial construction required under the Interagency Guidelines for Real Estate Lending Policies by 13.4%.

34. At the time the Loan Commitment was executed, it was contemplated that the loan documents would be immediately forthcoming and that a loan would close on or before April 6, 2007.

### Silverton and SFG Never Registered in Wisconsin

35. SFG has not registered as a mortgage banker or broker in Georgia or any state.

36. Neither Silverton nor SFG ever submitted to any type of regulation by the State of Wisconsin, including, without limitation, regulation by the Wisconsin Department of Financial Institutions, Division of Banking, as of the date the Loan Commitment was issued or at any other time.

37. Neither Silverton nor SFG ever submitted to regulation under Wisconsin Statutes section 215.21(4)(a), which applies to savings and loans associations, as of the date the Loan Commitment was issued or at any other time.

38. Neither Silverton nor SFG ever submitted to regulation under Wisconsin Statutes section 292.31(8)(I), which applies to Superfund projects, or Wisconsin Statutes section 292.81, which applies only to hazardous spills and Brownfield projects, as of the date the Loan Commitment was issued or at any other time.

39. Neither Silverton nor SFG ever submitted to regulation under Wisconsin Statutes section 706.11, which applies only to certain types of construction financing

13

mortgages, including (without limitation): Wisconsin Statutes sections 706.11(1)(a), 706.11(1)(b), 706.11(1)(c), 706.11(1)(d), 706.11(1)(e), 706.11(1)(f), 706.11(1)(g), or 706.11(1)(h), as of the date the Loan Commitment was issued or at any other time.

40.  Neither Silverton nor SFG ever registered or obtained a license issued by the Wisconsin Division of Banking under Wisconsin Statutes section 138.09, as of the date the Loan Commitment was issued or at any other time.

### SFG Never Complied With Wisconsin's Mortgage Banker Regulations

41.  In a complaint filed in the United States District Court for the Eastern District of Wisconsin, SFG asserts that it is a "mortgage banker" under Wisconsin Statutes section 706.11(1)(f) and 224.71(3). (10-CV-315, DN 1, ¶¶ 39 and 50.) However, neither Silverton nor SFG ever registered or obtained a license to act as a "mortgage banker," as defined in Wisconsin Statutes section 224.71(3), as of the date the Loan Commitment was issued or at any other time.

42.  SFG also does not fit the definition of a mortgage banker under Wisconsin Statutes section 224.71(3), which reads in relevant part:

> "(3)(a) 'Mortgage banker' means a person who is not excluded by par. (b) and who does any of the following:
>
> 1.  Originates residential mortgage loans for itself, as payee on the note, evidencing the residential mortgage loan, or for another person.
>
> 2.  Sells residential mortgage loans or interest in its residential mortgage loans to another person.

14

       3.     Services residential mortgage loans or provides escrow services.

   (b)   'Mortgage banker' does not include any of the following:

     . . .

       9.     A subsidiary that is owned and controlled by a depository institution and regulated by a federal banking agency."

43.    SFG is not a mortgage banker under the current version of Wisconsin Statutes section 224.71(3) because it does not provide residential mortgage loans.

44.    The language referencing a "residential" mortgage loan was not present in the language of Wisconsin Statutes section 224.71(3) until the enactment of 2009 Wisconsin Act 2, on February 19, 2009.

45.    When SFG recorded its mortgage, the term "mortgage banker" in Wisconsin Statutes section 224.71(3) was defined as follows:

> "(3)(a) 'Mortgage banker' means a person who is not excluded by par. (b) and who does any of the following"

    1.     Originates loans for itself, as payee on the note evidencing the loan, or for another person.

    2.     Sells loans or interests in loans to another person.

    3.     Services loans or land contracts or provides escrow services."

46.    At the time SFG recorded its mortgage, the term "loan" was defined as follows: "a loan secured by a lien or mortgage, or equivalent security interest, on real property." Wis. Stat. § 224.71(1g) (West 2007).

15

47.    Subsection (1g) of Wisconsin Statutes section 224.71 was changed by 2007 Wisconsin Act 211, which became effective on April 22, 2008.  The language change clarified the term "loan" as indicating a residential loan:

> "(1g)  'Loan' means a loan for personal, family, or household purposes that is secured by a lien or mortgage, or equivalent security interest, on real property located in this state.  For purposes of this subsection, a loan secured by real property consisting of 1 to 4 dwelling units, including individual condominium units, is a loan for household purposes, but a loan made by a landlord to a tenant as described in sub. (3)(b)4. is not a loan for household purposes."

48.    The current text of Wisconsin Statutes section 224.71 was enacted as part of a congressional mandate under the federal Secure and Fair Enforcement for Mortgage Licensing Act of 2008 ("SAFE").  SAFE was passed as part of P.L. 110-289 on July 30, 2008.  SAFE gave states one year to review their existing regulatory schemes, and pass remedial measures requiring licensure of mortgage loan originators if their current regulation was not in conformance with SAFE.

49.    At the time SAFE was enacted, the Wisconsin Mortgage Banking Statutes and Regulations did not conform to SAFE, and the Wisconsin legislature began to propose clarifications to Wisconsin law.

50.    The Wisconsin Department of Financial Institutions proposed modifications to sections of the Wisconsin Mortgage Banking Statutes and Regulations, and particularly to Wisconsin Statutes section 224.71.  These changes were adopted by the Wisconsin legislature as 2009 Wisconsin Act 2.  The provisions in the Act with respect to chapter 224, were deemed a "clarification" of previous statutory language to match the requirements of SAFE.  The Wisconsin Department of Financial

16

Institutions noted, "[t]he changes [to the mortgage banker statutes] are largely ones of terminology and procedures that stem directly from the S.A.F.E. Act of 2008 and legislatively by 2009 Wisconsin Act 2." (Ex. A, W.D.F.I. Order p. 2, ¶ 10.)

51.     The changes to Wisconsin Statutes section 224.71, and other statutory sections addressing mortgage bankers are remedial changes to the existing mortgage banker regulations. This means that the text found in current Wisconsin Statutes sections 224.71 and 224.72 apply retroactively to SFG's mortgage in this case.

52.     Regardless of the statutory clarification in the current text of chapter 224, SFG never complied with any of the other provisions of chapter 224 for registration as a mortgage banker, which would be required prior to SFG asserting status as a mortgage banker.

53.     Even the 2007 version of the Wisconsin Statutes prohibit an entity to act as a mortgage banker unless it submitted a verified application containing the identity of the partners, members, or officers, and included tax information. Wis. Stat. § 224.72(2). In addition, for an entity to be recognized as a mortgage banker, the entity would have to have posted a $300,000.00 bond and a minimum net worth statement. After all of those things were done, a person could only be classified as a mortgage banker if it received a certificate of registration.

54.     SFG never complied with any of the relevant statutes or regulations to assert status as a mortgage banker, and its assertion that it is a mortgage banker opens SFG to the private rights of action contained in chapter 224.

17

***Silverton Bank Converts to a National Association Submitting to OCC Rules***

55.     On April 2, 2007, three days after Silverton issued the Loan Commitment, it
        submitted an application to the OCC requesting permission to convert from a
        Georgia chartered commercial bank to a national association.

56.     As a result of Silverton's attempt to convert to a national association, it was required
        to submit to the OCC's jurisdiction and rules, as the OCC was Silverton's primary
        regulator.

57.     Banks regulated by the OCC are required to comply with the Federal Deposit
        Insurance Corporation Improvement Act of 1991, 12 U.S.C. § 1828(o), which
        establishes uniform regulations prescribing standards for extensions of credit that
        are "(A) secured by liens on interests in real estate; or (B) made for the purpose of
        financing the construction of a building or other improvements to real estate," and
        requires certain mandatory disclosures in its application and on a periodic basis.

58.     Silverton's conversion application specifically disclosed SFG as its wholly owned
        subsidiary.  It did not identify SFG as a registered or licensed mortgage banker in
        any jurisdiction, including Georgia or Wisconsin.

59.     Silverton's subsequent periodic regulatory disclosures made to the OCC did not
        identify SFG as a registered or licensed mortgage banker in any jurisdiction,
        including Georgia or Wisconsin.

60.     By submitting to the OCC's regulation, Silverton (for itself and its subsidiaries,
        including SFG) also agreed to submit to the internal loan to value ratio established
        by 12 C.F.R. § 34, including the Interagency Guidelines for Real Estate Lending

18

Policies, which are incorporated by reference; 12 U.S.C. § 1828(o); and the Comptroller's Handbook.

61.    Regulation by the OCC also prohibits insolvent banks from using federal foreclosure procedures if a receiver is appointed to administer assets of an insolvent national association.

62.    The loan to value ratio established by the Loan Commitment exceeded those established by the Interagency Guidelines for Real Estate Lending Policies by 13.4%.

63.    The Interagency Guidelines for Real Estate Lending Policies establish exemptions from this rule.  One exemption applies to loans issued by the bank in a jurisdiction in which the bank has specifically consented to state regulatory requirements and jurisdiction.

64.    Neither Silverton nor SFG ever disclosed the loan made for the Project as an excluded loan from the supervisory loan to value limits, or an excepted loan under the Exceptions to the General Lending Policy.

65.    The OCC commenced its pre-conversion evaluation on May 14, 2007.

66.    Under the Comptroller of the Currency, Department of the Treasury, Rules, Policies, and Procedures for Corporate Activities (the "Department of the Treasury Rules"), and specifically under 12 C.F.R. § 5.24, Silverton was required to identify all subsidiaries that would be retained following the conversion, and to provide the information and analysis of each such subsidiaries' activities. Silverton's regulatory filings identified SFG as a wholly owned subsidiary that it intended to retain, but did not disclose SFG as having ever registered or obtained any sort of license in the

19

State of Wisconsin, and did not disclose SFG as a registered or licensed mortgage banker doing business in the State of Wisconsin.

67.     Under 12 C.F.R. § 5.24 of the Department of the Treasury Rules, Silverton was required to identify all non-conforming activities, including loans with excessive loan to value ratios.  No non-conforming disclosure was made of SFG's intended or actual loan to DOC Milwaukee, even though its loan to value ratio exceeded the amounts established in the Interagency Guidelines for Real Estate Lending Policies.

### The OCC Has Concerns With Silverton's Viability

68.     On June 5, 2007, in an internal memorandum, OCC examiners expressed concerns with Silverton's credit risk management processes, strategic planning, and capital planning.

69.     Around the same time, the OCC determined that there were significant weaknesses in Silverton's banking practices, including compliance with regulatory capital requirements and statutory loan criteria.

70.     On June 18, 2007 and June 26, 2007, the OCC officials met with Silverton's management to discuss their concerns, which were ultimately memorialized in a July 26, 2007 letter recommending changes to Silverton's lending practices, among other things.

71.     The OCC reported to Silverton that its investigation noted unsafe and unsound underwriting and credit administration practices, including inadequate capitalization of loans, construction draw monitoring, and a lack of compliance with loan to value ratios.

20

72.    The review of the OCC examiner reported significant weaknesses in Silverton's portfolio and requested that Silverton review its business plan to reduce the risk, particularly of its construction loans.

73.    On August 7, 2007, the OCC approved Silverton's application for conversion to a national association, conditioned upon Silverton's agreement to address the concerns in the OCC's July 26, 2007 letter.

74.    Silverton was formally converted to a national association on August 17, 2007.

75.    At the time of the conversion, Silverton represented that its main office was in Atlanta, Georgia, and that it and its subsidiaries had offices for loan production or business development in Alabama, California, Colorado, Florida, Georgia, Illinois, Maryland, Mississippi, North Carolina, Ohio, and Tennessee.

76.    Silverton disclosed SFG as a wholly owned and operated subsidiary, established as a limited liability company that made direct commercial loans to the hospitality industry. This list was never amended, and at no time did Silverton advise the OCC that either it or its subsidiaries or branches maintained offices within the State of Wisconsin. Silverton also never amended its disclosures to indicate that SFG was engaged in the business of mortgage banking or serving as a mortgage banker in any state, including the State of Wisconsin.

77.    A significant benefit of having SFG operate as a limited liability company that was the wholly owned subsidiary of a national association is that SFG could avoid having to register or obtain a license from state lending and banking regulators when SFG made loans for projects outside of the State of Georgia. State lending and banking regulators often impose reserve requirements and other financial obligations, and

21

require an actual physical operating presence in the state. Many states also provide benefits to registered or licensed banks, including, without limitation, mortgage relation back rights. A lender or bank doing business in such states without licensing or registration runs the risk that it might not be eligible for such rights. As a sophisticated entity, Silverton and SFG were aware of these risks and benefits when they elected to have SFG continue solely as an unregistered and unlicensed limited liability company.

78.   On information and belief, SFG made no efforts before May 1, 2009, to comply with the standards established in the Comptroller's Handbook.

79.   As of August 17, 2007, the OCC reassigned Silverton from its Birmingham office to the Atlanta office for supervision. There was a brief gap in the supervision of Silverton for approximately 90 days, from August 17, 2007 until late November 2007.

**SFG Inspectors Have Issues With Construction Costs Before Agreeing to Lend**

80.   In late September 2007, SFG contracted with HMS Victory, LLC, to perform an evaluation of the Project's contractor, Economou Partners Construction, Inc. ("Economou Partners Construction") and the Project.

81.   On September 9, 2007, SFG received the HMS Victory, LLC's Contractor Evaluation. The evaluation notes that the Schedule of Values provided by Economou Partners Construction reported a construction price of $82/square foot. HMS Victory, LLC specifically advised SFG that it should expect an actual construction price in the $111/square foot range. The evaluation noted that, at the time Economou Partners Construction, Inc's Schedule of Values was prepared, it had limited subcontractor input. The evaluation also states the estimated Total Hard

22

Construction Cost number of $18,497,557 was probably too low, and "[i]t is recommended that you [SFG] are prepared for a potential cost overrun of at least 20% on this project."

82.    SFG had received, reviewed, and relied upon the HMS Victory, LLC, report before it agreed to lend funds to DOC Milwaukee.

83.    The loan documentation was not immediately forthcoming from SFG in August, as promised.  SFG advised DOC Milwaukee that the delays were a result of the regulatory process associated with the conversion of Silverton from a Georgia chartered bank to a national association.

### SFG's Loan for the Project

84.    In October 2007, SFG finally presented a loan agreement for DOC Milwaukee to sign based upon the terms of the Loan Commitment, which contemplated a $20,900,000 loan with a minimum 25% equity requirement.  Days later, SFG advised that it would be unable to sign the document.

85.    In October 2007, SFG contacted and retained Broadlands Financial Group, LLC ("Broadlands") to serve as a lender services agent for the Project.

86.    By October 2007, SFG was aware that a number of subcontractors had visibly commenced work at the Project.

87.    By the end of November 2007, the supervisory gap at the OCC was filled, and the OCC ordered a full-scope examination of Silverton and SFG.  The OCC began reviewing new loans and problem loans, assessing lending area risk, and conducting a targeted examination of lending risk and asset quality. Particular attention was given by the OCC to loan to value ratios and asset quality.  As part of

23

the evaluation process, the OCC identified Silverton and SFG loans that potentially fell outside of its commitments made to the OCC pre-conversion.

88.   As a result of pressures from regulators, and to stem its own losses, Silverton and its wholly owned subsidiary, SFG, began to aggressively restrict its loans to comply with federal lending guidelines, and attempted to obtain additional equity contributions from its borrowers to bring its total portfolio loan to value numbers into line.

89.   In November 2007, SFG advised DOC Milwaukee that it could not sign the loan agreement because its parent company, Silverton, was unwilling to provide funding for the loan.  SFG offered to issue a loan for a lower dollar amount and promised that it would issue a new loan based upon the original Loan Commitment promptly after Silverton's issues were worked out.

90.   At the time SFG advised DOC Milwaukee of this fact, SFG was aware that the Project was already under construction.  To keep the Project going, Askar, BuyCo, and Fasteignir stepped in and advanced additional emergency cash.

91.   On January 9, 2008, SFG and DOC Milwaukee entered into a new loan agreement for a lower amount—$14,900,000.00 (the "SFG Loan Agreement").  SFG recorded its mortgage on January 11, 2008.

92.   DOC Milwaukee provided a promissory note to SFG for $14,900,000.00.  The promissory note was guaranteed by Phil Hugh, John Economou, and Steve Economou.

93.   Photos taken of the Project on January 8, 2009 reflect that five stories of the Project had already been constructed.

94.     The October 2007 draft of the loan agreement and the January 9, 2008 executed

copy differed in the following respects. The October 2007 draft contemplated a loan

for $20,900,000.00 and a borrower's equity contribution of $6,993.302.00, or "25%

of the total project cost."

95.     The SFG Loan Agreement contemplated a loan for $14,900,000.00 and a borrower's

equity contribution of $12,993,302.00.  Although SFG changed the numbers, it left

in the original provision in Section 1.5 of the SFG Loan Agreement stating that the

borrower's equity contribution would be 25% of the total Project cost of

$26,317,603.00.  Of course, 25% of a total Project cost of $26,317,603.00 equals

an equity contribution of only $6,579,400.00. By contrast, the $12,993,302.00 equity

contribution amounts to nearly 50% of the total costs for the Project.  Thus, in this

very brief period, the loan was reduced by $6,000,000.00, yet the equity was

increased by 17%, from 33% to 50%.

96.     Finally, the SFG Loan Agreement was based upon a specific Cost Breakdown,

which is attached as exhibit C to the SFG Loan Agreement.  This reflects that DOC

Milwaukee advanced $7,286,802.98 in equity as of September 2007, and that the

total cost to complete the Project would be $26,317,603.00.

97.     Although exhibit C to the SFG Loan Agreement lists Total Development Costs of

$26,317,603.00, the Total Hard Construction Costs were $18,046,358.00—a

number that is slightly less than the Total Hard Construction Costs identified by HMS

Victory, LLC.

98.     At the time SFG recorded its mortgage, it was aware of the fact that substantially all

subcontractors had visibly commenced work, and that SFG was not in compliance

25

with the guidelines contained in the Comptroller's Handbook. SFG failed to take reasonable precautions to protect DOC Milwaukee, its investors, and other lenders, including the Icelandic Entities.

99. SFG, through its agent, Broadlands, began the process of processing payment applications in January 2007.

100. Under the terms of the SFG Loan Agreement, Broadlands was to serve as SFG's agent and provide construction risk management services, including Project oversight and contract funds administration.

101. Broadlands required that payment applications be submitted in accordance with its established procedure, directly to its project finance manager.

102. When Broadlands' project finance manager received a payment application, he was required to request a site inspection to confirm the accuracy of the payment application against the actual status of construction.

103. Broadlands provided virtually no guidance for its inspector, who only viewed areas of the Project, as directed by the general contractor. Broadlands never required its inspector to perform an independent review of the work that was actually performed at the Project.

104. As SFG's agent and construction inspector, Broadlands failed to properly inspect the Project to confirm the accuracy of the payment applications against the actual status of construction. Based on Broadlands' construction inspections, SFG released funds to pay payment applications that overstated the actual status of construction and that requested payment for work that had not yet been performed.

105.   At the time SFG and its agent, Broadlands, undertook this process, they were both aware that the Project had substantial construction work at the site.  Despite this knowledge, SFG, through its agent, Broadlands, failed to obtain appropriate lien waivers from contractors and subcontractors.  Even when Broadlands obtained lien waivers, some lien waivers were not compliant with Wisconsin Statutes chapter 779, while others were only partial or limited to specific payment applications. In doing so, SFG, through its agent, Broadlands, exposed the Project, DOC Milwaukee, and the Icelandic Entities to unnecessary risk.

106.   The Project's subcontractors have already raised the visible commencement of work argument under Wisconsin Statutes section 779.01(4), which may allow their liens to have priority over SFG's mortgage.

### Silverton's Viability Issues

107.   By January 2008, just prior to executing the SFG Loan Agreement, the OCC was reporting significant concerns over Silverton's viability.  Despite the fact that the loan had closed, the mortgage had been recorded, and the Project was over 60% complete, SFG failed to fund the first draw request.

108.   On information and belief, SFG failed to fund the fist draw request because it lacked sufficient cash to fund the loan.  As a result, SFG needed to obtain substantial funding from other banks, as participations.

109.   On information and belief, SFG's overall loan to value ratio for its portfolio fell below the amounts specified in the Interagency Guidelines for Real Estate Lending Policies.  As a result, SFG attempted to improve loan to value ratios for the loans it made within its portfolio.

27

110.    By April 24, 2008, the OCC's target examination reported that Silverton's asset quality had significantly deteriorated, and expressed concerns, for the first time, about Silverton's continued viability.

111.    Around the same time in April 2008, just three months after SFG entered into the SFG Loan Agreement and before it funded the first draw, SFG informed DOC Milwaukee that DOC Milwaukee was in default of the SFG Loan Agreement for "unauthorized cost overruns."  None of the alleged "cost overruns" were unknown events, and in fact had been fully disclosed to SFG and Broadlands by HMS Victory, LLC before the loan had closed.  In addition, the alleged cost overrun reflected an amount to complete that was less than the "Cost Breakdown" contained in the SFG Loan Agreement.

112.    Upon information and belief, the defaults alleged by SFG were caused in whole or in part by Broadlands' failure to properly inspect the Project to confirm the accuracy of the draw requests against the actual status of construction.  Indeed, although SFG contends there were cost overruns, SFG has failed to respond to any inquiries regarding how or why SFG's construction inspector failed to discover these cost increases before the work was done.

113.    At the time SFG declared the SFG Loan Agreement in default in April 2008, SFG had advanced only $7,605,866.98 under the SFG Loan Agreement.

114.    Even though SFG was protected by a 50% equity cushion, which was well within the Interagency Guidelines for Real Estate Lending Policies, SFG threatened to accelerate the SFG Loan Agreement, which would have required DOC Milwaukee to advance $7,645,444.38 within days, or face foreclosure.  At the time this demand

was made, DOC Milwaukee was not and had not been delinquent in any payments of interest or principal. Without justification, and despite the fact that it had a more than 50% equity cushion, officers of SFG also threatened the Icelandic Entities, stating that if they did not advance additional funds to DOC Milwaukee for the Project, SFG would wipe out their interests in the Project. This demand was not made in good faith.

115.   Upon information and belief, SFG took this position because its overall loan portfolio continued to deteriorate, and its loan to value ratios were falling below those specified in the Interagency Guidelines for Real Estate Lending Policies. Pressure from the FDIC, the OCC, and Silverton, coupled with concerns over a potential closure, resulted in SFG breaching the terms of the SFG Loan Agreement, and violating the Interagency Guidelines for Real Estate Lending Policies.

116.   On June 2, 2008, the OCC ordered a full-scope safety and soundness evaluation of Silverton and SFG. The FDIC and OCC pressured Silverton—and the FDIC, OCC and Silverton pressured SFG—to improve its loan to value ratios for its overall portfolio.

117.   Despite additional advances of cash to buttress its equity cushion, Silverton and SFG continued to experience sagging loan to value ratios for its portfolio and continued to demand additional cash be infused into the Project.

118.   In September 2008, SFG specifically demanded that DOC Milwaukee or its partners or lenders advance yet another $4,000,000.00 of additional equity into the Project in order to obtain SFG's agreement not to foreclose. At the time, DOC Milwaukee was current on principal and interest payments, the Project was 80% complete and

29

was still operating under the budget that had been disclosed to SFG prior to the execution of the SFG Loan Agreement. SFG promised that if the Icelandic Entities advanced additional emergency funds, SFG would not only forbear, but it would also fund the remaining principal balance of the SFG Loan Agreement. These demands were not made in good faith and the Icelandic Entities were forced to manifest assent to the transaction out of fear of their entire investment in the Project being wiped out.

119. On October 8, 2008, SFG and DOC Milwaukee entered into a forbearance agreement (the "First Forbearance Agreement"). The First Forbearance Agreement was also signed by the guarantors, Phil Hugh, John Economou, and Steve Economou. The Icelandic Entities are not parties to the First Forbearance Agreement.

120. On October 24, 2008, Silverton Financial Services, Inc., Silverton's holding company, filed an application for $77,300,000.00 under the Troubled Asset Relief Program. As of this date, the OCC began evaluating Silverton for a possible FDIC receivership.

121. On November 24, 2008, the OCC advised of its decision not to recommend approval of the bank's application. Ultimately, on December 12, 2008, the OCC made a finding that Silverton should be deemed in a troubled condition, and transferred supervision of the bank to the OCC's Special Supervision Division in Washington, D.C.

122. On February 2, 2009, the OCC began a targeted examination of all loans, including those made by SFG. On March 24, 2009, the OCC concluded its evaluation and

found that Silverton's overall condition had deteriorated substantially, and it declared Silverton's situation critically deficient. The OCC again concluded that an area of primary concern was Silverton's overall portfolio risk and poor loan to value ratios.

123. On or about February 10, 2009, approximately thirteen months after SFG entered into the SFG Loan Agreement, SFG again informed DOC Milwaukee that it was in default of the SFG Loan Agreement, again citing the failure to infuse additional equity into the project.

124. As of February 10, 2009, SFG had funded only $13,431,373.42 under the SFG Loan Agreement, while the Icelandic Entities had funded $17,419,807.75 through equity contributions and loans to DOC Milwaukee, or a 57% cushion. No matter what the loan to equity ratio was presented in either the SFG Loan Agreement or the Loan Commitment, the reality was that the was nearly a 60/40 ratio, where the amount the Icelandic Entities had contributed exceeded the total of all amounts advanced by SFG. In addition, neither the Loan Commitment or SFG Loan Agreement contemplated a 57% equity cushion.

125. At the time, the loan to value ratio was less than 43%, well inside the 80% established in the Interagency Guidelines for Real Estate Lending Policies.

### SFG Engages in Abusive Lending Practices

126. At the time SFG declared the SFG Loan Agreement in default in February 2009, DOC Milwaukee was not and had not been delinquent in any payments of interest or principal.

31

127.  Despite having adequate protection, SFG again threatened to accelerate the SFG Loan Agreement, which would have required DOC Milwaukee to advance $13,431,373.42 within days, or face foreclosure.

128.  Without justification, officers of SFG again threatened the Icelandic Entities that if they did not advance additional emergency funds to DOC Milwaukee for the Project, SFG would wipe out their interests in the Project.  The Icelandic Entities were forced to assent to advancing emergency funds out of fear of losing their over $17 million investment in the Project.

129.  These threats do not constitute good faith action, and SFG made these threats despite the fact that the Icelandic Entities are not parties to the SFG Loan Agreement and did not guarantee the SFG Loan Agreement.  However, SFG was aware that the Icelandic Entities were funding the Borrower Equity Contribution under the SFG Loan Agreement and additional funds for the Project through loans and mezzanine financing, among other ways.  As a result, SFG owed the Icelandic Entities an obligation to construe the provisions of the SFG Loan Agreement, including Section 3.25, among other provisions, in good faith.

130.  SFG also promised that if the Icelandic Entities advanced additional emergency funds, SFG would fund the remaining principal balance of the SFG Loan Agreement. It is believed that SFG's fully funding the loan, along with the funding from the Icelandic Entities, would have been sufficient to complete construction at the Project.

131.  To avoid acceleration and foreclosure, and to obtain the remaining loan proceeds, SFG again required DOC Milwaukee to enter into a forbearance agreement.  The

32

Icelandic Entities advanced emergency cash to allow this to happen even though the demand was not made in good faith.

132.   Based upon information and belief, SFG was aware that there were issues with Silverton's viability that would eliminate its ability to use federal foreclosure laws if the OCC appointed a receiver to administer Silverton's and SFG's assets.

133.   DOC Milwaukee entered into a second forbearance agreement with SFG on or about April 3, 2009 (the "Second Forbearance Agreement"). The guarantors, Phil Hugh, John Economou, and Steve Economou also signed the Second Forbearance Agreement. As with the First Forbearance Agreement, the Icelandic Entities were not parties to the Second Forbearance Agreement. The Loan Commitment, the SFG Loan Agreement, and the First and Second Forbearance Agreements are collectively referred to herein as the "Loan Documents."

134.   Based on information and belief, DOC Milwaukee entered into the Second Forbearance Agreement because, at that time, acceleration and foreclosure would have wiped out millions of dollars of DOC Milwaukee's and its investors' equity, and would have stopped work on the Project permanently.

135.   During this process, SFG engaged in additional abusive lending practices, and it has repeatedly threatened to sell the SFG Loan Agreement, including a specific threat to "sell the loan to a loan shark," if the Icelandic Entities did not take immediate steps to complete the Project using their own funds. The Icelandic Entities were forced to assent to SFG's abusive lending practices because they were fearful of losing their entire investment.

33

***Silverton Enters FDIC Receivership and SFG's Continued Failure to Fund***

136.   On May 1, 2009, Silverton was closed by the OCC.  Subsequently, the FDIC was appointed receiver. On the date Silverton was closed, an entity known as Silverton Bridge Bank was chartered by the OCC to take over operations as a new national bank and controlled by the FDIC in accordance with 28 U.S.C. § 1821(n).  As a result, Silverton ceased legal existence on May 1, 2009.

137.   A bridge bank allows a failed bank to be liquidated in an orderly fashion, and its duration is limited to the time reasonably necessary to complete the liquidation process.  Silverton Bridge Bank was expressly chartered to accomplish these purposes. Silverton Bridge Bank was empowered by the FDIC, as receiver, to administer Silverton's assets, including its wholly owned subsidiary, SFG.

138.   A receiver was appointed by the Comptroller of the Currency to administer the assets of Silverton Bank, including SFG.

139.   Even though the Icelandic Entities are not parties to, or a guarantor of the Loan Documents, they have made loans, cash advances, and payments on the Loan Documents to keep work progressing at the Project, and to avoid having their interests wiped out by SFG's threatened foreclosure.

140.   Despite additional funds being advanced by the Icelandic Entities, SFG failed to advance the remaining principal balance due under the Loan Documents.  Because of SFG's breach of its promises to fund, there are a number of unpaid subcontractors who have filed liens against the Project, with total liens now exceeding $4,500,000.00.

34

141.   On June 5, 2009, the FDIC announced that the Silverton receivership would be discontinued on June 29, 2009, due to the receiver's inability to sell Silverton's loan portfolios.

142.   The Icelandic Entities continued to advance funds to SFG to keep payments on the Loan Documents current through June 30, 2009.  The Icelandic Entities were the only parties who were willing or able to advance funds for the Project at that time.

143.   Although the Icelandic Entities advanced funds to keep the loan current, SFG declared the SFG Loan Agreement in default for a third time and advised on June 16, 2009, that it would not accept any further curative payments after June 30, 2009. SFG advised that it intended to foreclose and "wipe out" the Icelandic Entities' interests, as well as the interests of all subcontractors.

144.   In June 2009, after the FDIC stepped in, Fasteignir and Askar contacted SFG regarding arrangements to continue to service the mortgage, and were told that SFG would no longer accept payments from any of the Icelandic Entities to keep the loan current.

145.   On June 22, 2009, BuyCo petitioned for DOC Milwaukee to be placed into a receivership, and Mr. Dizard was appointed as receiver.  BuyCo petitioned for a receiver to address partnership impasse issues with EP Milwaukee, LLC, including a dispute over who had the right to be the general partner.  BuyCo also petitioned for the receivership because SFG would no longer accept payments from any of the Icelandic Entities, or other mezzanine lenders.

146.   On February 5, 2010, the FDIC announced that it was placing a number of Silverton's assets, including SFG's loans and participations, for forced auction. The

35

FDIC retained Deutsche Bank, N.A. to auction off a total loan portfolio valued at $400,000,000.00.   The portfolio consisted of 62 whole loans—including $162,402,456.00 in whole loans held by Silverton and $253,962,558.00 in 40 separate loan participations—including SFG's participation in the loan.  The FDIC assumed SFG's participation and sold the SFG participation at auction in April 2010.

### Interest in the Project Transfers to 2010-1 SFG Venture, LLC

147.   On May 18, 2010, SFG assigned its interest in the Project to the FDIC.

148.   The same day, the FDIC, who had been administering assets through its receiver, assigned that interest to 2010-1 SFG Venture LLC.

149.   On June 17, 2010, SFG asked the Court to substitute in 2010-1 SFG Venture LLC as the defendant in this action, but the Court subsequently denied SFG's request. (DN 41.)

### COUNT I
### Unjust Enrichment

150.   The Icelandic Entities incorporate all other paragraphs of this amended complaint as if fully set forth herein.

151.   Despite having adequate protection, SFG wrongfully issued default notices and used default as a pretext to breach the funding requirements of the Loan Documents.

152.   SFG's actions, conduct, and promises induced the Icelandic Entities to advance emergency monies to DOC Milwaukee, which conferred a benefit to SFG.  The Icelandic Entities advanced a total of $17,419,807.75 to DOC Milwaukee, which created a 57% cushion, which was well in excess of the protection stipulated in the Loan Documents.

153.  SFG was aware that the Icelandic Entities were providing emergency monies to DOC Milwaukee to fund its obligations under the Loan Documents.

154.  SFG's actions, conduct, and promises induced DOC Milwaukee to incur obligations to subcontractors based upon the reasonable expectation that SFG would fully fund the $20,900,000.00 amount in the Loan Documents if DOC Milwaukee kept its equity contribution to approximately 25%.

155.  SFG continued to ask for more funding and accepted the benefit of additional funding, despite the fact that it was already over secured per the Loan Documents.

156.  SFG will be unjustly enriched if it is allowed to retain the benefit of any funds advanced after October 8, 2009, when it wrongfully insisted upon the addition of more equity.

157.  It would be inequitable to allow SFG to retain the benefit of the provision of these emergency monies when it has not contributed as much as other investors, including the Icelandic Entities, and SFG has taken advantage of all of those monies while failing to fulfil its own funding obligations.

158.  Under Section 7.02(b) of the SFG Loan Agreement, in the event of default, SFG had the right to perform or cause to be performed any and all work necessary to complete the Project in accordance with the plans.  SFG owed a duty to DOC Milwaukee and its partners to exercise its rights in good faith and in a manner that did not unnecessarily jeopardize the interests of subordinate creditors or equity interests by failing to take means to abate physical damage to the Project.

159.  Under Section 7.02(c) of the SFG Loan Agreement, in the event of default, SFG had the right to hire security personnel to protect the Project.

37

160. Under Section 7.02(d) of the SFG Loan Agreement, in the event of default, SFG had the right to disburse the portion of the loan proceeds not previously disbursed to the extent necessary to complete the Project pursuant to the plans or to disburse additional funds above and beyond the remaining loan proceeds if such were necessary to complete the Project.

161. Despite having the contractual right to do so, and the means to do so, SFG did not take any affirmative measures to assume possession of and complete the Project, and it did nothing to protect the physical state of the Project.

162. As a result of SFG's failure to take affirmative measures to protect the Project, a water leak has developed at the Project, which is causing damage at the Project.

163. The Icelandic Entities are unsecured creditors of DOC Milwaukee.

164. Although they had no contractual obligation to take any affirmative measures, the Icelandic Entities took steps to protect the physical state of the Project, including making emergency payments for site security and insurance, and undertaking engineering assessments.  These efforts conferred a benefit to SFG.

165. In an effort to protect the Project, the Icelandic Entities retained Kim Anderson, Ph.D., Director of Toxicology at GZA GeoEnvironmental, Inc., to conduct an investigation and assessment of the Project.

166. Dr. Anderson's investigation and assessment of the Project is summarized in a report he prepared on or about July 2, 2009.

167. During his inspection of the Project, Dr. Anderson observed current and existing water intrusion at the Project, which he believes will cause extensive damage to

38

both the installed and stored building materials within the building if no additional preventative measures are taken.

168. There have also been break-ins at the Project, and SFG has taken no steps to keep the Project locked and secure.

169. The Project also has areas where openings in construction have left the Project exposed to the elements, and SFG has taken no steps to close the openings to secure and preserve the asset.

170. Despite notice that utilities were being turned off, SFG has taken no steps to turn the utilities back on, leaving the asset without heating or cooling, creating conditions conducive to mold growth and rot, along with other environmental damage.

171. SFG is, and has been, aware that the Icelandic Entities have advanced and continue to advance additional emergency funds to make repairs and otherwise protect the physical condition of the Project.  SFG has also been aware that the Icelandic Entities have been providing emergency funding for insurance for the Project.

172. SFG has not indicated any willingness to advance funds to make repairs or otherwise protect the physical condition of the Project, and it seems intent to let the Project deteriorate and rot, diminishing the Project's value.

173. SFG has not indicated any willingness to advance funds to complete the improvements in accordance with the Project's plans.

174. SFG has taken no steps and expended no monies to protect the Project or to keep the building from going to waste.

175. SFG has not expended any monies, nor indicated any willingness to expend any monies to provide insurance for the Project.

39

176. Strangely, SFG's complaint in case number 10-CV-315 asks that the court appoint a receiver to protect the Project from waste, to secure the Project, and to collect rents, among other things, despite the fact that the Icelandic Entities and the current state court receiver already acted to ensure that such actions are being taken.

177. The emergency funds that the Icelandic Entities have advanced to protect the Project are protecting and maximizing the value of the Project, which collateralizes the SFG Loan Agreement. The Icelandic Entities' advancement of such monies conferred a benefit to SFG.

178. SFG was aware that the Icelandic Entities were providing funds to protect the Project and prevent waste. SFG took no measures to stop the Icelandic Entities' expenditure of funds in protecting the Project and preventing waste.

179. SFG has been unjustly enriched by the funds that the Icelandic Entities have advanced to protect the Project.

180. It would be inequitable for SFG to retain the benefit of the funds advanced by the Icelandic Entities to protect the Project because the Icelandic Entities' expenditures maximized the value of the Project, which is collateral for the SFG Loan Agreement.

181. SFG has taken advantage of the funds advanced by the Icelandic Entities while taking no responsibility for the Project.

**COUNT II**
**Promissory Estoppel**

182. The Icelandic Entities incorporates all other paragraphs of this amended complaint as if fully set forth herein.

183. SFG promised in the SFG Loan Agreement and Loan Commitment to advance $20,900,000.00 for the Project.

40

184.   SFG, by its loan officers, also orally promised to advance additional funds over and
       above the amount promised in the SFG Loan Agreement and Loan Commitment.

185.   The Icelandic Entities relied upon the promises contained in the SFG Loan
       Agreement and the oral promises made by SFG's loan officers, and agreed to
       advance $7,286,802.98 for the Project based upon those promises.

186.   At the time the Second Forbearance Agreement was executed, SFG also promised
       the Icelandic Entities that if they advanced additional funds, SFG would fund the
       remaining principal balance of the SFG Loan Agreement and Loan Commitment.

187.   The Icelandic Entities paid an additional $10,419,807.75 toward the Project in
       reliance on SFG's promises and representations that it would fund the SFG Loan
       Agreement and Loan Commitment.

188.   Despite receiving additional collateral in the Project from the Icelandic Entities'
       advancement of additional funds, SFG failed to fully fund the loan and failed to
       comply with its funding promises.

189.   The Icelandic Entities would not have expended additional funds if they had known
       that SFG did not intend to, and would not fully fund, the SFG Loan Agreement and
       Loan Commitment as it had promised.

190.   The Icelandic Entities suffered real and proximate harm because of SFG's breach
       of its promises.

### COUNT III
### Violation of Subchapter III of Wisconsin Statutes Chapter 224

191.   The Icelandic Entities incorporate all other paragraphs of this amended complaint
       as if fully set forth herein.

41

192.  SFG has alleged in paragraph 39 of its complaint in case number 10-CV-315, among other places, that SFG is a mortgage banker under Wisconsin Statutes section 706.11(1)(f):

> "[a]t the time that the Loan Documents were executed, and delivered, SFG was in the business of originating loans for itself, as the payee on promissory notes, of selling interests in loans for itself, as the payee on promissory notes, of selling interests in loans to other persons, and of servicing mortgage loans. As such, SFG was a 'mortgage banker' as per Section 706.11(1)(f), Wisconsin Statutes."

193.  As an alleged mortgage banker, SFG is required to abide by subchapter three of Wisconsin Statutes chapter 224, which regulates mortgage bankers. SFG is also responsible for compliance with the regulations that apply to mortgage bankers, promulgated by the Wisconsin Department of Financial Institutions and other relevant Wisconsin and federal entities.

194.  SFG did not abide by the statutory and regulatory requirements applicable to mortgage bankers, even under the applicable statutory text that was in effect when SFG recorded its mortgage. All of the remaining allegations in this Count III will reference the 2007 version of the Wisconsin Statues, unless otherwise noted.

195.  The Icelandic Entities have a private cause of action against SFG under Wisconsin Statutes section 224.80(2) for SFG's violations of Wisconsin Statutes section 224.77(1).

196.  SFG's violations of Wisconsin Statutes section 224.77(1), listed below in this amended complaint, caused real and proximate harm to the Icelandic Entities.

197.  SFG violated Wisconsin Statutes section 224.77(1)(b) and (c) because SFG made false and misleading promises in the SFG Loan Agreement and Loan Commitment

42

to advance $20,900,000.00 for the Project.  SFG's loan officers also made false and misleading oral promises to advance additional funds over and above the amount promised in the SFG Loan Agreement and Loan Commitment.  Based upon the promises contained in the SFG Loan Agreement and the oral promises from SFG's loan officers, the Icelandic Entities agreed to provide additional funding to the Project.  At the time the Second Forbearance Agreement was executed, SFG also promised the Icelandic Entities that if additional funds were advanced for the Project, SFG would fund the remaining principal balance of the SFG Loan Agreement and the Loan Commitment. The Icelandic Entities advanced additional monies based upon SFG's promises.  SFG's promises were made in a flagrant manner and were false.  SFG failed to fund according to its promises, causing the Project to go insolvent.  SFG now seeks to foreclose and wipe out all of the monies provided by the Icelandic Entities for the Project despite failing to fulfill its own promises.

198.    SFG violated Wisconsin Statutes section 224.77(1)(I) because SFG failed to act with competency as a mortgage banker.  Upon information and belief, SFG committed an act of incompetency, as defined by Wisconsin Administrative Code, DFI-Bkg 43.02(15), by failing to maintain the proper surety bond in Wisconsin, as required under Wisconsin Statutes section 224.72(4)(a)2.

199.    SFG violated Wisconsin Statutes section 224.77(1)(k) because, upon information and belief, it failed to comply with the following requirements of Wisconsin Statutes sections 224.71–224.80 as follows:

a.   SFG failed to maintain a surety bond required under Wisconsin Statutes section 224.72(4)(d)1;

b.   SFG never registered or obtained a certificate of registration from the Wisconsin Department of Financial Institutions under Wisconsin Statutes section 224.72(5)(b);

c.   SFG issued Loan Documents that did not comply with the disclosure requirements in Wisconsin Statutes section 224.79(1); and

d.   SFG failed to provide a Consumer Disclosure Statement, as required by Wisconsin Statutes section 224.79(2).

200.   SFG violated Wisconsin Statutes section 224.77(1)(l) because SFG's behavior referenced in this amended complaint failed to conform with the requisite standard of professional behavior and standard of care for mortgage bankers.

201.   SFG violated Wisconsin Statutes section 224.77(1)(m) because SFG has engaged in conduct referenced in this complaint that constitutes improper conduct and dishonest dealings.

202.   SFG violated Wisconsin Statutes section 224.77(1)(o) because it treated the Icelandic Entities unequally due to their national origin.  The Icelandic Entities are all Icelandic companies and their primary officers who were associated with the Project were Icelandic citizens.  SFG employees made disparaging remarks about the Icelandic Entities' national origin in connection with their behavior in the lending process, in violation of this section of the Wisconsin Statutes.  For example, when the Icelandic Entities raised various objections to SFG's continuous changes to the

44

terms of the Loan Documents, and when SFG refused to accept the Icelandic Entities' payments to keep the loan current, SFG's officers and employees indicated that they would "not negotiate the Icelanders," they "will not negotiate with the Vikings," and that they "will only deal with Americans."  Such comments evidence unequal treatment towards BuyCo, Fasteignir, and Askar because of their national origin, which is prohibited by Wisconsin Statutes section 224.77(1)(o).

**COUNT IV**
**Unclean Hands**

203.  The Icelandic Entities incorporate all other paragraphs of this amended complaint as if fully set forth herein.

204.  SFG has claimed that it has a right to foreclose on the Project.

205.  SFG asserts that its right to foreclose on the Project arises from failures to cure default payments under the SFG Loan Agreement and the Second Forbearance Agreement.

206.  SFG failed to accept payments from the Icelandic Entities to continue servicing the SFG Loan Agreement.

207.  SFG instead pushed for default on the SFG Loan Agreement instead of accepting payments under the terms of the SFG Loan Agreement and the Second Forbearance Agreement.

208.  Defaults would have been cured had SFG accepted payments to service the loan, and this foreclosure action would not have been necessary.

209.  SFG's behavior toward the servicing of the SFG Loan Agreement is evidence of unclean hands that prevents foreclosure.

210.   SFG also seeks a receiver in case number 10-CV-315 to provide security, preservation, and administration of the Project to prevent diminution of value.

211.   However, SFG never provided any monies to secure, preserve, or administer the Project for nearly a year after asserting breaches of the SFG Loan Agreement and Second Forbearance Agreement.

212.   SFG benefitted from the Icelandic Entities' contribution of monies for security, preservation, and administration of the Project, as well as the current state court receiver's actions.

213.   SFG also benefitted from the state court receiver's work in taking care of the Project.

214.   SFG should not be allowed to foreclose, and no receiver should be appointed.

215.   SFG has unclean hands because it failed to provide any funding for security, preservation, or administration of the Project, but benefitted from the Icelandic Entities' provision of funding for the security, preservation, and administration of the Project.

## COUNT V
### Declaration of Rights Under Wisconsin Statutes Section 840.03

216.   The Icelandic Entities incorporate all other provisions of this amended complaint as if fully set forth herein.

217.   The Icelandic Entities have an interest in the Project.

218.   The Icelandic Entities provided funding to the Project prior to the time SFG provided funding to the Project through a construction loan.

219.   The Icelandic Entities have an interest in the Project for equitable reasons and have specific rights of action relating to the Project.

220.   The Icelandic Entities' rights to the Project should be declared because of the competing interests that are being asserted by SFG, the Icelandic Entities, and the subcontractors who worked at the Project.

221.   Under Wisconsin Statutes section 840.03(1)(a) and (d), the Icelandic Entities may bring claims for a declaration of their interests and for enforcement of such interests.

222.   A declaration of the Icelandic Entities' rights will provide relief to them and clarify the rights of other interest holders.

223.   Without such a declaration, the Icelandic Entities will not be able to protect their rights.

**COUNT VI**
**Declaration of Interest in Real Project Under Wisconsin Statutes Section 841.01**

224.   The Icelandic Entities incorporate all other provisions of this amended complaint as if fully set forth herein.

225.   Wisconsin Statutes section 841.01 allows claims for a declaration of interest in real property to be brought by any person claiming a conflicting interest in real property.

226.   The Icelandic Entities have an interest in the Project, as do the subcontractors and SFG.  Each party has an interest that will potentially rearrange the priority of interests in the Project, which will impact SFG's ability to foreclose in a first position or will rearrange the priority of interests of distributions upon sale and the order of interests for the Project.

227.   Without resolution of its property rights to the Project, the Icelandic Entities will suffer real and proximate harm.

47

228.   Resolution of the adverse claims to the Project among the subcontractors, the Icelandic Entities, and SFG is necessary for resolution of the issues among all of the parties.

**COUNT VII**
**Interference With Interest and Physical Injury to Real Property**

229.   The Icelandic Entities incorporate all other provisions of this amended complaint as if fully set forth herein.

230.   Wisconsin Statutes section 844.01 permits legal action by persons who claim an interest in real property to bring an action to remedy physical injury to property or interference with rights to property.

231.   The Icelandic Entities have rights to the Project for equitable reasons, and also have specific causes of action against SFG.

232.   The Icelandic Entities provided funding for the Project prior to SFG providing any funding under the Loan Documents.

233.   The Icelandic Entities continued to provide funding in order to comply with SFG's requests for further equity to continue to funds its loan.

234.   After construction stopped, the Icelandic Entities continued to attempt to service the loan and provided funding to protect the Project from waste.

235.   SFG has not provided any funding to prevent waste to the Project, and its refusal to provide monies for the upkeep and physical protection of the Project has caused harm to the Project.

236.   The Icelandic Entities have a right to compensation for the effort and monies spent in protecting the Project.

48

237.   Without resolution of the dispute of property interest at the Project between the Icelandic Entities, SFG, and the subcontractors, all interests in the Project are being devalued.   This will cause direct and proximate harm to the Icelandic Entities' interests in the Project.

238.   Without resolution of the dispute over the parties' interests, it will be impossible to resolve the issue of who has the right to possession of the Project for purposes of Wisconsin Statutes section 844.15.

239.   Wisconsin Statutes section 844.18 specifically allows the Icelandic Entities to resolve its property interest claims and to resolve this dispute.

**WHEREFORE**, the Icelandic Entities respectfully request that this Court enter judgment:

A.   Awarding actual monetary damages, statutory damages, and penalties to the Icelandic Entities and against SFG, including interest, attorneys' fees, and costs;

B.   Awarding the Icelandic Entities damages under Wisconsin Statutes section 224.80 to the fullest extent possible under the statute;

C.   Declaring the Icelandic Entities' rights in the Project to the extent such declaration is consistent with the Court's August 25, 2010 Order (DN 41); and

D.   Awarding the Icelandic Entities any other relief the Court deems just and proper.

49

Dated September 27, 2010.

HALLOIN & MURDOCK, S.C.
Attorneys for Plaintiff

s/ Scott R. Halloin
Scott R. Halloin
State Bar No. 1024669
Joshua J. Roever
State Bar No. 1059540

HALLOIN & MURDOCK, S.C.
839 North Jefferson Street
Fifth Floor
Milwaukee, Wisconsin 53202
p 414-732-2424
f  414-732-2422
shalloin@halloinmurdock.com
jroever@halloinmurdock.com
S:\Clients\ASKAR-BuyCo\BuyCo\SJ Properties et al v. SFG (Eastern District 10-CV-00198)\Pleadings\Amended Complaint.wpd

50

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

I hereby certify that on September 27, 2010, I electronically filed the foregoing with the Clerk of the Court using the ECF system and that the foregoing is available on the ECF system for viewing and downloading. The ECF system will send a notice of electronic filing to the following:

Specialty Finance Group LLC
c/o S. Todd Farris, Esq.
Christopher M. Meuler, Esq.
Friebert, Finerty & St. John, S.C.
Two Plaza East
330 East Kilbourn Avenue
Suite 1250
Milwaukee, Wisconsin 53202

Specialty Finance Group LLC
c/o Lewis E. Hassett, Esq.
J. Ben Vitale, Esq.
Morris, Manning, & Martin, L.L.P.
1600 Atlanta Financial Center
3343 Peachtree Road NE
Atlanta, Georgia 30326

Dated September 27, 2010.

HALLOIN & MURDOCK, S.C.
Attorneys for Plaintiffs

  s/ Scott R. Halloin
Scott R. Halloin
State Bar No. 1024669
Joshua J. Roever
State Bar No. 1059540

HALLOIN & MURDOCK, S.C.
839 North Jefferson Street
Fifth Floor
Milwaukee, Wisconsin 53202
p 414-732-2424
f 414-732-2422
shalloin@halloinmurdock.com
S:\Clients\ASKAR-BuyCo\BuyCo\SJ Properties et al v. SFG (Eastern District 10-CV-00198)\Pleadings\Amended Complaint.wpd