IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SPECIALTY FINANCE GROUP LLC | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO: 1:10-CV-1020-TCB |
| EP MILWAUKEE, LLC; DOC MILWAUKEE II, LLC; SJ PROPERTIES SUITES, BUYCO, EHF; JOHN W. ECONOMOU; and STEVE J. ECONOMOU; | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff, Specialty Finance Group LLC ("SFG"), and hereby sets forth its First Amended Complaint as follows:

## A. PARTIES

1.

SFG is a Georgia limited liability company headquartered in Atlanta, Georgia. SFG's sole member is Silverton Bank, NA, a national banking association whose principal place of business is located in Georgia. On May 1,

2009, Silverton Bank, NA was placed into receivership and the Federal Deposit Insurance Company ("FDIC") was named receiver.

2.

The defendant EP Milwaukee, LLC ("EP Milwaukee") is a limited liability company organized and existing under the laws of the State of Illinois with its principal place of business in Park Ridge, Illinois. EP Milwaukee's registered agent for service of process is John R. Wieser, 1030 West Higgins Road, Suite 305, Park Ridge, Illinois 60068. EP Milwaukee's members are John W. Economou, Steve J. Economou, and Thomas V. Economou, all of whom are citizens of the State of Illinois.

3.

The defendant DOC Milwaukee II, LLC ("DOC Milwaukee II") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Fort Myers, Florida. DOC Milwaukee II's registered agent for service of process is the Corporation Trust Co., 1209 Orange Street, Wilmington, Delaware 19801. The members of DOC Milwaukee II are the defendants EP Milwaukee (whose citizenship is described above) and the non-party Development Opportunity Corporation ("DOC").

4.

Non-party DOC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Florida.

5.

The defendant SJ Properties Suites, Buyco, ehf ("Buyco") is a private limited company organized and existing under the laws of Iceland with its principal place of business at Kringlunni 5, 103 Reykjavík, Iceland. Buyco maintains no offices in the United States and is a citizen of Iceland. Buyco is managed by Askar Real Estate Investment Advisory ehf, which is a fully owned subsidiary of Askar Capital hf, both of which are organized and existing under the laws of Iceland with their principal places of business at Sudurlandsbraut 12, 108 Reykjavík, Iceland. Buyco is wholly owned by SJ-Fasteignir, ehf ("Fasteignir"). Fasteignir is a private limited company organized and existing under the laws of Iceland with its principal place of business in Reykjavík, Iceland. Fasteignir is a wholly owned subsidiary of Sjóvá-Almennar Tryggingar, hf ("Sjóvá"), which is incorporated under the laws of Iceland with its principal place of business in Reykjavík, Iceland.

3

6.

Phillip E. Hugh ("Hugh"), is an individual citizen of Florida and is domiciled in Florida. Although Hugh was originally named as a defendant in this case, he filed bankruptcy and has been dismissed without prejudice.

7.

The defendant John W. Economou ("John Economou") is an individual citizen of the State of Illinois and is domiciled in the State of Illinois.

8.

The defendant Steve J. Economou ("Steve Economou") is an individual citizen of the State of Illinois and is domiciled in the State of Illinois.

9.

The defendants EP Milwaukee, DOC Milwaukee II and Buyco are past and/or present general partners of the non-party DOC Milwaukee, LP ("the Partnership"). Non-party DOC is a limited partner of the Partnership. The Partnership is a limited partnership organized and existing under the laws of the State of Delaware.

4

10.

By order entered July 8, 2008, in that certain case known as *SJ Properties Suites, Buyco, ehf v. DOC Milwaukee, LP*, Circuit Court of Milwaukee County, Wisconsin, Case No. 09CV009785, the Partnership was placed into receivership.

## B. JURISDICTION AND VENUE

11.

This is an action to recover against the general partners of the Partnership on a promissory note made and delivered by the Partnership and against the guarantors of payment of such promissory note. The outstanding principal balance of the promissory note, exclusive of interest and costs, is $13,401,286.37.

12.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because SFG's citizenship is diverse from that of all Defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13.

Defendants are subject to the jurisdiction of this court by consent and under the Georgia long arm statute. *See* Off. Code Ga. Ann. § 9-10-91, *et seq*.

14.

Jurisdiction is appropriate under Georgia's long arm statute because, (a) the loan at issue in this case was obtained from SFG, a Georgia resident; (b) the loan was underwritten by SFG in Georgia; (c) the borrower and guarantors delivered the original signed Loan Documents (as hereafter defined) to SFG in Georgia; (d) Defendants' funding requests were sent to SFG in Georgia; (e) SFG's funding disbursements were made from Georgia; (f) loan payments were to be made to SFG in Georgia; and (g) all of SFG's loan servicing and administrative decisions were made in Georgia.

15.

Additionally, the Loan Documents contain provisions consenting to jurisdiction and venue in this Court. Specifically, Section 8.18 of the Loan Agreement (as hereafter defined) stated as follows:

> 8.18  Consent to Jurisdiction. BORROWER AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF GEORGIA OR ANY FEDERAL COURT SITTING THEREIN AND CONSENTS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT AND THE SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON BORROWER BY MAIL AT THE ADDRESS SPECIFIED IN ITEM 8.11. BORROWER HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR

6

THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.

(Emphasis in original).

Similarly, Section 23 of the Guaranty (as hereafter defined) states as follows:

> 23. Consent of Jurisdiction. THE GUARANTORS AGREE THAT ANY SUIT FOR THE ENFORCEMENT OF THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF GEORGIA OR ANY FEDERAL COURT SITTING THEREIN AND CONSENT TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT. THE GUARANTORS HEREBY WAIVE ANY OBJECTION THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.

(Emphasis in original).

16.

The Loan Agreement, the Note (as hereafter defined), the Guaranty, the First Forbearance Agreement (as hereafter defined) and the Second Forbearance Agreement (as hereafter defined) all incorporate Georgia law.

17.

Venue is appropriate in this Court under 28 U.S.C. § 1391(a). Moreover, Defendants consented to venue in this District in the Loan Agreement and in the Guaranty.

## C.  **FACTUAL BACKGROUND**

1.    **The Partnership's Background**

### 18.

The Partnership was originally formed on May 15, 2006, as a limited liability company (the "LLC") under the laws of the State of Delaware.

### 19.

The sole purpose of the LLC was to acquire land at the corner of Water Street and Juneau Street in downtown Milwaukee, Wisconsin (the "Property") and develop commercial retail space thereon, a 120-room extended stay hotel and a minimum of eighteen (18) luxury condominiums (the "Project").

### 20.

On November 6, 2006, the LLC filed a certificate with the Secretary of State of Delaware electing to convert the LLC into a limited partnership.

### 21.

On November 9, 2006,  Buyco, EP Milwaukee, DOC Milwaukee II, and DOC entered into a partnership agreement, formally establishing the Partnership.

### 22.

Like the LLC, the purpose of the Partnership was to develop the Project.

23.

As of November 9, 2006, the Partnership was the owner of the Property and the Project.

24.

The Partnership's original general partner was DOC Milwaukee II.

**2.**     **SFG's Loan to DOC Milwaukee**

25.

On or about January 9, 2008, SFG and the Partnership entered into a Loan Agreement (the "Loan Agreement").  The purpose of the loan described in the Loan Agreement (the "Loan") was to provide financing for the Project.  A true and correct copy of the Loan Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

26.

Pursuant to the Loan Agreement, the Partnership made and delivered to the order of SFG a Promissory Note (the "Note") of even date therewith in the original principal amount of $14,900,000.00.  A true and correct copy of the Note is attached hereto as Exhibit "B" and incorporated herein by reference.

27.

DOC Milwaukee II executed the Loan Agreement and the Note in its capacity as general partner of the Partnership.

28.

Also of even date therewith, Hugh, John Economou, and Steve Economou (collectively, the "Guarantors") executed and delivered to SFG a Guaranty Agreement (the "Guaranty" and collectively with the Loan Agreement and the Note, the "Loan Documents"). A true and correct copy of the Guaranty is attached hereto as Exhibit "C" and incorporated herein by reference.

29.

Under the terms of the Guaranty, the Guarantors "jointly, severally, unconditionally, and absolutely guarantee to SFG the full and prompt payment to SFG of the Note when due, whether by acceleration or otherwise, with such interest as may accrue thereon."

**3.** **The First Forbearance Agreement**

30.

On or about October 8, 2008, SFG and the Partnership entered into the Forbearance Agreement (the "First Forbearance Agreement"). The First Forbearance Agreement was signed by DOC Milwaukee II in its capacity as

10

general partner of the Partnership.  A true and correct copy of the First Forbearance

Agreement is attached hereto as Exhibit "D" and incorporated herein by reference.

31.

The First Forbearance Agreement included the following provisions:

(a)     The Partnership confirmed that it was indebted to SFG on the Note
        and Loan Agreement in the amount of $7,645,444.38;

(b)     The Partnership acknowledged that it had defaulted on its obligations
        under the Loan Agreement;

(c)     The "Budget Shortfall" was quantified at $3,151,943;

(d)     The Partnership agreed to fund the "Budget Shortfall," i.e. the
        $3,151,943, by December 1, 2008; and

(e)     The Partnership released SFG from any and all claims or demands of
        any kind.

**4.    EP Milwaukee Becomes the General Partner**

32.

On or about December 16, 2008, DOC Milwaukee II resigned as the general

partner of the Partnership and EP Milwaukee assumed the role of general partner.

11

33.

In or about late December 2008 or early January 2009, the Partnership became insolvent.

34.

By the spring of 2009, work on the Project had effectively ceased.

## 5.  Buyco Participates in the Control of the Business of the Partnership

35.

On or about November 11, 2008, Buyco sent a letter via email directly to SFG requesting that SFG fund a draw request submitted by the Partnership.

36.

On or about November 28, 2008, Buyco initiated negotiations directly with SFG for an additional forbearance agreement on behalf of the Partnership.

37.

On or about January 27, 2009, Buyco, on behalf of the Partnership, ordered a wire payment to be made directly to SFG for an interest payment due under the Loan Documents.

38.

On or about February 2, 2009, Buyco contacted SFG directly confirming that it had transferred funds directly to SFG's account to be applied to an interest payment owed by the Partnership.

39.

From January 2009 through July 2009, Buyco representatives met with SFG representatives in person and by telephone on numerous occasions to discuss the Loan and forbearances.

40.

On or about March 2, 2009, SFG provided written notice to the Partnership that it was in default of the terms of the Loan Agreement, the First Forbearance Agreement, and other documents associated with the Loan.

41.

On or about March 5, 2009, Buyco notified SFG via email that it intended "to take an even more active role in the management" of the Partnership. In that email, Buyco confirmed that it would be the sole source of the funds for the Partnership's outstanding interest payments under the Loan Documents and inquired as to SFG's willingness to negotiate another forbearance agreement.

42.

On March 6, 2009, Buyco again contacted SFG directly by email to confirm that it would be wiring funds directly to SFG and asking whether SFG would negotiate with Buyco for a "grace period" for the Partnership under the Loan Documents.

43.

On or about March 10, 2009, Buyco wired $39,169.86 from its account directly to SFG to be applied to an interest payment owed by the Partnership under the Loan Documents.

44.

Throughout the month of March 2009, Buyco and its counsel negotiated directly with SFG to secure a thirty (30) forbearance by SFG. Buyco and its counsel participated in the negotiation and drafting of a forbearance agreement.

45.

The contacts between SFG and Buyco continued through May and June of 2009, as Buyco reached out to SFG in an effort to negotiate yet another forbearance agreement. These regular contacts continued through the time Buyco filed its first lawsuit against SFG.

### 6.    The Second Forbearance Agreement

46.

The Partnership failed to comply with the First Forbearance Agreement and the Loan Documents and on or about April 3, 2009, SFG and the Partnership entered into the Second Forbearance Agreement (the "Second Forbearance Agreement"). The Second Forbearance Agreement was signed by EP Milwaukee in its capacity as a general partner of the Partnership. A true and correct copy of the Second Forbearance Agreement is attached hereto as Exhibit "E" and incorporated herein by reference.

47.

The Second Forbearance Agreement confirmed the outstanding balance of the Note at $13,431,373.42, acknowledged that the Partnership was in default under the terms of the Loan Agreement and the First Forbearance Agreement, acknowledged that SFG had no further obligation to disburse any loan proceeds, and released SFG from any and all claims or demands. The Partnership further agreed to provide weekly reports on its ability and plans to cure the defaults, including the quantification of the amounts necessary to complete the Project and the source of any such funds. In consideration of the foregoing, SFG agreed not to exercise its rights and remedies until May 1, 2009.

48.

On or about April 2, 2009, Buyco directed that a wire transfer be made directly to SFG's account to be applied to the Partnership's obligation to pay SFG's legal fees under the Second Forbearance Agreement and the interest payments owed by the Partnership under the Loan Documents.

**7.     Buyco Becomes a General Partner**

49.

Buyco has declared that it is the owner of more than 71 percent of the equity interests in the Partnership and had removed EP Milwaukee as general partner of the Partnership and elected or appointed itself as general partner.

50.

On April 29, 2009, Buyco notified SFG by email that it had taken over as sole general partner of the Partnership and had removed EP Milwaukee from its role of general partner.

51.

Buyco assumed the role of general partner of the Partnership no later than April 29, 2009.

52.

SFG understandably and reasonably believed that Buyco had become a general partner of the Partnership.

53.

The Partnership failed to comply with the Second Forbearance Agreement and the Loan Documents.

54.

Buyco again initiated negotiations, on behalf of the Partnership, for an extension of the Second Forbearance Agreement for an additional sixty (60) days.

55.

Buyco has repeatedly and unequivocally represented to SFG and others that it is now the sole general partner of the Partnership.

8.    **Continued Default and Acceleration**

56.

The defaults were not cured, and by letter dated July 13, 2009 (the "Acceleration Letter"), SFG gave notice that the maturity of the Note had been accelerated. The Acceleration Letter demanded full and immediate payment of the entire outstanding balance of the Note, and provided notice pursuant to O.C.G.A. § 13-1-11 of SFG's intent to enforce the provisions of the Note relative to the

payment of attorneys' fees if the indebtedness was not paid in full within ten (10) days after receipt of the Acceleration Letter.  Pursuant to Section 8.11 of the Loan Agreement, the Acceleration Letter was delivered to the Partnership on July 14, 2009, and Brenda J. Yurick, Esq., Yurick Law Offices, P.C. on July 15, 2009.  A true and correct copy of the Acceleration Letter is attached hereto as Exhibit "F" and incorporated herein by reference.

57.

As of March 31, 2010, the total outstanding balance of the Note is $13,401,286.37, principal; $891,368.88, interest; and $15,016.56 in other charges. Interest continues to accrue at the rate of $1,861.29 per day.

58.

In Paragraph 42 of the original Complaint in this action, SFG notified all Defendants of SFG's intent to collect attorneys' fees under Georgia Code Section 13-1-11 and offered Defendants the opportunity to void liability for attorneys' fees by paying the full amount of outstanding principal and interest within ten (10) days of service of the original Complaint.

59.

The Defendants failed to pay the full amount of principal and interest within the applicable ten-day period.  Therefore, in accordance with Georgia Code

Section 13-1-11, Defendants are liable for attorneys' fees equal to 15 percent of the first $500 of principal and interest owed and 10 percent of the remaining principal and interest owed.

## COUNT ONE
## SUIT AGAINST GENERAL PARTNERS

### 60.

Paragraphs 1 through 59 are hereby realleged in their entirety and incorporated herein by reference.

### 61.

The Partnership is in default of numerous obligations under the Loan Agreement, the Note, the First Forbearance Agreement, and the Second Forbearance Agreement.

### 62.

As stated above, the maturity of the indebtedness evidenced by the Note has been accelerated and the entire outstanding balance of the Note is due and payable.

### 63.

As general partners of the Partnership, DOC Milwaukee II, EP Milwaukee, and Buyco are liable for the obligations of the Partnership under the Loan Documents.

64.

As per the Acceleration Letter and Paragraph 42 of the original Complaint, the general partners of the Partnership, DOC Milwaukee II, EP Milwaukee, and Buyco were sufficiently notified of SFG's intention to collect attorneys' fees and of their opportunity to avoid liability for attorneys' fees by paying the full amount of principal and interest owed under the Note within ten (10) days of receipt thereof. The general partners of the Partnership failed to pay the full amount of principal and interest owed under the Note within the applicable ten (10) days.

## COUNT TWO
## BREACH OF THE GUARANTY

65.

Paragraphs 1 through 64 are hereby realleged in their entirety and incorporated herein by reference.

66.

Under the terms of the Guaranty, the Guarantors "jointly, severally, unconditionally, and absolutely guarantee to SFG the full and prompt payment to SFG of the Note when due, whether by acceleration or otherwise, with such interest as may accrue thereon."

67.

In the Acceleration Letter, SFG notified the Guarantors that the maturity of the indebtedness evidenced by the Note had been accelerated and demanded immediate payment of the entire indebtedness in full.

68.

As per Paragraph 42 of the original Complaint, the Guarantors were notified of SFG's intention to collect attorneys' fees and of the Guarantors' opportunity to avoid liability for attorneys' fees by paying the full amount of principal and interest owed under the Guaranty within ten (10) days of service of the original Complaint. The Guarantors failed to pay the full amount of principal and interest owed under the Note within that time period.

## COUNT THREE
## EXPENSES OF LITIGATION

69.

Paragraphs 1 through 68 are hereby realleged in their entirety and incorporated herein by reference.

70.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused SFG unnecessary trouble and expense.

71.

As a result, Defendants are liable under Section 13-6-11 of the Official Code of Georgia Annotated for the reasonable expenses of this litigation, including attorneys' fees, to the extent such fees exceed those awarded under Section 13-1-11 of the Official Code of Georgia Annotated.

WHEREFORE, SFG prays as follows:

(a)     That judgment be entered in favor of SFG, or its assignee, and against Defendants, in the amount of $13,401,286.37, principal; $891,368.88, interest (plus additional interest after March 31, 2010, accruing at the rate of $1,861.29 per day); $15,016.56 in other charges, and attorneys' fees equal to 15 percent of the first $500 in principal and interest owed and 10 percent of the remaining principal and interest owed;

(b)     That judgment be entered against Defendants for the reasonable expenses of this litigation, including attorneys' fees, to the extent such fees exceed those awarded under Paragraph (b), above;

(c)     That all costs of this action be cast against Defendants; and

(d)     That this Court enter such other and further relief as it shall deem just and proper.

This 1st day of June, 2010.

MORRIS, MANNING & MARTIN, LLP

/s/ J. Ben Vitale
Lewis E. Hassett
Georgia Bar No. 336140
J. Ben Vitale
Georgia Bar No. 108106

Attorneys for Plaintiff Specialty
Finance Group LLC

1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA  30326
Telephone:  (404) 233-7000
Facsimile:   (404) 365-9532

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SPECIALTY FINANCE GROUP LLC | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 1:10-CV-1020-TCB |
| EP MILWAUKEE, LLC; DOC MILWAUKEE II, LLC; SJ PROPERTIES SUITES, BUYCO, EHF; PHILLIP E. HUGH; JOHN W. ECONOMOU; and STEVE J. ECONOMOU; | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have served "SPECIALTY FINANCE GROUP LLC'S FIRST AMENDED COMPLAINT" upon Defendants by electronic delivery through the ECF delivery system, as follows:

> Charles Pekor, Esq. (chuckpekor@yahoo.com)
> Pekor & Associates, LLC
> Lenox Center, Suite 450
> 3355 Lenox Road, N.E.
> Atlanta, Georgia 30338
>
> Scott Zucker, Esq. (scott@wzlegal.com)
> Weissmann Zucker Euster, P.C.
> 3490 Piedmont Road, Suite 650
> Atlanta, Georgia 30305

and depositing copies of same in the United States Mail, with adequate postage

thereon to ensure delivery, addressed as follows:

> DOC II, LLC
> The Corporation Trust Company - Registered Agent
> Corporation Trust Center
> 1209 Orange Street
> Wilmington, Delaware 19801
>
> Gregory J. Cook, Esq.
> Greg Cook Law Offices, S.C.
> The Renaissance on Water
> 309 North Water Street, Suite 160
> Milwaukee, Wisconsin 53202
>
> Scott R. Halloin, Esq.
> Halloin & Murdock, S.C.
> 839 North Jefferson Street, Suite 503
> Milwaukee, Wisconsin 53202

This 1st day of June, 2010.

> MORRIS, MANNING & MARTIN, LLP
>
>
> /s/ J. Ben Vitale
> _____
> J. Ben Vitale
> Georgia Bar No. 108106

# Exhibit A

Part 1 of 2

# LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "Agreement"), made and entered into this 9th day of January, 2008 and between **SPECIALTY FINANCE GROUP LLC**, a Georgia limited liability company (hereinafter referred to as "SFG"), and **DOC MILWAUKEE, LP**, a Delaware limited partnership (hereinafter referred to as "Borrower");

## W I T N E S S E T H:

In consideration of the mutual covenants and agreements hereinafter set forth, SFG agrees to make and Borrower agrees to accept a loan in accordance with and subject to the terms and conditions hereinafter set forth.

## ARTICLE 1
## TERMS AND DEFINITIONS

In addition to the other terms hereinafter defined, the following terms shall have the meanings set forth in this Article I; and where the meaning of any term is stated to be "None", provisions involving the application of that term shall be disregarded as to that term.

1.1     Agreement for Sale. The Agreement for Sale by and among the Redevelopment Authority of the City of Milwaukee ("Agency"), Market Street Partners II, LLP, a Wisconsin limited liability partnership ("Buyer") and Doc Milwaukee, LP, a Delaware limited partnership ("Redeveloper"), dated December 6, 2006, recorded as Document No. 09350839, Official Records.

1.2     Approved Condominium Purchase Agreement Form.   The form of sales contract approved by SFG as provided in the Loan Documents, together with such amendments, modifications, supplements and addenda thereto as are approved by SFG and, to the extent applicable, all applicable governmental agencies in accordance with the Loan Documents.

1.3     Intentionally Deleted.

1.4     Borrower's Architect. Economou Partners.

1.5     Borrower's Equity Contribution.   TWELVE MILLION NINE HUNDRED NINETY-THREE THOUSAND THREE HUNDRED TWO AND NO/100 DOLLARS ($12,993,302.00) or twenty-five percent (25%) of the total project cost as set forth in the Cost Breakdown on Exhibit "C".

1.6     Cash Flow.  As defined in Section 3.33 hereof.

1.7     Commitment Letter. That certain letter from SFG to Borrower dated March 29, 2007, in which SFG agrees to make and Borrower agrees to accept the Loan, subject to certain terms and conditions, a copy of which is attached hereto as Exhibit "G".

1.8     Completion Date. May ___, 2010.

1.9     Condominium. The condominium form of ownership for the Premises to be established by the Condominium Documents.

1.10    Condominium Approved Sale. A bona fide, arms-length cash sale of a Condominium Unit to a Condominium Buyer pursuant to a Condominium Purchase Agreement and such other sales of Condominium Units to Condominium Buyers as may be approved in writing by SFG in its good faith sole discretion.

1.11    Condominium Buyer. A purchaser of not more than one (1) Condominium Unit pursuant to a Condominium Purchase Agreement, which purchaser shall, unless SFG has given its prior written consent before Borrower's execution of the applicable Condominium Purchase Agreement, be a third-party unaffiliated with Borrower or Guarantors.

1.12    Condominium Declaration. The declaration of covenants, conditions and restrictions creating and governing the operation of the condominium project and the owner's association relating thereto, and governing the operation, maintenance and repair of such condominium project, together with all articles, bylaws and other organizational and/or operational documents for the association created thereunder and all documents required by any laws or governmental agencies in connection therewith, all of which shall comply with all applicable laws and the requirements of all applicable governmental agencies and shall be subject to SFG's prior written approval, which shall not be unreasonably withheld.

1.13    Condominium Deposit Holder. Knight-Barry Title Insurance Company.

1.14    Condominium Deposits. The Condominium Purchase Deposits and any Condominium Upgrade Deposits.

1.15    Condominium Documents. The Condominium Declaration, the Condominium Plan, the Condominium Plat and the Condominium Sales Materials.

1.16    Condominium Finish Standards. The detailed description and quality level of the applicable Condominium Unit and all fixtures and personal property and interior finishes included in the standard sales price thereof, including, without limitation, bathroom and kitchen fixtures, cabinetry and appliances, floor coverings, wall coverings, electrical systems, lighting plans and HVAC systems, all as consistent with the Plans and any applicable Condominium Purchase Agreement and as approved by SFG, which approval shall not be unreasonably withheld.

1.17    Condominium Gross Sales Proceeds. The gross proceeds of a Condominium Approved Sale, including, without limitation, the Condominium Purchase Deposit.

2

1.18　Condominium Interior Finishes.  With respect to each Condominium Unit all interior finishes, fixtures and personal property, including, without limitation, bathroom and kitchen fixtures, cabinetry and appliances, floor coverings, wall coverings, electrical systems, lighting plans and HVAC systems.

1.19　Condominium Material Amendment.  Any material amendment, modification or supplement of, or addition or addendum to, the Approved Condominium Purchase Agreement Form.

1.20　Condominium Minimum Purchase Deposit. An amount equal to five percent (5.0%) of the total purchase price payable under the applicable Condominium Purchase Agreement, excluding the price of Condominium Upgrades.

1.21　[Intentionally Deleted].

1.22　Condominium Minimum Sales Price. For each Condominium Unit, excluding any Condominium Upgrades, the amount set forth in Exhibit "H" attached hereto, plus for any Condominium Upgrades to such Condominium Unit, an amount not less than 100% of the actual cost to construct the applicable Condominium Upgrades.

1.23　Condominium Minimum Upgrade Deposit. An amount not less than 100% of the actual cost to construct the applicable Condominium Upgrades.

1.24　Condominium Net Sales Proceeds. For each Condominium Approved Sale the positive amount by which the applicable Condominium Gross Sales Proceeds exceeds the sum of the applicable Condominium Permitted Sales and Closing Costs.

1.25　Condominium Permitted Sales and Closing Costs.  For each Condominium Approved Sale reasonable third-party sale and closing costs, including brokerage fees, as determined by SFG in its good faith sole discretion.

1.26　Condominium Plan.  The condominium plan for the Premises, or applicable portion thereof, which shall comply with all applicable laws and the requirements of all applicable governmental agencies, shall be subject to SFG's prior written approval, which shall not be unreasonably withheld, and shall be consistent with the Plans.

1.27　Condominium Plat. The final map for the Property consistent with the Condominium Declaration, the Condominium Plan and the Plans, which shall comply with all applicable laws and the requirements of all applicable governmental agencies and shall be subject to SFG's prior written approval, which shall not be unreasonably withheld.

1.28　Condominium Preliminary Stage Principal Paydown. SFG's receipt of a $8,400,000 pay down of the outstanding principal balance of the Loan from the sale proceeds from sold Condominium Units.

1.29　Condominium Pre-sale Requirements. SFG shall have received and approved, in its good faith sole discretion (a) the Condominium Documents, and (b) evidence satisfactory to

3

SFG that Borrower and Condominium Buyers have entered into Condominium Purchase Agreements (excluding any Condominium Purchase Agreement entered into with any buyer which is a part of the Borrower Group unless approved by SFG) which are in full force and effect for not less than nine (9) Condominium Units. For purposes of clause (b) above each Condominium Purchase Agreement (i) must have a purchase price which meets or exceeds the applicable Condominium Minimum Sales Price included in Exhibit "H" for the respective Condominium Unit (unless otherwise approved in writing by SFG), excluding the price of any Condominium Upgrades, (ii) shall only have commercially reasonable contingencies in favor of the Condominium Buyer that are standard in the area that the Project is located, and (iii) shall not include any discretionary cancellation clauses in favor of the Condominium Buyer.

     1.30   Condominium Purchase Agreement.  A purchase agreement for the sale of a Condominium Unit to a Condominium Buyer which (a) meets all of the following requirements: (i) is on the Approved Condominium Purchase Agreement Form with no Condominium Material Amendments, other than those Condominium Material Amendments approved in writing by SFG prior to the execution of such purchase agreement, which approval may be withheld in SFG's good faith sole discretion; (ii) provides for a minimum purchase price of not less than the applicable Condominium Minimum Sales Price (unless otherwise approved in writing by SFG), with no deferred payments to be made by the Condominium Buyer thereunder; (iii) requires a Condominium Purchase Deposit; (iv) requires Condominium Minimum Upgrade Deposit(s) not less than the Condominium Minimum Upgrade Deposit; (v) includes an allocation of closing costs between Borrower and the Condominium Buyer no less favorable to Borrower than is customary practice for comparable condominium sales in the area in which the Project is located; (vi) must be non-contingent, except for commercially reasonable contingencies that are standard in the area that the Project is located; (vii) shall not include any cancellation clauses in favor of Buyer; (viii) shall not have any of Borrower's principals or investors of Guarantors as a buyer; and (ix) otherwise is in compliance with the terms of the Loan Documents; or (b) is approved in writing by SFG in advance of the execution thereof, which approval may be withheld in SFG's good faith sole discretion.

     1.31   Condominium Purchase Deposit.  The amount deposited with the Condominium Deposit Holder by a Condominium Buyer, in cash, under the Condominium Purchase Agreement to secure the Condominium Buyer's performance thereunder.

     1.32   Condominium Property.  That portion of the Premises to be a Condominium pursuant to the Plans.

     1.33   Condominium Requirements.  The Condominium Documents and all permits, licenses, approvals, governmental requirements and laws relating thereto and/or to the creation, formation and/or maintenance of condominium property and/or the marketing, sale and/or conveyance of Condominium Units, including, without limitation, Wisconsin condominium law and all amendments and modifications thereof.

     1.34   Condominium Sales Materials.  All advertising, offering and promotional materials used in the marketing of the Condominium Units for sale and all materials, disclosures

4

and information required to be provided purchasers or prospective purchasers of Condominium Units by any laws or governmental agencies.

1.35    Condominium Unit.  A residential condominium unit as provided in, and as created pursuant to, the Condominium Declaration, the Condominium Plat and Condominium Plan, together with the undivided fractional interest in the common area, and the exclusive right to use any exclusive use common area relating thereto (including, without limitation, any exclusive use balcony, patio, storage area and any exclusive use parking space(s) for such Condominium Unit as shown on the Condominium Plat).

1.36    Condominium Upgrade Deposits.  Any amount deposited from time to time by a Condominium Buyer, in cash, as a deposit for the Condominium Upgrades.

1.37    Condominium Upgrades.  Any change in the Condominium Finish Standards or any alteration, change or addition to the base or standard construction or floor plan for any Condominium Unit, including, without limitation, changes to fixtures, appliances, equipment, hardware or other base construction which are not included in the Cost Breakdown.

1.38    Construction Contract.  That certain construction contract dated July 1, 2006, between Borrower and Contractor for the construction of the Improvements.

1.39    Construction Period.  The period of time from the date of this Agreement through and including the Completion Date.

1.40    Construction Inspector.  Broadlands Financial Group, LLC, or such other party as SFG may designate from time to time.

1.41    Contractor.  Economou Partners Construction, Inc., the general contractor for the construction of the Improvements.

1.42    Cost Breakdown.  As shown on Exhibit "C" attached hereto.

1.43    Debt Service.  As defined in Section 3.33 hereof.

1.44    Draw Request.  As defined in Section 5.01(a) hereof.

1.45    DSCR (Debt Service Coverage Ratio).  As defined in Section 3.33 hereof.

1.46    Earnest Money Escrow Agreement.  A Pledge, Control and Escrow Agreement among the Borrower and the Condominium Deposit Holder, in the form attached hereto as Exhibit "I".

1.47    Event of Default.  As defined in Article VI hereof.

1.48    Environmental Laws.  As defined in the Security Instrument.

1.49    FF& E Reserves.  As defined in Section 3.32(a) hereof.

1659953 v08

1.50   **Franchise Agreement.**   That certain Franchise Agreement between Holiday Hospitality Franchising, Inc. and Borrower, dated September 29, 2006.

1.51   **Franchisor.** Holiday Hospitality Franchising, Inc., the franchisor and manager of the Premises pursuant to the Franchise Agreement.

1.52   **Guarantor.**   Collectively, individually, jointly and severally, Phillip E. Hugh, Steve Economou, and John Economou.

1.53   **Guaranty.** That certain Guaranty Agreement of even date herewith, by Guarantor to and in favor of SFG, as amended or modified from time to time.

1.54   **Hotel.**   That certain Staybridge Suites Hotel to be constructed on the Land pursuant to the Plans.

1.55   **Improvements.** The buildings, and other facilities, amenities and improvements on the Land and to be erected or repaired pursuant to the Plans.

1.56   **Interest Reserve.**  As defined in Section 3.31 hereof.

1.57   **Knowledge; Knowledge of Borrower.**  The knowledge of Borrower's directors, members, managers, partners or officers based on reasonable investigation.

1.58   **Land.**   The real property described in **Exhibit "A"** attached hereto and by this reference made a part hereof.

1.59   **Loan.**  The loan which is the subject of this Agreement.

1.60   **Loan Documents.**   Collectively, the Note, Security Instrument, Guaranty, this Loan Agreement, an Assignment of Leases and Rents by Borrower to SFG, an Environmental Indemnification by Borrower and Guarantors to SFG, an Assignment of Project Documents by Borrower in favor of SFG, an Assignment and Subordination of Management Agreement by Borrower to SFG, a Collateral Assignment of Purchase Contracts and Escrow Deposits, with the Consent and Acknowledgment of Escrow Agent by Borrower in favor of SFG, any UCC Financing Statements by Borrower in favor of SFG, the and all other documents and instruments evidencing, securing or otherwise relating to the Loan.

1.61   **Management Company.**  Pursuant to that certain management agreement by and between Borrower and DOC Hospitality Milwaukee, LLC dated as of June 26, 2006 (the "Management Agreement").

1.62   **Monthly Gross Revenues.**  As defined in Section 3.32(a) hereof.

1.63   **Master Declaration.** The declaration of covenants, conditions and restrictions creating and governing the operation of the Premises, and governing the operation, maintenance and repair of the Premises, together with all articles, bylaws and other organizational and/or operational documents for the association created thereunder and all documents required by any

1659953 v08

laws or governmental agencies in connection therewith, all of which shall comply with all applicable laws and the requirements of all applicable governmental agencies and shall be subject to SFG's prior written approval, which shall not be unreasonably withheld.

1.64     Note.  The Promissory Note in the principal amount of $14,900,000.00 from Borrower to SFG of even date herewith, as amended, restated, renewed, supplemented or modified from time to time.

1.65     Plans.  The plans for the Site Work, described on Exhibit "B" attached hereto and by reference made a part hereof.

1.66     Premises.  The Land together with the Improvements and all other fixtures and property described in the Security Instrument.

1.67     Requirement.  Any law, ordinance, order, rule or regulation pertaining to the use, development and operation of the Premises and issued by the United States, the State of Wisconsin, and/or any political subdivision thereof and/or any agency, department, commission, board, bureau or instrumentality of any of them, including but not limited to the Environmental Laws, applicable zoning laws, and the Flood Disaster Protection Act of 1973 (42 U.S.C.§4001).

1.68     Redevelopment Plan.  The Redevelopment Plan for the North Market Street-East Highland Avenue Urban Renewal Project (the "Redevelopment Plan"), prepared by the Department of City Development, of the City of Milwaukee, Wisconsin, dated May 9, 1985, recorded in Register of Deeds, Milwaukee County, Milwaukee, Wisconsin (the "Official Records"), Reel 1176, Image 418, as amended by that certain Amendment No. 1 to the Redevelopment Plan, dated December 19, 1985, recorded in Reel 1847, Image 903, Official Records, as amended by that certain Amendment No. 2 to the Redevelopment Plan, dated June 18, 1987, recorded in Reel 2124, Image 1111, Official Records.

1.69     Security Instrument.  The Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Borrower to SFG of even date herewith, encumbering the Premises as security for the Note, as amended or modified from time to time.

1.70     Site Work.  As described in the cost breakdown ("Cost Breakdown") attached hereto as Exhibit "C" and in the Plans, including the construction, repair and renovation of the Improvements.

1.71     Subcontract, Subcontractor.  As defined in Section 5.01(b) hereof.

1.72     Test Date.  As defined in Section 3.33 hereof.

1.73     Testing Period.  As defined in Section 3.33 hereof.


ARTICLE II
WARRANTIES OF BORROWER


7

Borrower hereby warrants and represents to SFG as follows:

2.01    Validity of Loan Documents.   The Loan Documents are in all respects legal, valid and binding in accordance with their terms and grant to SFG a direct, valid and enforceable first lien on and/or security title in and to the Premises and the materials, fixtures, machinery, equipment, articles and personal property now or hereafter located thereon together with any instrument or agreement (whether or not a part of such mortgage, or like instrument) encumbering any materials, fixtures, machinery, equipment, articles and/or personal property incorporated or to be incorporated in the Improvements or used in the operation of the Premises.

2.02    Priority of Lien on Personalty.    No chattel mortgage, bill of sale, security agreement, financing statement or other title retention agreement (except those executed in favor of SFG) has been or will be executed with respect to any materials, fixtures, machinery, equipment, articles and personal property of Borrower used in connection with the construction, operation or maintenance of the Improvements and incorporated therein, without the prior written consent of SFG, which consent shall not be unreasonably withheld.

2.03    Conflicting Transactions of Borrower and Guarantor.    Consummation of the transactions hereby contemplated and the performance by Borrower of its obligations under and by virtue of the Loan Documents and by Guarantor of his obligations under and by virtue of the Guaranty will not result, as to Borrower, any partner of Borrower, or any Guarantor, in any breach of, or constitute an event of default under, any security instrument, evidence of indebtedness, partnership agreement, corporate charter, bylaws or operating agreement, or any other instrument to which Borrower, any partner of Borrower, or Guarantor is a party or by which any of them may be bound or affected.

2.04    Pending Litigation.   There are no actions, suits or proceedings at law or in equity, or before any governmental or administrative agency, which are pending, or, to the Knowledge of Borrower, threatened against or affecting Borrower, any partner of Borrower, Guarantor or the Premises, the adverse result of which would affect the Premises or the financial condition of Borrower, any partner of Borrower, or Guarantor in any material respect.

2.05    Violations of Requirements.   Borrower has no Knowledge of any violations or notices of violations of any Requirement relating to the Premises.

2.06    Plans.   The Plans, true and correct copies of which have been furnished to SFG, are satisfactory to Borrower and have been approved by SFG.   The Plans and the use of the Premises comply with all applicable Requirements and restrictive covenants affecting the Premises.   No material change to any of the Plans shall be made without the prior written approval of SFG first having been obtained, which approval will not be unreasonably withheld.

2.07    Organization, Status and Authority of Borrower.    (i) Borrower is a limited partnership duly formed, existing and in good standing under the laws of the state in which it is formed, (ii) Borrower is duly qualified to do business and is in good standing in the state wherein the Land is situated, (iii) Borrower has the authority and legal right to carry on the business now

8

being conducted by it and to engage in the transactions contemplated by the Loan Documents; and (iv) the execution and delivery of the Loan Documents to which Borrower is a party and the performance and observance of the provisions thereof have been duly authorized by all necessary partner actions; and

2.08    Availability of Utilities.   All utility services necessary for the Improvements and the occupancy and operation thereof are available (in size, capacity and quantity sufficient to serve the needs of the Premises) through public or private easements or rights-of-way (which would inure to the benefit of SFG in the event of the foreclosure of, or sale under the powers contained in, the Security Instrument) at the boundaries of the Land, including but not limited to, water supply, storm and sanitary sewer, gas, electric and telephone facilities.  Borrower has no knowledge that any suspension, interruption or moratorium of any such utility services is planned or threatened.

2.09    Access.   Access to the Land is provided by way of public rights of way which abut the Land, or by way of private roads built upon easements which would inure to the benefit of SFG upon foreclosure.  All curb cut permits and other licenses, permits and approvals for the driveways, roadways and other means of pedestrian and vehicular traffic to and from the Land have been lawfully obtained are in effect and are irrevocable.

2.10    Conditions of Premises.   The Premises are not now damaged or injured as a result of any fire, explosion, accident, flood or other casualty.

2.11    Brokerage Commission.   Any brokerage commission or similar compensation due in connection with the purchase of the Land and in connection with the transactions contemplated hereby have been paid in full and any such commissions coming due in the future will promptly be paid by Borrower.  Borrower agrees to and shall indemnify SFG from any liability, claims or losses (including reasonable attorneys' fees) incurred by SFG and arising by reason of any claim for any such brokerage commission.  This provision shall survive the repayment of the Loan and shall continue in full force and effect so long as the possibility of such liability, claims or losses exists.

2.12    Quality of Work and Materials.   The Improvements, as-built, shall conform to the Plans, shall be free of defects, shall be performed in a good and workmanlike manner, shall make use of materials of quality typical for projects similar in location, intended use, size, and type to the Premises, and shall be performed in accordance with the Plans and in compliance with all Requirements.  To the best of Borrower's Knowledge, both Borrower and Contractor are in full compliance with their respective obligations under the Construction Contract.  The work to be performed by Contractor under the Construction Contract is the worked called for by the Plans.

2.13    Financial Statements.   The financial statements of Borrower and Guarantor heretofore delivered to SFG are true and correct in all respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fairly represent the respective financial conditions of the subjects thereof as of the respective dates thereof.  No

9

material adverse change has occurred in the financial conditions reflected therein since the respective dates thereof.

2.14   Contracts.  Except for the contracts and agreement expressly identified herein, Borrower has made no contract or arrangement of any kind or type whatsoever (whether oral or written, formal or informal), the performance of which by the other party thereto could give rise to a lien on the Premises, except for the contracts (all of which have been disclosed in writing to SFG) made by Borrower with parties who executed and delivered lien waivers to Borrower, and which, in the opinion of SFG's counsel, will not create rights in existing or future lien claimants which may be superior to the Security Instrument.

2.15   No Event of Default Under Loan Documents.  No Event of Default exists under this Agreement or under any of the other Loan Documents, including but not limited to the Franchise Agreement or Management Agreement, and no event has occurred and is continuing which, with notice or the passage of time or both as provided herein or in any of the other Loan Documents, would constitute an Event of Default under any of the Loan Documents.

2.16   Effect of Draw Request.  Each draw request shall constitute an affirmation that the representations and warranties of this Article II remain true and correct as of the date thereof, and, unless SFG is notified to the contrary prior to the disbursement of the requested advance (or any portion thereof), shall constitute an affirmation that the same remain true and correct on the date of such disbursement.

2.17   Non-Commencement of Work.  There has been no commencement of work  or delivery of materials or services (including, without limitation, architectural, engineering, surveying, or other planning or design services) on or before the date hereof that would or might give rise to any statutory or common law lien against the Premises or any part thereof, with the exception of parties who have delivered lien waivers acceptable to the title company and to SFG.

2.18   Architect's Agreement.  Both Borrower and Borrower's Architect are in full compliance with their respective obligations under any agreement between Borrower and Borrower's Architect.  Borrower shall, from time to time, in addition to any reports submitted with any and all draw requests, upon written request by SFG cause Borrower's Architect to provide SFG with reports relative to the status of construction of the Improvements.

2.19   Agreement for Sale, Condominium Documents, Condominium Purchase Agreement and Master Declaration.  Each party to the Agreement for Sale, Condominium Documents, Condominium Purchase Agreement and Master Declaration, is not in default under each of said agreements, nor is Borrower aware of any facts which shall result in a default thereunder.  Borrower shall not amend, cancel or terminate the  Agreement for Sale, Condominium Documents, Condominium Purchase Agreement and Master Declaration without the prior written consent of SFG, which consent may be withheld in SFG's sole discretion.  The Agreement for Sale, Condominium Documents, Condominium Purchase Agreement and Master Declaration are each valid and enforceable in accordance with its terms.

1659953 v08

## ARTICLE III
## COVENANTS OF BORROWER

Borrower hereby covenants and agrees with SFG as follows:

3.01   Insurance.   Borrower shall obtain such insurance as required by the Security Instrument.

3.02   Collection of Insurance Proceeds.   Borrower will cooperate with SFG in obtaining for SFG the benefits of any insurance or other proceeds lawfully or equitably payable to Borrower and/or SFG in connection with the transactions contemplated hereby and will reimburse SFG for any reasonable expenses actually incurred in connection therewith (including the payment by Borrower of the expense of an independent appraisal on behalf of SFG in case of fire or other casualty affecting the Premises). The application of such proceeds shall be governed by the Security Instrument.

3.03   Application of Loan Proceeds.   Borrower will use the proceeds of the Loan solely for the acquisition of the Premises, Site Work and closing costs related thereto and for the purposes described on the Cost Breakdown and such incidental costs relative to such construction as may be approved from time to time in writing by SFG. In no event shall Borrower use any of the proceeds of the Loan for personal, family, or household purposes.

3.04   Expenses.   Borrower shall pay all costs of closing the Loan and all expenses of SFG with respect thereto, including but not limited to, reasonable legal fees (including reasonable legal fees incurred by SFG subsequent to the closing of the Loan in connection with the disbursement, administration, collection, extension or transfer of the Loan), advances, recording expenses, fees and expenses of Construction Inspector, surveys, intangible taxes (if any), expenses of foreclosure (including reasonable attorneys' fees) and similar items. Borrower agrees that all closing papers, Loan Documents and other legal matters will be subject to the approval of SFG's attorneys.

3.05   Commencement and Completion of Construction.   Borrower will commence within thirty (30) days and will diligently pursue the Site Work and the construction of the Improvements to completion within the Construction Period and without deviation from the Plans unless with the prior written approval of SFG. Borrower will provide satisfactory evidence of full compliance including, but not limited to, all release of mechanic's and materialman's liens for all of the work related to the Plans and Site Work and a final Certificate of Occupancy, with all of the above matters upon request from SFG.

3.06   Right of SFG to Inspect Premises.   Borrower will permit SFG and its representatives and agents and the Construction Inspector to enter upon the Premises and to inspect the Improvements and all materials to be used in connection therewith or in the construction or installation thereof, and will cooperate with SFG, its representatives and agents and the Construction Inspector during such inspections (including making available to SFG

1659953 v08

working copies of the Plans together with all related supplementary materials); provided, however, that this provision shall not be deemed to impose upon SFG any obligation to undertake such inspections or any liability for the failure to detect or failure to act with respect to any defect which was or might have been disclosed by such inspections. Such inspections shall be done during regular business hours and in such a manner as shall not be disruptive to the ongoing construction or operation of the Premises.

3.07    Correction of Defects. Unless Borrower demonstrates to SFG that such corrective work is inappropriate or inconsistent with the Plans, Borrower will promptly correct all defects in the Improvements or any departure from the Plans not previously approved in writing by SFG other than those departures in plans permitted pursuant to Section 3.24 herein. Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or departures from the Plans are discovered by, or brought to the attention of SFG, shall not constitute a waiver of SFG's right to require compliance with this covenant.

3.08    Sign Regarding Financing. During the Construction Period, Borrower shall erect or shall allow SFG, or a party at the direction of SFG, to erect and continuously maintain on a site on the Land approved by SFG a sign approved by SFG indicating that financing is being provided by SFG, all to the reasonable satisfaction of SFG. Borrower shall use commercially reasonable efforts to prevent the destruction or removal of said sign without the prior written approval of SFG. All costs of designing and creating such sign shall be paid by SFG.

3.09    [Intentionally Omitted].

3.10    Accounting Records. Borrower agrees to maintain accounting records for the Premises, separate from any general accounting records which Borrower may maintain in connection with Borrower's other business activities. Borrower acknowledges that the purpose of this provision is to facilitate determination of costs incurred with reference to the construction and installation of the Improvements and the obligations of Borrower in respect thereof. Borrower agrees that SFG shall, at any reasonable time, have access to and the right to examine all accounting records of Borrower which relate directly or indirectly to the Premises. It is expressly agreed that the actual and reasonable cost to SFG of the services of accountants which SFG may employ, after an Event of Default under any of the Loan Documents, to make examinations of Borrower's accounting records with reference to the Premises, as SFG shall determine to be necessary or appropriate in the protection of SFG's interests, shall be an expense which shall be treated as an advance on account of the Loan. Borrower shall furnish SFG current financial statements of Borrower, Guarantor and the Premises as specified in the Security Instrument, and such other financial information and reports that SFG may reasonably request from time to time, all of which shall be promptly submitted to SFG and shall be in form and content and shall contain such certifications as SFG shall reasonably require.

3.11    Security. Borrower shall cause the Premises and all equipment and materials stored or located thereon to be secured and protected against vandalism and unauthorized use and possession.

1659953 v01

3.12    Soil Test.  Borrower shall provide to SFG at Borrower's expense such soil tests of the Land as SFG may reasonably request.

3.13    Additional Documents.  Borrower shall:

(a)    Regarding Construction.  Furnish to SFG all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document and instrument required to be furnished by the terms of the Loan Documents, all at Borrower's expense;

(b)    Regarding Preservation of Security.  Execute and deliver to SFG such documents, instruments, assignments and other writings, and do such other acts necessary or desirable, to preserve and protect the collateral at any time securing or intended to secure the Note as SFG may reasonably require; and

(c)    Regarding This Agreement.  Do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement as SFG shall reasonably require from time to time.

3.14    Easements and Restrictions.  All proposed easements, permits, licenses, and other instruments, which would or might affect the title to the Premises shall be submitted to SFG for SFG's approval prior to the execution thereof by Borrower, accompanied by a survey showing the exact proposed location thereof and such other information as SFG shall reasonably require. Borrower shall not subject the Premises or any part thereof to any restrictive covenant, declaration or use restrictions including, without limitation, any restriction or exclusive use provision in any lease or other occupancy agreements, without the prior written consent of SFG.

3.15    Compliance With Requirements.  Borrower shall comply promptly with each and every Requirement and shall furnish SFG, on demand, independent evidence of such compliance. Without limiting the foregoing, if either or both the so-called Federal Clean Air Act, as amended, or the Federal Water Pollution Control Act, as amended, are applicable to the Premises, Borrower represents that the Improvements are not in violation of such Acts and any of the rules, regulations and orders issued thereunder, and Borrower affirmatively agrees with SFG, so long as Borrower is obligated to SFG under this Agreement, that construction will take place and be completed in conformity with such Acts, and the Improvements will thereafter be maintained in conformity therewith.

3.16    Bills of Sale.  Borrower shall deliver to SFG, on demand, copies of any contracts, bills of sale, statements, receipted vouchers or agreements, under which Borrower claims title to any materials, fixtures or articles of personal property incorporated in the Improvements or subject to the lien or security title of the Security Instrument.

3.17    Leases.  Borrower has not granted any lease affecting the Premises or any portion thereof except for those leases listed on Exhibit "F" attached hereto.  Borrower shall not enter

13

1659953 v08

into any leases or occupancy agreements affecting the Premises without the prior written consent and approval of SFG, which consent shall not be unreasonably withheld.  Borrower shall deliver to SFG copies of all leases and occupancy agreements affecting the Premises whether executed before or after the date of this Agreement.  Notwithstanding the foregoing, this provision shall not apply to Condominium Approved Sales.

3.18    Compliance With Restrictive Covenants and Easements.  Borrower shall comply with all restrictive covenants and easements now or hereafter affecting the Premises; provided, that this Paragraph shall not supersede or lessen the effect of Paragraph 3.14 hereof.

3.19    Mechanics and Materialmen.  Borrower will furnish to SFG, upon request at any time, and from time to time, affidavits listing all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished material or labor to the Premises or any portion thereof, together with affidavits, or other evidence reasonably satisfactory to SFG, showing that such parties have been paid all amounts then due for labor and materials furnished to the Premises.  In addition, Borrower will notify SFG immediately, and in writing, if Borrower receives any notice, written or oral, from any laborer, subcontractor or materialman to the effect that said laborer, subcontractor or materialman has not been paid when due for any labor or materials furnished in connection with the Improvements; and Borrower will furnish to SFG, at any time and from time to time upon demand by SFG, lien waivers bearing a then current date and prepared on SFG's standard form from Contractor and such subcontractors or materialmen as SFG may designate.

3.20    Further Assurance of Title.  If at any time SFG's counsel has reason to believe that any disbursement of the Loan is not secured or will or may not be secured by the Security Instrument as a first lien or first security title on the Premises, subject only to the matters in the title insurance policy insuring the Security Instrument and approved by SFG, then Borrower shall, within ten (10) days after written notice from SFG, do all things and matters necessary to assure to the satisfaction of SFG that any disbursement previously made hereunder or to be made hereunder is secured or will be secured by the Security Instrument as a first lien or first security title on the Premises, subject to the matters in such title insurance policy and SFG, at its option, may decline to make further disbursements hereunder until SFG has received such assurance, but nothing in this Paragraph 3.20 shall limit SFG's right to require endorsements extending the effective date of such title insurance policy as hereinafter set forth.

3.21    Title Policy Endorsements.  Borrower shall, without notice or demand from SFG, within the first ten (10) days of each calendar month during the term of this Agreement, and at any time and from time to time promptly upon demand by SFG, obtain, deliver to SFG, and pay all fees and charges incurred in connection with the issuance of, an endorsement to SFG's title insurance policy.  Each such endorsement so obtained shall advance the effective date of SFG's title insurance policy to the most current date then reasonably obtainable and shall reflect any change in the status of the title to the Premises since the date of said policy or the date of the previous endorsement, as the case may be, and shall increase the coverage thereunder to the total amount of Loan proceeds theretofore advanced.

1659953 v08

3.22 <u>Survey</u>. From time to time during the Construction Period upon request of SFG, Borrower shall furnish plats of survey updated to show the progress of the Improvements. Upon the completion of the Improvements, Borrower shall, upon request of SFG, promptly furnish SFG a final as-built plat of survey. All such plats of survey shall be prepared by a surveyor, and shall be in form and detail, reasonably satisfactory to SFG.

3.23 <u>Contracts</u>. Borrower shall furnish SFG copies of any and all executed contracts, including but not limited to the Construction Contract, the agreement with Borrower's Architect, or any Condominium Purchase Agreement for the planning and construction of the Improvements, all of which shall be in form and with parties reasonably satisfactory to SFG.

3.24 <u>Construction Contract</u>. Borrower will not (i) permit any default under the terms of the Construction Contract, (ii) waive any of the obligations of Contractor thereunder, (iii) do any act which would relieve Contractor from its obligations to construct the Improvements according to the Plans, or (iv) make any amendments to the Construction Contract or enter into any agreement other than the Construction Contract for the performance of work on or the furnishing of materials or services to or in connection with the Premises, over $25,000.00 individually and $250,000.00 in the aggregate for each and all related cause for such amendment, without the prior written consent of SFG, which consent shall not be unreasonably withheld.

3.25 <u>Insufficiency of Loan Proceeds</u>. If at any time during the term of this Agreement, in SFG's reasonable judgment and opinion, the remaining undisbursed portion of Borrower's Equity Contribution and the Loan is insufficient to fully complete the Improvements in accordance with the Plans, and to pay all interest projected by SFG to accrue under the Note and such other indebtedness, and to pay all other costs for which proceeds of the Loan have been allocated as shown on the Cost Breakdown, Borrower shall, within seven (7) days after written notice thereof from SFG or such other times as agreed to by SFG in writing, in SFG's sole discretion, deposit with SFG or such other party SFG shall require, such sums of money in cash as SFG may require, and in an amount or amounts sufficient to remedy such condition, and sufficient to pay any liens for services and materials alleged to be due and payable at the time in connection with the Improvements, and no further disbursements of the Loan, at SFG's option, shall be made by SFG until this Paragraph has been fully complied with. All such deposited sums shall stand as additional security for Borrower's obligations under this Agreement and may be disbursed, at SFG's option, before any further advances of the Loan are made, or paid over to Borrower upon termination of Borrower's obligations under this Agreement.

3.26 <u>Modification or Amendment to Formative Documents</u>. Borrower shall not materially modify or amend its limited partnership agreement or any certificate thereof without the prior written consent of SFG, and except as may be expressly permitted by SFG in writing, Borrower shall not change its name, identity (including its trade name or names) or, limited partnership structure without notifying SFG at least thirty (30) days prior to the effective date of such change and, in the case of a change in the Borrower's structure, without first obtaining the prior written consent of SFG.

3.27 <u>Intentionally Omitted</u>.

1659953 v08

3.28   Management of Premises and Franchise Agreements.   Borrower shall cause the Premises to be managed in a professional manner by the Management Company or by such other persons or parties and the Management Agreement or another management agreement approved in writing by SFG.   Borrower shall not modify the Franchise Agreement or enter into any franchise agreement relating to the Premises (other than the Franchise Agreement) without the prior written approval of SFG, which approval shall not be unreasonably withheld.

3.29   No Zoning Change.   Borrower shall not, without first obtaining the written consent and approval of SFG, apply for, join in, permit or pursue any change in the classification under which the Premises is zoned or any condition related thereto or any use permitted or prohibited thereunder.

3.30   Deposit of Income.   If and to the extent Borrower receives, after an Event of Default under this Agreement or any of the other Loan Documents, any sums from tenants or occupants of the Premises, other than amounts paid by tenants to reimburse Borrower for construction work performed for tenants (the cost of which has not been disbursed to Borrower by SFG under the Loan), SFG shall have the right to require the deposit of the same with SFG or a depository designated by SFG in SFG's sole discretion in a special account, from which no funds shall be drawn by Borrower without SFG's prior written consent, and which fund shall be paid over to Borrower upon termination of Borrower's obligations under this Agreement, or disbursed in the same manner as Loan proceeds before any further advances of the Loan are made.   Any interest on such deposits shall accrue to Borrower.

3.31   Interest Reserve.   The Cost Breakdown shall provide for an interest reserve of $1,450,000.00 (the "Interest Reserve"), and such funds shall be held with SFG, or a depository designated by SFG in SFG's sole discretion, in an account in Borrower's name.   Provided there is no Event of Default, SFG may, at its sole discretion, (i) disburse proceeds of the Loan against the Interest Reserve, and (ii) use funds from the Interest Reserve to make monthly interest payments on the outstanding principal balance of the Loan.   Borrower hereby agrees that SFG is hereby irrevocably authorized, without further notice, instruction or authorization from Borrower to make such advance to fund the Interest Reserve and that if SFG elects in any month not to pay all interest accrued on the Loan from the Interest Reserve, Borrower shall pay all interest accrued and then due from Borrower's funds other than the proceeds of the Loan.   All interest on the funds in the Interest Reserve shall accrue to the benefit of Borrower.

3.32   FF&E Reserve.

   (a)   Commencing on the date that a certificate of occupancy is issued for the Hotel, Borrower shall deposit the following sums each month during the term of the Loan as a reserve for furnishings, fixtures and equipment (collectively, the "FF&E Deposits"):

1659953 v08

| Loan Year | % of Monthly Gross Revenues |
|---|---|
| 1 | 2% |
| 2 | 3% |
| 3-Maturity of the Loan | 4% |

"Monthly Gross Revenues" shall be defined as the sum of cash received by Borrower in any given month in payment of room and facilities rent, all receipts from restaurant, lounge, recreational and parking facilities and vending machines, and all other operating revenues received by Borrower from the Premises. Monthly Gross Revenues shall be determined on the basis of sound cash basis accounting practices applied on a consistent basis.

(b) All such FF&E Deposits:

(i) shall be held by SFG or a depository designated by SFG in SFG's sole discretion, in trust, with no obligation to segregate such payments;

(ii) shall be held in trust to be applied by SFG for the purposes for which made (as hereinabove provided) subject, however, to the security interest granted SFG therein pursuant to the Security Instrument; and

(iii) shall not be subject to the direction or control of Borrower.

(c) Provided that no Event of Default exists and there are sufficient funds in the FF&E Deposits, SFG agrees to make disbursement to Borrower for the payment of the FF&E costs following its receipt of appropriate bills therefor, or alternatively upon presentation by Borrower of receipts or bills paid, SFG shall reimburse the Borrower for such payments made by the Borrower.

(d) Upon the occurrence of an Event of Default, SFG may, at its option, without being required to do so, apply any FF&E Deposits on hand on account of any of the Indebtedness, in such order and manner as SFG may elect. When the Indebtedness has been fully paid, any remaining FF&E Deposits shall be paid to Borrower.

3.33    Debt Service Coverage Ratio.

Commencing on the date twenty-four (24) months following the issuance of a certificate of occupancy for the Hotel (but in no event shall such commencement occur later than the first Test Date listed below), Borrower shall not permit the ratio of Cash Flow to Debt Service (the "DSCR") as of the end of each fiscal quarter (each a "Test Date") for four (4) previous consecutive fiscal quarters (each a "Testing Period") to be less than the following:

1659953 v08

| Test Date | DSCR |
|---|---|
| Quarters ending December 31, 2010, March 31, 2011 and June 30, 2011 | 1.15:1.00 |
| Quarters ending September 30, 2011. December 31, 2011 and March 31, 2012 | 1.25:1.00 |
| Quarters ending June 30, 2012, September 30, 2012 and the Maturity Date | 1.35:1.00 |

Compliance with this covenant shall be tested at the end of each fiscal quarter using the requisite financial information from the preceding Testing Period on a rolling four-quarter basis.

"Cash Flow" for any Testing Period shall be the sum of the Borrower's (i) pre-tax income, (ii) interest expense, (iii) all non-cash amounts of depreciation and amortization, (iv) non-recurring expenses, as deemed acceptable by SFG, in SFG's sole discretion, (v) extraordinary management fees, as deemed acceptable by SFG, in SFG's sole discretion and (vi) all operating lease or rent expense, less all non-recurring or extraordinary gains including in calculating income, each and all as reflected on Borrower's financial statements for the Testing Period in accordance with generally accepted accounting principles.

"Debt Service" for any Testing Period shall be the sum of (i) Borrower's accrued interest expense, (ii) the current principal due and payable on any and all loans of Borrower, (iii) the current portion of any and all capital lease obligations and (iv) all operating lease or rent expenses, each and all as reflected on Borrower's financial statements for the Testing Period in accordance with generally accepted accounting principles.

Borrower shall deliver a compliance certificate to SFG on each Test Date described above reflecting compliance with the DSCR described herein.

In the event that the DSCR requirements set forth in Section 3.3 herein, are not met for any Testing Period, Borrower shall be required within five (5) days from receiving notice of such from SFG to, do one of the following:

(i)     Pay down the principal amount of the Loan so that the remaining outstanding balance and amortization schedule shall meet the required DSCR for the current Testing Period; or

18

(ii)     Escrow funds with SFG, or a depository designated by SFG in SFG's sole discretion, equal to the amount that would be required so that the remaining outstanding balance and amortization schedule would meet the required DSCR for the current Testing Period.

Said funds shall be held by SFG for the benefit of SFG until such time as the DSCR requirements have been met at a subsequent Testing Period.

3.34     Intentionally Deleted.

3.35     Compliance With Securities Laws. In the offering and sale of Condominium Units, including preparation and distribution of the condominium prospectus and the advertising and promotional materials (including any website) used in the offering of the Condominium Units, Borrower and all of its brokers, sales representatives and other staff, agents or contractors, have complied fully, and shall at all times hereafter comply fully, with all applicable state and federal securities laws, regulations and governmental requirements. Borrower shall indemnify and hold harmless SFG from any and all claims and losses whatsoever arising from the untruth or violation of any of the foregoing representations and covenants. The indemnity and hold harmless agreement set forth in the preceding sentence (the "Securities Indemnity") shall include, without limitation, the obligation to pay to SFG (from sources other than the proceeds of the Loan or of any collateral for the Loan) an amount equal to the amount required under Section 5.07A(vii) of this Agreement for any and all purchase contracts for Condominium Units which are cancelled or rescinded in connection with any claim by the purchaser which is consistent with untruth or violation of any of the foregoing representations and covenants. Upon receipt of such required payment amounts for any Condominium Unit, SFG shall release the lien of the Security Instrument as to that Condominium Unit. The obligation of the Guarantors under the Guaranty shall include the Securities Indemnity.

3.36     Condominium Covenants.

A.     Prior to the closing Borrower shall promptly prepare and deliver to SFG final forms of the Condominium Documents in form acceptable to SFG (as determined by SFG in its good faith sole discretion). No Condominium Document shall be executed, recorded, or filed by Borrower without SFG's prior written consent, which consent shall not be unreasonably withheld. In addition, Borrower shall enter into an Earnest Money Escrow Agreement in form and substance acceptable to SFG. In addition, prior or upon execution or acceptance of any of the Condominium Documents or Earnest Money Escrow Agreement, Borrower at SFG's request shall execute and deliver ancillary security documents for the Loan pledging all of Borrower's interest in the foregoing documents and Condominium Deposits as SFG may require in its good faith sole discretion. All Condominium Deposits shall be placed into an escrow account approved by SFG and SFG shall have a first priority perfected security interest in Borrower's rights thereunder. Borrower shall perform all of its obligations under the Condominium Documents and all applicable Laws relating to the Condominium, and shall promptly and diligently take all steps necessary, appropriate or desirable in order to establish, create and maintain in effect the condominium regime and satisfy and continually maintain satisfied all

19

legal and other requirements requisite for the marketing, sale and conveyancing of the Condominium Units, and the Condominium Property.

B.    Borrower shall pay prior to the date due, all dues and assessments imposed pursuant to, and shall perform all of its obligations under, the Condominium Documents or Master Declaration to the Borrower or the Property is subject.

C.    The Condominium Documents shall not during the term of the Loan, be materially altered, amended, supplemented, terminated, surrendered, released, cancelled or annulled, without the prior written consent of SFG in each instance, such consent not to be unreasonably withheld, conditioned or delayed, accompanied by copies of all documents and information deemed necessary by SFG for its evaluation of such request, such consent not to be unreasonably withheld, conditioned or delayed.

D.    Borrower shall upon creation of the Condominium, deliver to SFG (i) evidence, satisfactory to the SFG, that the Condominium has been duly and legally organized and is validly existing as such under all applicable Laws and that all other legal requirements for the marketing, sale and conveyancing of the units have been satisfied; (ii) an endorsement to the Title Policy affirmatively insuring against loss or damage as a result of the Property not being a legally and validly established condominium under the Condominium Documents; and (iii) Estoppel Certificates from the Condominium Association, in form and substance satisfactory to SFG. The Project shall thereafter at all times consist of a legal and separate condominium for tax assessment purposes and under all applicable Laws.

E.    Borrower further agrees that upon creation of the Condominium, Borrower shall not terminate, amend, revise or in any way materially modify the Master Declaration or cause any such modification, without the express written consent of SFG, which consent shall not be unreasonably withheld.

F.    All Condominium Material Amendments shall require SFG's prior written approval, which may be withheld in SFG's good faith sole discretion. Without limiting the foregoing, Borrower shall not sell, or enter into any agreement to sell, any Condominium Unit for a purchase price less than the applicable Condominium Minimum Sales Price or under a form of agreement other than the Approved Condominium Agreement Purchase Form without SFG's prior written approval, which may be withheld in SFG's good faith sole discretion. All Condominium Deposits shall be assigned to SFG, shall constitute collateral for the Loan and shall be delivered to, and held and disbursed (including, without limitation, to pay the costs of Condominium Upgrades) by the Condominium Deposit Holder pursuant to the Earnest Money Escrow Agreement, by which Condominium Deposits shall be returned to the applicable Condominium Buyers when required by applicable law or the applicable Condominium Purchase Agreements. Provided no Event of Default has occurred under the Loan Documents, (a) the Condominium Purchase Deposit for each Condominium Unit upon the release of such Condominium Unit in accordance with Section 5.07 be released for disbursement in accordance with Section 5.07, and (b) any Condominium Upgrade Deposit for each Condominium Unit shall be delivered to Borrower upon the Condominium Buyer's unconditional acceptance of all of the

1659953 v08

Condominium Upgrades for such Condominium Unit. In the event of a default by a Condominium Buyer, all Condominium Purchase Deposits forfeited by such Condominium Buyer, and all Condominium Upgrade Deposits forfeited by such Condominium Buyer in excess of the actual cost of any completed Condominium Upgrades for which Borrower has not received payment, shall be delivered to SFG and at SFG's election shall be applied to the outstanding principal balance of the Loan subject to the rights of the Condominium Buyers under the Condominium Purchase Agreements or deposited into a cash collateral account for the benefit of SFG as security for the Loan.

## ARTICLE IV
## CONDITIONS PRECEDENT TO
## DISBURSEMENT OF LOAN PROCEEDS

4.01  Conditions Precedent to SFG's Obligations.  SFG shall in no manner be obligated to disburse any proceeds of the Loan unless and until all items required by the Commitment Letter in connection with the Loan have been delivered to the proper parties as required therein, all conditions and requirements set forth herein and in the Commitment Letter have been satisfied and met, and until the following additional conditions shall have been satisfied:

(a)  Items To Be Received By SFG.  SFG shall have received:

(i)  Approval of Construction Inspector.  Certification from Construction Inspector stating that the Plans have been approved by it and by any necessary governmental authority, that the Improvements comply with all Requirements, that the Construction Contract is acceptable to Construction Inspector and satisfactorily provides for the construction of the Improvements, and that the construction of the Improvements theretofore completed, if any, have been performed in accordance with the Plans;

(ii)  Title Insurance Policy.  A paid title insurance policy in form and content, and with a company acceptable to SFG, insuring that the Loan Documents constitute a valid first lien and/or first security title in the Premises, free and clear of all defects and encumbrances except such as SFG shall approve and containing:

(A)  full coverage against liens of mechanics, materialmen, laborers and any other parties who might claim statutory or common law liens;

(B)  no survey exceptions other than those theretofore approved by SFG;

(C)  a "pending disbursement clause" in form and substance satisfactory to SFG; and

1659953 v08

          (D)   if available in the state where the Land is located, an endorsement insuring that the enforceability of the Security Instrument is not subject to the defense of usury and such other endorsements as shall be requested by SFG;

          (iii)   <u>Loan Documents</u>.   All Loan Documents fully executed and delivered;

          (iv)   <u>Evidence of Sufficiency of Funds</u>.  Evidence satisfactory to SFG that the proceeds of the Loan, and Borrower's Equity Contribution, will be sufficient to cover all costs reasonably anticipated to be incurred in connection with the acquisition of the Premises and the completion of construction of the Improvements;

          (v)   <u>Evidence of Access, Availability of Utilities, Governmental Approvals</u>. Evidence satisfactory to SFG as to:

          (A)  the method of access to and from the Premises, and nearby or adjoining public ways, meeting the reasonable requirements of projects of the type contemplated to be completed under this Agreement and the status of completion of any required improvements to such access;

          (B)  the availability of storm and sanitary sewer facilities meeting the reasonable requirements of the Premises;

          (C)  the availability of all other required utilities, in location and capacity sufficient to meet the reasonable needs of the Premises; and

          (D)   the securing of all requisite governmental approvals of sanitary facilities, the Plans and any other matters which are subject to the jurisdiction of any governmental authority;

          (vi)   <u>Insurance</u>.  Suitable policies of insurance against fire and other hazards in accordance with applicable requirements of the Security Instrument;

          (vii)   <u>Survey</u>.  A survey, certified by a surveyor registered as such in the state in which the Land is located, to which is attached a certificate satisfactory to SFG;

          (viii)   <u>Bonds</u>.  If SFG so elects, performance and payment bonds guaranteeing performance of Contractor's obligations under the Construction Contract, in which SFG is named as an obligee, both of which shall be in form and substance, and issued by a surety, acceptable to SFG;

          (ix)   <u>Borrower's Equity Contribution</u>.   Proof of Borrower's Equity Contribution shall have been delivered to SFG;

1659953 v08

        (x)    <u>Payment of Fees</u>. Borrower shall have paid the remainder of the commitment fee as set forth in the Commitment Letter;

        (xi)    <u>Appraisal</u>. SFG shall have received from a MAI certified appraiser, selected by SFG, in its sole discretion, of the Premises in form and substance satisfactory to SFG, which supports that the principal amount of the Loan set forth in the Note shall not be greater than the lesser of (A) seventy-five percent (75%) of the reviewed appraised value of the Premises at stabilization, as determined by the MAI appraiser selected by SFG, or (B) that amount supported by a minimum DSCR of 1.35:1.00 based on the reviewed appraisal's calculation of net operating income at stabilization, as determined by the MAI appraiser selected by SFG; and the condominium units discount bulk-sale value based on the reviewed appraisal shall be satisfactory to SFG;

        (xii)    <u>Environmental Reports</u>. SFG shall have received environmental site assessment reports for the Premises prepared by an Environmental Engineer, which indicates the condition of the Premises and which sets forth no qualifications except those that are acceptable to SFG, in its sole discretion, and disclosing that the Premises are free of oil, underground storage tanks, asbestos, or asbestos containing material, lead paint and other Hazardous Substances, and which reports are otherwise in form and substance satisfactory to SFG; and

        (xiii)    <u>Comfort Letter</u>. SFG shall have received from Holiday Hospitality Franchising, Inc., the Franchisor under the Franchise Agreement, a comfort letter, satisfactory to SFG in SFG's sole discretion.

        (b)    <u>Legal Opinion</u>. SFG shall have received an opinion of local counsel in form and substance satisfactory to SFG.

        (c)    <u>Certification Regarding Chattels</u>. SFG shall have received a certification from the title insurer or an attorney acceptable to SFG (which shall be updated from time to time at Borrower's expense upon request by SFG) that a search of the public records disclosed no conditional sales contract, chattel mortgages, leases of personalty, financing statements or title retention agreements (except those in favor of SFG) which affect the Premises other than those agreements described herein.

        (d)    <u>Warranties and Representations True</u>. The warranties and representations and covenants of Borrower in the Loan Documents shall be true and correct on and as of the date of the advance with the same effect as if made on such date.

        (e)    <u>No Event of Default</u>. There shall be no Event of Default and no event or state of facts in existence which constitute or, with notice or passage of time or both would constitute an Event of Default under this Agreement or any of the Loan Documents.

    4.02    <u>Subsequent Advances</u>. SFG's obligation to make any advances after the first advance shall be subject to the following conditions:

23

(a)     <u>Prior Conditions Satisfied</u>.  All conditions precedent to the first advance shall have been satisfied as of the date of such subsequent advance.

(b)     <u>No Event of Default</u>.  There shall be no Event of Default and no event or state of facts in existence which constitute or, with notice or passage of time or both would constitute an Event of Default under this Agreement or any of the Loan Documents.

(c)     <u>No Damage</u>.  The Improvements shall not have been injured or damaged by fire or other casualty, unless SFG shall have received insurance proceeds sufficient in the judgment of Construction Inspector to effect the satisfactory restoration of the Improvements and to permit the completion thereof prior to the Completion Date.

(d)     <u>Receipt by SFG and Construction Inspector</u>.  Construction Inspector and SFG shall have received:

(i)     <u>Draw Request</u>.  A Draw Request complying with the requirements hereof, including those set forth in Paragraph 5.01 below;

(ii)     <u>Endorsement to Title Policy</u>.  An endorsement, as described in Paragraph 3.21 above, to the title insurance policy theretofore delivered, indicating that there has been no change in the state of title and containing no survey exceptions not theretofore approved by SFG, which endorsement shall expressly or by virtue of a proper "pending disbursements" clause increase the amount of coverage to the total amount of Loan proceeds theretofore advanced;

(iii)     <u>Current Survey</u>.  A current survey if required by the title insurer or SFG;

(iv)     <u>Certificates</u>.  At the option of the SFG, certificates from Borrower, Contractor and Construction Inspector to the effect that in their opinion, the construction of the Improvements theretofore performed was performed in accordance with the Plans, stating the estimated total costs of construction of the Improvements, stating the percentage of in-place construction of the Improvements attained by Borrower as of the date of the Draw Request mentioned in Subparagraph (d)(i) hereof, and stating that the remaining non-disbursed portion of the Loan allocated for such purpose is adequate to complete the construction of the Improvements;

(v)     [Intentionally Omitted];

(vi)     <u>Final Survey</u>.  In connection with the final draw, a final survey acceptable to SFG showing the as-built location of the completed Improvements.

(vii)     <u>Certificate of Borrower's Architect</u>.  In connection with the final draw, a certification of Borrower's Architect that the Improvements have been completed in

1659953 v08

accordance with the Plans and that the Improvements comply with all applicable Requirements and are in all respects (except for work to be performed by tenants) ready for occupancy.

(viii)   Payment of Costs.  Evidence satisfactory to SFG that all sums due in connection with the construction of the Improvements have been paid in full (or will be paid out of the funds requested to be advanced) and that no party claims any statutory or common law lien arising out of the construction of the Improvements or the supplying of labor, material and/or services in connection therewith.

## ARTICLE V
## METHOD OF DISBURSEMENT OF LOAN PROCEEDS

SFG agrees to make disbursements to Borrower against the Note up to the face amount thereof in accordance with the cost breakdown and estimate attached hereto as Exhibit "C" and by this reference made a part hereof, and in accordance with and subject to the following procedures:

5.01   Draw Request to be Submitted to SFG and Construction Inspector.

(a)   At such time as Borrower shall desire to obtain, subject to the other requirements hereof, a disbursement of any portion of the Construction Loan Proceeds, Borrower shall complete, execute and deliver to SFG and Construction Inspector a request for an advance on SFG's standard form certificate for payment (hereinafter referred to as a "Draw Request"), a copy of which form is attached hereto as Exhibit "D" and by this reference made a part hereof.

(b)   Where the Draw Request includes amounts to be paid to Contractor, such Draw Request shall be accompanied by requisitions from Contractor, to be paid from the proceeds of the advance (together with invoices relating to items covered by such requisitions, when requested by SFG or Construction Inspector).  All such requisitions shall show all subcontracts by name and trade, the total amount of each subcontract, and the amount theretofore paid to each subcontractor as of the date of the requisition form, and shall contain a suitable certificate by the Contractor of the accuracy of the same.  For the purposes of this reference, and like references elsewhere in this Agreement, the terms "subcontractor" and "subcontract" shall refer to substantial laborers, materialmen or suppliers, and contracts made by Contractor or subcontractors with them.

(c)   Where the Draw Request relates to items other than payments for work performed under the Construction Contract, there shall be included a statement of the purpose for which the advance is desired and/or invoices for the same, as SFG or Construction Inspector shall reasonably require.

(d)   In no event shall any advance allocable to a payment on account of the construction work (as distinguished from other costs and expenses incurred with reference to the Improvements, such as financing changes, insurance or attorney's fees) exceed an amount equal

25

to ninety percent (90%) of the total cost of Improvements theretofore completed, less the sum of all payments theretofore made against construction; provided, however, that an advance in excess thereof may be made hereunder for the purpose of making final payment of any balance due any subcontractor (including materialmen or suppliers within the term "subcontractor") after full and final completion of the work on the Improvements being done by such subcontractor, as certified by Construction Inspector, and delivery to SFG of such evidence as may be reasonably required by SFG's counsel to assure SFG that no party claims or has right to claim any statutory or common law lien arising out of such subcontractor's work or the supplying of labor, materials and/or services in connection therewith.

5.02    Notice, Frequency and Place of Disbursements.

(a)    At the option of SFG (i) each Draw Request shall be submitted to SFG and Construction Inspector at least five (5) business days prior to the date of the requested advance, (ii) disbursements shall be made no more frequently than monthly, and (iii) all disbursements shall be made at the principal office of SFG or Construction Inspector or at such other place as SFG and Construction Inspector may designate.

(b)    In the event any request for payment is submitted to SFG in the form of a change order, prior SFG approval will not be required where (i) on an individual threshold, the change order amount requested is the lesser of .5% of the loan amount or $50,000, and (ii) on an aggregate threshold, the change order amount requested is the lesser of 1% of the loan amount or $250,000.    In the event any change order request exceeds either threshold, change order notification to SFG is required before the change order draw can be approved or funds disbursed.

5.03    Deposit of Funds Advanced.    Borrower will immediately deposit all proceeds of the Loan advanced by SFG to Borrower in a separate and exclusive account at the main office of SFG, and all such proceeds shall be withdrawn and used solely for the purposes specified in the Draw Request, and Borrower shall upon SFG's request promptly furnish SFG with evidence of such deposit and use.

5.04    Advances to Construction Inspector.    At its option, SFG may make any or all advances for construction expenses directly to Construction Inspector for payment purposes specified in the Draw Request, in an appropriately designated special bank account and the execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable authorization so as to advance the proceeds of the Loan.    Any advances made under this Paragraph 5.04 will be joint payee advances between Construction Inspector and Borrower and shall be secured by the Security Instrument as fully as if made directly to Borrower.

5.05    Advances to  Title Insurer or to Others.    At its option, SFG may make any or all advances through the title insurance company which issues SFG's title insurance policy, and any portion of the Loan so disbursed by SFG shall be deemed disbursed as of the date on which such title insurance company receives such disbursement.    At its option, SFG may make advances of portions of the Loan proceeds to any person to whom SFG in good faith determines payment is due and any portion of the Loan so disbursed by SFG shall be deemed disbursed as of the date on

which the person to whom payment is made receives the same joint advances. The execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable authorization to so advance the proceeds of the Loan. No further authorization from Borrower shall be necessary to warrant such direct advances and all such advances shall satisfy pro tanto the obligations of SFG hereunder and shall be secured by the Security Instrument as fully as if made directly to Borrower.

5.06    Advances Do Not Constitute a Waiver. No advance of the proceeds of the Loan shall constitute a waiver of any of the conditions of SFG's obligation to make further advances nor, in the event Borrower is unable to satisfy any such conditions, shall any such advance have the effect of precluding SFG from thereafter declaring such inability to be an Event of Default under Article VI hereof.

5.07    Partial Releases of Condominium Units.

A.    Requirements. Except as may be otherwise provided in the Earnest Money Escrow Agreement with Condominium Deposit Holder, provided that (i) SFG has approved all of the Condominium Documents and (ii) all of the Condominium Requirements and Condominium Pre-Sale Requirements have been satisfied, SFG shall partially release its interest under the Security Instrument with respect to each Condominium Unit for a Condominium Approved Sale, upon the satisfaction of all of SFG's conditions with respect to each release, including, without limitation, the following:

(i)    there shall be no Event of Default or Potential Default under any of the Loan Documents;

(ii)    no less than ten (10) business days prior to the sale of Condominium Unit,

Borrower shall deliver notice to SFG (a "Closing Notice") which Closing Notice shall:

(a)    specifically identify the Condominium Unit to be conveyed;

(b)    state the purchase price to be paid therefore, specifically identifying the portion thereof applicable to the Condominium Unit and the portion applicable to any upgrades; and

(c)    be accompanied by a copy of the draft closing statement;

(iii)    SFG has received evidence satisfactory to SFG that the Condominium Unit and the portion of the Property remaining subject to the Security Instrument (the "Remaining Parcel") (a) are legally created tracts under all applicable laws and regulations, (b) will have the benefit of such easements and rights of way in, over, and through the Condominium Unit as are, in SFG's judgment, necessary or desirable to provide or assure access to and from, utility service to, parking for (if required by applicable law), and common wall maintenance and support to the Remaining Parcel, as applicable, (c) complies, either by virtue of the location of the

1659951 v08

improvements or with a duly issued variance, with all applicable setback requirements, and (d) constitutes a separately assessed parcel(s) for tax and assessment purposes, or the local governmental equivalent thereof, as verified by SFG in its absolute sole discretion;

(iv)     Title Company has issued appropriate endorsements to the Title Policy acceptable to SFG which provide that, notwithstanding the release of the applicable Condominium Unit from the Security Instrument, the lien of the Security Instrument will continue to be a first lien upon the Remaining Parcel, subject to no exceptions to title other than those shown on the title insurance policy issued as prescribed herein. SFG will require such title endorsement all to be issued immediately with respect to Condominium Units sold during the month;

(v)      Borrower has satisfied such other terms and conditions to such release and reconveyance as SFG may reasonably require;

(vi)     Borrower has paid all of SFG's out-of-pocket costs associated with the release of SFG's interest in the applicable Condominium Unit, including, without limitation, the cost of SFG's title policy endorsements referred to above, escrow costs, and SFG's reasonable legal fees and costs incurred in connection therewith or, if the same have not been determined by SFG as of such sale, within ten (10) days after SFG's demand;

(vii)    SFG shall have received payment, in immediately available funds, of the following:

      (a)     Prior to SFG's receipt of the Condominium Preliminary Stage Principal Paydown, in connection with each Condominium Approved Sale SFG shall receive (i) a non-refundable processing fee of $100 per Condominium Unit to be released, and (ii) the Condominium Net Sales Proceeds, which amount shall be applied to amounts then due and owing to SFG under the Loan, in such order as SFG elect in its sole and absolute discretion and then to the outstanding principal balance of the Loan until the Loan is paid in full, and which payments shall be in addition to all other payments required to be made by Borrower under the Loan Documents.

      (b)     Following SFG's receipt of the Condominium Preliminary Stage Principal Paydown, in connection with each Condominium Approved Sale SFG shall receive a non-refundable processing fee of $100 per Condominium Unit to be released

      (c)     Prepayments received by SFG in accordance with this Section 5.07A(vii) shall not be subject to any Prepayment Fee;

(viii)   Every sale of a Condominium Unit shall be an arms length sale to a third party unaffiliated with Borrower or any Guarantor and shall be pursuant to Condominium Purchase Agreements and applicable requirements of law and shall be in form previously approved by SFG without material change. When Borrower enters into a Condominium Purchase Agreement with respect to any Condominium Unit, Borrower (1) shall promptly deliver a copy of the fully executed Condominium Purchase Agreement to SFG, (2) shall observe, perform and comply with all of the provisions of the Condominium Purchase Agreement and of all other instruments

and documents related to or entered into in connection with the Condominium Purchase Agreement, (3) shall not do any act or suffer or permit any event to occur that would render impossible or impracticable (x) the timely performance of any condition on Borrower's part to be performed under the Condominium Purchase Agreement, or (y) the satisfaction of any condition to the obligation of the purchaser under the Condominium Purchase Agreement to purchase such Condominium Unit, and (4) shall deposit the Condominium Deposits with the Condominium Deposit Holder. Upon request of SFG, Borrower shall furnish SFG with satisfactory evidence with respect to satisfaction of the foregoing;

(ix) All Condominium Purchase Agreements, together with the Condominium Deposits, shall be assigned to SFG pursuant to that certain Collateral Assignment of Purchase Agreements with an Irrevocable Power of Attorney of even date herewith together with any ancillary security and/or control agreements as may be requested by SFG in its good faith sole discretion;

(x) SFG has approved all other Project and Condominium-related documents, including but not limited to any covenants, conditions and restrictions, association documents, reciprocal easement agreements and other Project-related and property owner's association documents, proposed retail sales contracts, project disclosures, property owners' association budgets, bylaws, form of deed and any new Condominium Plat or Condominium Plans; and

B. Adjustments to Condominium Minimum Sales Price. The Condominium Minimum Sales Price shown on Exhibit "H" for unsold Condominium Units may be adjusted, in SFG's sole but reasonable discretion. To the extent that any undisbursed portions of the Loan are determined by SFG in its sole discretion to be allocated to a Condominium Unit, then, following SFG's release of such Condominium Unit, Borrower shall have no right to receive, and SFG shall have no obligation to disburse such undisbursed portions of the Loan.

## ARTICLE VI
## EVENTS OF DEFAULT

6.01 An Event of Default shall at SFG's option be deemed to have occurred hereunder if:

(a) Event of Default Under Other Loan Documents. Any Event of Default, default or event of default shall occur under and as defined in the Note or any of the other Loan Documents, including the Guaranty; or

(b) Breach of This Agreement. Borrower shall breach or fail to perform, observe or meet any covenant, condition or agreement made in this Agreement or any other Loan Document; provided that for any breach or failure (other than a payment default) that is capable of being cured is not cured within thirty (30) days after notice to Borrower of such breach or failure; or

1659953 v08

(c) <u>Abandonment or Cessation of Construction</u>. The work on the Improvements shall cease and not be resumed within thirty (30) days thereafter or shall be abandoned; or

(d) <u>Event of Default Under Guaranty</u>. Guarantor shall fail to comply with any of his obligations under the Guaranty; or

(e) <u>Denial of Inspection</u>. SFG or its representatives or the Construction Inspector shall not be permitted, at all reasonable times, to enter upon the Premises to inspect the Improvements and all materials, fixtures and articles used or to be used therein, and to examine all detailed plans, shop drawings, specifications and other records which relate to the Improvements, or if Borrower shall fail to furnish to SFG or Construction Inspector, at SFG's or Construction Inspector's place of business, or to SFG's authorized representative, when requested, copies of such plans, shop drawings, specifications and records; or

(f) <u>Improper Materials</u>. Any of the materials, fixtures, machinery, equipment, articles and/or personal property used in the Improvements shall not fully comply with the Plans; or

(g) <u>Failure to Complete Improvements</u>. The Improvements, in the sole but reasonable judgment of SFG, are not or cannot reasonably be, completed on or before the Completion Date; or

(h) <u>False Representation or Warranty</u>. At any time any representation, warranty or statement made by Borrower or Guarantor in any of the Loan Documents shall be incorrect or misleading in any material respect; or

(i) <u>Substantial and/or Material Adverse Change in Financial Status of Borrower or Guarantor</u>. Any substantial or material change of an adverse nature shall occur in the financial status of Borrower or its member or Guarantor, or any of them, from that reported and delivered to SFG heretofore which, in SFG's reasonable opinion, would materially impair the ability of Borrower or Guarantor to comply with all their obligations hereunder and under the terms and conditions of the Loan Documents; or

(j) <u>Default Under Management/Franchise Agreement</u>. Any Event of Default under the Franchise Agreement or the Management Agreement; or

(k) <u>Default in Agreements</u>. Any default or Event of Default by Borrower under the Franchise Agreement, the Management Agreement, the Master Declaration, any Condominium Purchase Agreements, the Agreement for Sale, or the Redevelopment Plan.

(l) <u>Filing of Liens Against the Premises</u>. Any lien for labor, materials or taxes (except for ad valorem taxes not yet due and payable) or otherwise shall be filed against the Premises and not be released (by payment, bonding or otherwise) within the earlier of sixty (60)

1659953 v08

days after the date of filing thereof or forty (40) days after Borrower receives actual notice thereof; or

(m)     Litigation Against Borrower or Guarantor.  Any judgment shall be entered against Borrower or Guarantor, which, based upon evidence that SFG has received, could reasonably be expected to substantially impair the ability of Borrower or Guarantor to perform each and every one of their respective obligations under and by virtue of the Loan Documents; or

(n)     Levy Upon the Premises.  A levy shall be made under any process on, or a receiver be appointed for, the Premises or any part thereof or any other property of Borrower or Guarantor, which levy is not released within thirty (30) days from the date it is made or properly contested pursuant to Section 3.5 of the Mortgage; or

(o)     Bankruptcy of Borrower or Guarantor.   Borrower or Guarantor shall commit any act of bankruptcy; or any proceedings under bankruptcy laws or other debtor-relief or similar laws shall be brought against Borrower or Guarantor, or Borrower or Guarantor shall file for or take advantage of any form of reorganization or arrangement under any bankruptcy law or other debtor-relief or similar law or proceeding; or

(p)     Assignment for the Benefit of Creditors.    Borrower or Guarantor shall make a general assignment for the benefit of creditors; or

(q)     Materials Not Free and Clear.  Borrower shall execute (other than to SFG) any conditional bill of sale, chattel mortgage, security agreement or other security instrument covering any materials, fixtures, machinery, equipment, articles and/or personal property intended to be incorporated in the Improvements or the appurtenances thereto, or placed in the Improvements, or if a financing statement publishing notice of such security instrument shall be filed, or if any of such materials, fixtures, machinery, equipment, articles and/or personal property shall not be purchased so that the ownership thereof will vest unconditionally in Borrower, free from encumbrances other than to SFG, on delivery at the Premises, or if Borrower shall not produce to SFG upon demand the contracts, bills of sale, statements, receipted vouchers or agreements, or any of them, under which Borrower claims title to any thereof, notwithstanding the language in item 3.24; or

(r)     Failure to Disprove Event of Default.   SFG shall reasonably suspect the occurrence of any Event of Default and Borrower, upon the request of SFG, shall fail to provide evidence reasonably satisfactory to SFG that such Event of Default has not in fact occurred.

(s)     Cross-Default.    Borrower shall fail to pay at maturity, or within any applicable period of grace, any obligation for borrowed money or credit received or other indebtedness with SFG, or fail to observe or perform any material term, covenant or agreement contained in any agreement with SFG by which it is bound, evidencing or securing any such borrowed money or credit received or other indebtedness with SFG for such period of time as would permit (assuming the giving of appropriate notice is required) the holder or holders thereof or any obligations issued thereunder to accelerate the maturity thereof.

1659953 v08

(t)     Death of a Guarantor.  At its option, SFG may deem the death of all of the Guarantors as an Event of Default under this Loan Agreement.

6.02    Plural "Borrower" or "Guarantor".  If more than one person or entity constitutes, collectively, Borrower, all the foregoing provisions with reference to Borrower shall be construed to refer to each such person or entity.  For example, if there are two parties who are, collectively, Borrower, and one shall become bankrupt, then SFG shall have the right to invoke the remedies above set forth applicable to the bankruptcy of Borrower.  If Borrower is a limited liability company, all of the foregoing provisions with reference to Borrower shall be construed to apply to each of the members thereof.   Likewise, if more than one person or entity constitutes Guarantor, all of the foregoing provisions with reference to Guarantor shall be construed to refer to each such person or entity.

## ARTICLE VII
## REMEDIES OF SFG

Upon the occurrence of any Event of Default, SFG, at its option and in addition to and not in lieu of the remedies provided for in the other Loan Documents, shall be entitled to exercise any one or more of the following remedies.

7.01    Event  of  Default Constitutes Event  of  Default Under Other Loan  Documents.  Borrower agrees that an Event of Default hereunder shall at the option of SFG constitute an Event of Default under each of the other Loan Documents, thereby entitling SFG (a) to exercise any of the various remedies therein provided, including but not limited to the acceleration of the indebtedness evidenced by the Note and the foreclosure of the Security Instrument or sale of the Premises under the powers contained therein, and (b) cumulatively to exercise all other rights, options and privileges provided by law or in equity.

7.02    Right of SFG to Assume Possession and Complete    Development.     Borrower agrees, upon the request of SFG, to vacate the Premises and to permit SFG:

(a)     to enter into possession of the Premises;

(b)     to perform or cause to be performed any and all work and labor necessary to complete the Improvements in accordance with the Plans, with such modifications thereto as SFG shall deem to be necessary or desirable;

(c)     to employ security watchmen to protect the Premises; and

(d)     to disburse that portion of the Loan proceeds and/or Borrower's Equity Contribution not previously disbursed to the extent necessary to complete the Improvements and construction of the Improvements in accordance with the Plans, and if such completion requires a larger sum than the remaining undisbursed portion of the Loan, to disburse such additional funds, all of which funds so disbursed by SFG shall be deemed to have been disbursed to Borrower and

1659953 v0R

shall be secured by the Security Instrument. For this purpose, Borrower hereby constitutes and appoints SFG its true and lawful attorney-in-fact with full power of substitution to complete the Improvements in the name of Borrower, and hereby empowers SFG, as said attorney, to take all actions deemed by SFG to be necessary in connection therewith including, but not limited to, the following: to use any funds of Borrower including without limitation Borrower's Equity Contribution any balance which may be held by SFG as security or in escrow and any funds which may remain unadvanced hereunder for the purpose of completing the Improvements in the manner called for by the Plans; to make such additions, changes and corrections in the Plans as SFG shall deem to be reasonably necessary or desirable; to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for said purposes; to pay, settle or compromise all existing or future bills and claims which are or may be liens against the Premises, or may be necessary or desirable for the completion of the Improvements or the clearance of title to the Premises; to execute all applications and certificates in the name of Borrower which may be required by any Requirement or governmental authority, or the Construction Contract or any other contract; and to do any and every other act with respect to the Improvements and the operation of the Premises which Borrower may do in its own behalf. It is understood and agreed that this power of attorney shall be deemed to be a power coupled with an interest which cannot be revoked by death or otherwise. As said attorney-in-fact, SFG shall also have power (but not the duty) to prosecute and defend all actions or proceedings in connection with the Improvements and to take such action and require such performance as it deems necessary. In accordance therewith Borrower hereby assigns and transfers to SFG all sums to be advanced hereunder including Borrower's Equity Contribution, any sums held by SFG as security or in escrow and any funds held by Borrower relating to the Premises or Improvements, conditioned upon the use of said sums for the completion of the Improvements and the performance of Borrower's obligations under the Loan Documents.

## ARTICLE VIII
## GENERAL CONDITIONS

The following conditions shall be applicable throughout the term of this Agreement.

8.01  <u>Rights of Third Parties</u>. All conditions of the obligations of SFG hereunder, including the obligation to make advances, are imposed solely and exclusively for the benefit of SFG and its successors and assigns and no other person or entity shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that SFG will refuse to make advances in the absence of strict compliance with any or all thereof, and no other person or entity shall, under any circumstances, be deemed to be a beneficiary of such conditions, any and all of which may be freely waived in whole or in part by SFG at any time if in its sole discretion it deems it desirable to do so. In particular, SFG makes no representations and assumes no obligations as to third parties concerning the quality of the Improvements or the absence therefrom of defects. Borrower shall and does hereby indemnify SFG from and against any liability, claims or losses resulting from the disbursement of the proceeds of the Loan or from the condition of the Premises whether related to the quality of construction or otherwise and whether arising during or after the term of the Loan. This provision shall survive the repayment

1659953 v08

of the Loan and shall continue in full force and effect so long as the possibility of such liability, claims or losses exists.

8.02    Evidence of Satisfaction of Conditions.    Any condition of this Agreement which requires the submission of evidence of the existence or non-existence of a specified fact or facts implies as a condition the existence or non-existence, as the case may be, of such fact or facts, and SFG shall, at all times, be free independently to establish to its reasonable satisfaction and in its reasonable discretion such existence or non-existence.

8.03    All Matters Satisfactory to SFG.    All proceedings taken in connection with the transactions provided for herein, all surveys, appraisals and documents required or contemplated by the Loan Documents, and the persons responsible for the execution and preparation thereof, Contractor, all subcontractors, leases, bonds, guaranties and policies of insurance, shall be reasonably satisfactory to SFG, and SFG and SFG's shall receive copies of all documents which they may request in connection therewith.

8.04    Payment of Construction Costs.    SFG shall be under no duty or obligation to anyone to ascertain whether Borrower has used or will use the proceeds of the Loan for the payment of bills incurred by Borrower in connection with the purposes for which disbursements are to be made hereunder as herein provided.  Payments of all bills for labor and materials in connection with the Improvements shall be the responsibility of Borrower, and SFG's sole obligation shall be to advance the proceeds of the Loan subject to and in accordance with this Agreement.

8.05    No Agency.    SFG is not the agent or representative of Borrower, and Borrower is not the agent or representative of SFG, and nothing in this Agreement shall be construed to make SFG liable to anyone for goods delivered to or labor or services performed upon the Premises or for debts or claims accruing against Borrower.  Nothing herein shall be construed to create a relationship ex contractor or ex delicto between SFG and anyone supplying labor or materials or services for or to the Premises.

8.06    No Partnership or Joint Venture.    Nothing herein, nor any of the provisions of any of the Loan Documents, nor the acts of the parties hereto, shall be construed to create a partnership or joint venture between Borrower and SFG.  Borrower and SFG hereby expressly deny that it is their purpose or intent that any relationship between them, as partners or joint venturers, shall exist.

8.07    No Assignment by Borrower.    This Agreement may not be assigned by Borrower without the written consent of SFG.  If SFG approves an assignment hereof by Borrower, SFG shall be entitled to make advances to such assignee and such advances shall be evidenced by the Note and be secured by the Security Instrument.  Borrower shall remain liable for payment of all sums advanced hereunder before and after such assignment, and Guarantor shall remain liable under the Guaranty.

1659953 v08

8.08   <u>Advances to Borrower's Successor</u>.   In the event Borrower or any subsequent owner of the Premises shall part with or be in any manner whatsoever deprived of its title to the Premises, SFG may, at its option, continue to make advances under this Agreement to such person or persons as may succeed to the title to the Premises. All sums so advanced shall be deemed advances under this Agreement, and shall be evidenced by the Note and secured by the Security Instrument. However, nothing contained in this paragraph shall or shall be deemed to limit or act in derogation of any restriction on transfer or assignment of the Premises impressed upon Borrower under any of the Loan Documents.

8.09   <u>Assignment by SFG</u>.   The Note, the Security Instrument, this Agreement and any and all of the other Loan Documents may be endorsed, assigned, and transferred in whole or part by SFG, and any such holder and assignee of all or part of same shall succeed to and be possessed of the rights of SFG under all of the same to the extent transferred and assigned.

8.10   <u>Entire Agreement</u>.   This Agreement contains the entire terms of the agreement between Borrower and SFG covering the disbursement of the Loan by SFG and the use of the Loan by Borrower.

8.11   <u>Notices</u>.   Any and all notices, elections or demands permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice, election or demand, and shall be delivered personally, by receipted commercial courier service, or sent by registered or certified United States mail, postage prepaid, return receipt requested to the other party at the address set forth below, or at such other address as may have heretofore been designated in writing. The date of personal delivery or three (3) days after postmark of date of mailing, as the case may be, shall be the date of such notice, election or demand. For the purposes of this Agreement:

The address of SFG is:

Specialty Finance Group LLC
Three Ravinia Drive, Suite 230
Atlanta, Georgia 30346
Attn: Dilip R. Petigara

The address of Borrower is:

DOC Milwaukee, LP
2222 Second Street
Fort Myers, Florida 33901
Attn: Phillip E. Hugh

With a copy to:

Brenda J. Yurick, Esq.
Yurick Law Offices, P.C.

1659953 v03

550 Brooktree Road, Suite 302
Wexford, Pennsylvania 15090

    8.12   <u>Successors and Assigns Included in Parties</u>.  Whenever in this Agreement any party hereto is named or referred to, the heirs, executors, legal representatives, successors, successors-in-title and assigns of such party shall be included, and all covenants and agreements contained in this Agreement by or on behalf of Borrower or by or on behalf of SFG shall bind and inure to the benefit of their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether so expressed or not; provided, however, that nothing contained in this Agreement shall or shall be deemed to limit or act in derogation of any restriction on transfer or assignment of the Premises impressed upon Borrower in any of the Loan Documents.

    8.13   <u>Headings</u>.  The headings of the articles, paragraphs and subparagraphs of this Agreement are for the convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

    8.14   <u>Invalid Provisions to Affect No Others</u>.  If fulfillment of any provision hereof or any transaction related hereto at the time performance of such provisions shall be due, shall involve transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity; and if any clause or provision herein contained operates or would prospectively operate to invalidate this Agreement in whole or in part, then such clause or provision only shall be held for naught, as though not herein contained, and the remainder of this Agreement shall remain operative and in full force and effect.

    8.15   <u>Number and Gender</u>.  Whenever the singular or plural number, or the masculine, feminine or neuter gender is used herein, it shall equally include the other.

    8.16   <u>Amendments</u>.  Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

    8.17   <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the substantive, and not the conflict, laws of the State of Georgia.

    8.18   <u>Consent to Jurisdiction</u>. BORROWER AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF GEORGIA OR ANY FEDERAL COURT SITTING THEREIN AND CONSENTS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT AND THE SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON BORROWER BY MAIL AT THE ADDRESS SPECIFIED IN ITEM 8.11. BORROWER HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR

1659953 v08

HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR
THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.

8.19    Time of Essence.    Time is of the essence of this Agreement and in the
performance of all the covenants and agreements contained herein.

8.20    SFG's Liability.    No action shall be commenced by Borrower for any claim against
SFG under the terms of this Agreement unless notice thereof specifically setting forth the claim
of Borrower, shall have been given to SFG within fifteen (15) days after the occurrence of the
event or omission which Borrower alleges gave rise to such claim, and failure to give such notice
shall constitute a waiver of any such claim.  The liability of SFG to Borrower for any breach of
the terms of this Agreement by SFG shall not exceed a sum equal to (i) the amount which SFG
shall have failed to advance in consequence of a breach by SFG of its obligations under this
Agreement, (ii) interest thereon at the rate payable by Borrower for advances which Borrower is
to receive hereunder, computed from the date when the advance is, in fact, made by SFG.  Upon
the making of any such payment by SFG to Borrower, the portion of such payment attributable to
subparagraph (i) above shall be treated as an advance under this Agreement, in the same fashion
as any other advance under the terms of this Agreement.

8.21    Sums Held by SFG.    SFG shall not, except to the extent required by law, have any
obligation to pay interest on any sums from time to time deposited by Borrower with SFG, or a
depository designated by SFG at SFG's sole discretion, pursuant to this Agreement, including,
without limitation, the Borrower's Equity Contribution.

8.22    Additional Stipulations.    Attached hereto as Exhibit "E" and by this reference
being made a part hereof are certain Additional Stipulations to this Agreement.  To the extent, if
any, that any provision of any Additional Stipulation conflicts with or is contrary to any other
provision of this Agreement, the provision of the Additional Stipulation shall govern and control.

8.23    Jury Trial Waiver.    Borrower hereby waives, to the fullest extent permitted by
Applicable Law, the right to trial by jury in any action, proceeding or counterclaim filed by any
party, whether in contract, tort or otherwise, relating directly or indirectly to this Deed or any acts
or omissions of the Grantor in connection therewith or contemplated thereby.

**[SIGNATURES ON THE FOLLOWING PAGE]**

1659953 v08

IN WITNESS WHEREOF, Borrower and SFG have executed this Agreement under seal on the date first above written.

BORROWER:

DOC MILWAUKEE, LP, a Delaware limited
partnership

By: DOC Milwaukee II, LLC, a Delaware
limited liability company, its general
partner

    By: Development Opportunity Corporation,
       a Delaware corporation, its manager


By: _____
Name: Phillip E Hugh
Title: President


SFG:

SPECIALTY FINANCE GROUP LLC, a
Georgia limited liability company


By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, Borrower and SFG have executed this Agreement under seal on the date first above written.

BORROWER:

DOC MILWAUKEE, LP, a Delaware limited
partnership

By:  DOC Milwaukee II, LLC, a Delaware
     limited liability company, its general
     partner

     By:  Development Opportunity Corporation,
          a Delaware corporation, its manager


          By: _____
          Name: _____
          Title: _____


SFG:

SPECIALTY FINANCE GROUP LLC, a
Georgia limited liability company


By:  _____
Name:  _____ DILIP R. PETIGARA _____
Title:  _____ SVP _____


1659953 v02

AGREEMENT OF GUARANTOR

For value received, the undersigned (being the "Guarantor" identified and referred to in the within and foregoing Loan Agreement), jointly and severally, if more than one, does hereby unconditionally guarantee the performance of all obligations of Borrower under the terms of this Loan Agreement, including the repayment of all sums advanced by SFG hereunder. Nothing contained herein shall be construed to limit or modify in any respect the obligations of the undersigned under and pursuant to the "Guaranty" referred to in this Loan Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Loan Agreement under seal on the date first above written.

_____(SEAL)
Phillip E. Hugh

_____(SEAL)
John W. Economou

_____(SEAL)
Steve J. Economou

AGREEMENT OF GUARANTOR

For value received, the undersigned (being the "Guarantor" identified and referred to in the within and foregoing Loan Agreement), jointly and severally, if more than one, does hereby unconditionally guarantee the performance of all obligations of Borrower under the terms of this Loan Agreement, including the repayment of all sums advanced by SFG hereunder. Nothing contained herein shall be construed to limit or modify in any respect the obligations of the undersigned under and pursuant to the "Guaranty" referred to in this Loan Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Loan Agreement under seal on the date first above written.

_____(SEAL.)
Phillip E. Hugh

_____(SEAL)
John W. Economou

_____(SEAL)
Steve V Economou

# Exhibit
# A

Part 2 of 2

## EXHIBIT "A"

## DESCRIPTION OF LAND

Parcel I: The North 20 feet of Lot 9 except the West 40 feet for street in Block 58 in the Plat of Milwaukee, together with the vacated alley adjoining said lot, all being in the Northeast ¼ of Section 29, Township 7 North, Range 22 East. Said land being in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

2006 Tax Key No.: 392-1303-100-0
2007 Tax Key No.: 392-2561-100-2

Parcel II: Lots 5, 6 and 7 except the West 40 feet for street in Block 58 in Subdivision of Lot 10, together with the vacated alley adjoining said lot, all being in the Northeast ¼ of Section 29, Township 7 North, Range 22 East.  Said land being in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

2006 Tax Key No.: 392-0501-100-9
2007 Tax Key No.: 392-2561-100-2

Parcel III: Lot 3, except for street in Block 58 in Subdivision of Lot 10 all being in the Northeast ¼ of Section 29, Township 7 North, Range 22 East.  Said land being in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

2006 Tax Key No.: 392-0502-100-4
2007 Tax Key No.: 392-2561-100-2

Parcel IV: Lots 1 and 2 except for street in Block 58 in Subdivision of Lot 10, together with the vacated alley adjoining said lot, all being in the Northeast ¼ of Section 29, Township 7 North, Range 22 East.  Said land being in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

2006 Tax Key No.: 392-0503-100-X
2007 Tax Key No.: 392-2561-100-2

Parcel V: The West 20 feet of Lot 1, except for street, Block 58, together with the vacated alley adjoining said lot, all being in the Plat of Milwaukee, in the Northeast ¼ of Section 29, Township 7 North, Range 22 East.  Said land being in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

2006 Tax Key No.: 392-1292-100-2
2007 Tax Key No.: 392-2561-100-2

Parcel VI: Lot 1 of Certified Survey Map No. 7322 recorded in the office of the Register of Deeds for Milwaukee County, Wisconsin, on November 7, 2003, as Document No. 8674474,

1659953 v08

being a division of part of Lot 1 and all of Lots 6, 7, 8 and 9, Block 58, in Plat of the Town of Milwaukee on the East Side of the River, together with the vacated alley adjoining said lots, all being in the Northeast ¼ of the Northeast ¼ of Section 29, Township 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

2006 Tax Key No.: 392-2571-0
2007 Tax Key No.: 392-2561-100-2

Parcel VII: Lot 1 of Certified Survey Map No. 7323 recorded in the office of the Register of Deeds for Milwaukee County, Wisconsin, on November 7, 2003, as Document No. 8674476, being a division of part of Lot 1 and all of Lots 2, 3, 4 and 5, Block 58, in Plat of the Town of Milwaukee on the East Side of the River, together with the vacated alley adjoining said lots, all being in the Northeast ¼ of the Northeast ¼ of Section 29, Township 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin. Except that portion conveyed in Quit Claim Deed recorded as Document No. 9144996.

2006 Tax Key No.: 392-2561-6
2007 Tax Key No.: 392-2561-100-2

Parcel VIII: Non-exclusive easement for vehicular and pedestrian access under that certain Access Easement recorded in the office of the Register of Deeds for Milwaukee County, Wisconsin as Document No. 8713596, corrected by Document No. 8785725, as amended by Amendment to Access Easement recorded as Document No. 9144997.

Parcel IX: Units 1 through 31, inclusive, in the Residences on Water Condominium created by a "Declaration of Condominium" recorded on October 16, 2007, in the Office of the Register of Deeds for Milwaukee County, Wisconsin, as Document No. 9509922, and any amendments thereto, and by its Condominium Plat. Said land being in the City of Milwaukee, County of Milwaukee, Wisconsin.

EXHIBIT "B"

PLANS AND SPECIFICATIONS

(SEE ATTACHED)

CIVIL ENGINEERING DRAWINGS

| CE 1 | DEMOLITION PLAN | 11/21/2006 |
| CE 2 | SITE PLAN | 11/21/2006 |
| CE.3 | EROSION CONTROL PLAN | 11/21/2006 |
| CE.4 | GRADING & PAVING PLAN | 11/21/2006 |
| CE.5 | UTILITY PLAN | 11/21/2006 |
| CE 6 | SITE DETAILS | 11/21/2006 |

SITE/SURVEY DRAWINGS:

| SP-1 | SURVEY PLAN | 8/20/2007 |
| SP-2 | CONSTRUCTION SITE FENCE / BARRICADE PLAN | 8/20/2007 |

ARCHITECTURAL

| | COVER SHEET | 8/20/2007 |
| A0.1 | SITE PLAN, NOTES, AND ABBREVIATIONS | 8/20/2007 |
| A0.2 | ADA NOTES AND DETAILS | 8/20/2007 |
| A0.3 | FIRE EGRESS PLANS | 8/20/2007 |
| A0.3A | FIRE EGRESS PLANS | 8/20/2007 |
| A2.1 | FIRST FLOOR PLAN | 8/20/2007 |
| A2.2 | SECOND FLOOR PLAN | 8/20/2007 |
| A2.3 | THIRD FLOOR PLAN | 8/20/2007 |
| A2.4 | FOURTH FLOOR PLAN | 8/20/2007 |
| A2.5 | FIFTH FLOOR PLAN | 8/20/2007 |
| A2.6 | SIXTH, EIGHTH AND TENTH FLOOR PLANS | 8/20/2007 |
| A2.7 | SEVENTH AND NINTH FLOOR PLANS | 8/20/2007 |
| A2.8 | ELEVENTH AND THIRTEENTH FLOOR PLANS | 8/20/2007 |
| A2.9 | TWELFTH FLOOR PLAN | 8/20/2007 |
| A2.10 | FOURTEENTH FLOOR PLAN | 8/20/2007 |
| A2.11 | LOWER AND LOFT FLOOR PLAN | 8/20/2007 |
| A2.12 | UPPER ROOF PLAN | 8/20/2007 |
| A2.13 | ROOM FINISH SCHEDULE AND NOTES | 8/20/2007 |
| A2.14 | ROOM FINISH SCHEDULE AND NOTES | 8/20/2007 |
| A2.15 | DOOR / FRAME SCHEDULE | 8/20/2007 |
| A2.16 | DOOR / FRAME SCHEDULE | 8/20/2007 |
| A2.17 | DOOR / ELEVATIONS, DETAIL AND NOTES | 8/20/2007 |
| A3.1 | EXTERIOR ELEVATIONS | 8/20/2007 |
| A3.2 | EXTERIOR ELEVATIONS | 8/20/2007 |
| A3.3 | EXTERIOR ELEVATIONS | 8/20/2007 |
| A3.4 | ENLARGED EXTERIOR ELEVATIONS | 8/20/2007 |
| A3.5 | BUILDING SECTIONS | 8/20/2007 |
| A3.6 | BUILDING SECTIONS | 8/20/2007 |
| A3.7 | BUILDING SECTIONS | 8/20/2007 |
| A3.8 | BUILDING SECTIONS | 8/20/2007 |
| A3.9 | BUILDING SECTIONS | 8/20/2007 |
| A3.10 | WALL SECTIONS | 8/20/2007 |
| A3.11 | WALL SECTIONS | 8/20/2007 |
| A3.12 | WALL SECTIONS | 8/20/2007 |
| A3.13A | WALL SECTIONS | 8/20/2007 |
| A3.13B | WALL SECTIONS | 8/20/2007 |
| A3.14 | WALL SECTIONS | 8/20/2007 |
| A3.15 | WALL SECTIONS | 8/20/2007 |
| A3.16 | BUILDING SECTION | 8/20/2007 |
| A4.1 | ENLARGED FLOOR PLANS - FOURTH FLOOR | 8/20/2007 |
| A4.2 | ENLARGED FLOOR PLANS - FOURTH FLOOR | 8/20/2007 |
| A4.3 | ENLARGED FLOOR PLANS - GROUND & ROTUNDA ABOVE FOURTH FLOOR PLANS | 8/20/2007 |
| A5.1 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.2 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.3 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.4 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.5 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.6 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.7 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.8 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.9 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.10 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.11 | INTERIOR ELEVATIONS | 8/20/2007 |
| A5.12 | INTERIOR ELEVATIONS | 8/20/2007 |
| A5.13 | INTERIOR ELEVATIONS | 8/20/2007 |
| A5.14 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.15 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |

| | | |
|---|---|---|
| A5.16 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.17 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.18 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A5.19 | ENLARGED PLAN AND INTERIOR ELEVATIONS | 8/20/2007 |
| A6.1 | REFLECTED CEILING PLAN - PARKING & FIRST FLOOR | 8/20/2007 |
| A6.2 | REFLECTED CEILING PLAN - SECOND FLOOR | 8/20/2007 |
| A6.3 | REFLECTED CEILING PLAN - THIRD FLOOR | 8/20/2007 |
| A6.4 | REFLECTED CEILING PLAN - FOURTH FLOOR | 8/20/2007 |
| A6.5 | REFLECTED CEILING PLAN - FIFTH FLOOR | 8/20/2007 |
| A6.6 | REFLECTED CEILING PLAN - SIXTH, EIGHTH AND TENTH FLOOR | 8/20/2007 |
| A6.7 | REFLECTED CEILING PLAN - SEVENTH AND NINTH FLOOR | 8/20/2007 |
| A6.8 | REFLECTED CEILING PLAN - ELEVENTH AND THIRTEENTH FLOOR | 8/20/2007 |
| A6.9 | REFLECTED CEILING PLAN - TWELFTH FLOOR | 8/20/2007 |
| A6.10 | REFLECTED CEILING PLAN - FOURTEENTH FLOOR | 8/20/2007 |
| A7.1 | ENLARGED STAIRWELL PLANS | 8/20/2007 |
| A7.2 | ENLARGED STAIRWELL PLANS | 8/20/2007 |
| A7.3 | ENLARGED STAIRWELL PLANS | 8/20/2007 |
| A7.4 | CIRCULATION SECTIONS | 8/20/2007 |
| A7.5 | CIRCULATION SECTIONS | 8/20/2007 |
| A7.6 | CIRCULATION SECTION DETAILS | 8/20/2007 |
| A8.1 | WALL TYPE DETAILS | 8/20/2007 |
| A8.2 | WALL TYPE DETAILS | 8/20/2007 |
| A8.3 | ENLARGED WALL TYPE DETAILS | 8/20/2007 |
| A8.4 | ENLARGED WALL TYPE DETAILS | 8/20/2007 |
| A8.5 | ENLARGED WALL TYPE DETAILS | 8/20/2007 |
| A8.6 | ENLARGED WALL TYPE DETAILS | 8/20/2007 |
| A8.7 | ENLARGED WALL TYPE DETAILS | 8/20/2007 |
| A8.8 | ENLARGED WALL TYPE DETAILS | 8/20/2007 |
| A8.9 | ENLARGED WALL TYPE DETAILS | 8/20/2007 |
| A9.1 | PARTION TYPE DETAILS | 8/20/2007 |
| A10.1 | FINISH PLAN - FIRST FLOOR | 8/20/2007 |
| A10.2 | FINISH PLAN - SECOND FLOOR | 8/20/2007 |
| A10.3 | FINISH PLAN - THIRD FLOOR | 8/20/2007 |
| A10.4 | FINISH PLAN - FOURTH FLOOR | 8/20/2007 |
| A10.5 | FINISH PLAN - FIFTH FLOOR | 8/20/2007 |
| A10.6 | FINISH PLAN - SIXTH FLOOR | 8/20/2007 |
| A10.7 | FINISH PLAN - SEVENTH FLOOR | 8/20/2007 |
| A10.8 | FINISH PLAN - EIGHTH FLOOR | 8/20/2007 |
| A10.9 | FINISH PLAN - NINTH FLOOR | 8/20/2007 |
| A10.10 | FINISH PLAN - TENTH FLOOR | 8/20/2007 |
| A10.11 | FINISH PLAN - ELEVENTH FLOOR | 8/20/2007 |
| A10.12 | ENLARGED FINISH FLOOR PLANS - FOURTH FLOOR | 8/20/2007 |
| A10.13 | ENLARGED FINISH FLOOR PLANS - FOURTH FLOOR | 8/20/2007 |
| A10.14 | ENLARGED FINISH FLOOR PLANS - FOURTH FLOOR | 8/20/2007 |
| A10.15 | ENLARGED FINISH FLOOR PLANS - FIFTH FLOOR | 8/20/2007 |
| A10.16 | ENLARGED FINISH FLOOR PLANS - SIXTH FLOOR | 8/20/2007 |
| A10.17 | ENLARGED FINISH FLOOR PLANS - ELEVENTH FLOOR | 8/20/2007 |
| A10.18 | ENLARGED FINISH FLOOR PLANS - ELEVENTH FLOOR | 8/20/2007 |
| A10.19 | ENLARGED FINISH FLOOR PLANS - ELEVENTH FLOOR | 8/20/2007 |
| A10.20 | ENLARGED FINISH FLOOR PLANS - FOURTEENTH FLOOR | 8/20/2007 |
| A10.21 | ENLARGED FINISH FLOOR PLANS - FOURTEENTH FLOOR | 8/20/2007 |
| A10.22 | ENLARGED FINISH FLOOR PLANS - FOURTEENTH FLOOR | 8/20/2007 |
| A10.23 | ENLARGED FINISH FLOOR PLANS - LOFT | 8/20/2007 |
| A11.1 | FURNITURE PLAN - FIRST FLOOR | 8/20/2007 |
| A11.2 | NOT INCLUDED | 8/20/2007 |
| A11.3 | NOT INCLUDED | 8/20/2007 |
| A11.4 | FURNITURE PLAN - FOURTH FLOOR | 8/20/2007 |
| A11.5 | FURNITURE PLAN - FIFTH FLOOR | 8/20/2007 |
| A11.6 | FURNITURE PLAN - SIXTH, EIGHTH AND TENTH FLOOR | 8/20/2007 |
| A11.7 | FURNITURE PLAN - SEVENTH AND NINTH FLOOR | 8/20/2007 |
| A11.8 | FURNITURE PLAN - ELEVENTH AND THIRTEENTH FLOOR | 8/20/2007 |
| A11.9 | FURNITURE PLAN - TWELFTH FLOOR | 8/20/2007 |
| A11.10 | FURNITURE PLAN - FOURTEENTH FLOOR | 8/20/2007 |
| A11.11 | FURNITURE PLAN - LOWER ROOF AND LOFT FLOOR | 8/20/2007 |
| A11.12 | ENLARGED FURNITURE PLAN - FOURTH FLOOR | 8/20/2007 |
| A11.13 | ENLARGED FURNITURE PLAN - FIFTH FLOOR | 8/20/2007 |
| A11.14 | ENLARGED FURNITURE PLAN - SIXTH FLOOR | 8/20/2007 |

FOUNDATION:

| | | |
|---|---|---|
| F1.1 | STRUCTURAL SPECIFICATIONS | 6/19/2007 |
| F2.1 | CASSION PLAN | 6/18/2007 |
| F2.2 | FOUNDATION PLAN | 6/19/2007 |

| F3.1 | CAISSON PLAN | 6/20/2007 |
| F3.2 | DETAILS | 6/21/2007 |
| F3.3 | DETAILS | 6/22/2007 |
| F3.4 | FOUNDATION DETAILS | 6/23/2007 |

PRECAST STRUCTURAL:

| | | COVER SHEET | 9/4/2007 |
| | 0 | COVER SHEET | 9/4/2007 |
| | 1 | FOUNDATION EMBED & ANCHOR BOLT LAYOUT | 9/4/2007 |
| 001A | | FOUNDATION DETAILS | 9/4/2007 |
| 001B | | FOUNDATION DETAILS | 9/4/2007 |
| | 2 | FIRST FLOOR FRAMING PLAN | 9/4/2007 |
| | 3 | SECOND LEVEL FRAMING PLAN | 9/4/2007 |
| | 4 | THIRD LEVEL FRAMING PLAN | 9/4/2007 |
| | 5 | FOURTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 6 | FIFTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 7 | SIXTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 8 | SEVENTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 9 | EIGHTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 10 | NINTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 11 | TENTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 12 | ELEVENTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 13 | TWELFTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 14 | THIRTEENTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 15 | FOURTEENTH LEVEL FRAMING PLAN | 9/4/2007 |
| | 16 | LOWER ROOF FRAMING PLAN | 9/4/2007 |
| | 17 | HIGH ROOF FRAMING PLAN | 9/4/2007 |
| | 18 | INTERIOR ELEVATIONS | 9/4/2007 |
| | 19 | INTERIOR ELEVATIONS | 9/4/2007 |
| | 20 | INTERIOR ELEVATIONS | 9/4/2007 |
| | 21 | NORTH ELEVATION (INTERIOR) | 9/4/2007 |
| | 22 | NORTH ELEVATION (EXTERIOR) | 9/4/2007 |
| | 23 | WEST ELEVATION (INTERIOR) | 9/4/2007 |
| | 24 | WEST ELEVATION (EXTERIOR) | 9/4/2007 |
| | 25 | PARTIAL SOUTH AND EAST ELEVATIONS | 9/4/2007 |
| | 26 | SOUTH ELEVATION AT RAMP & MISC. ELEVATIONS | 9/4/2007 |
| | 27 | INTERIOR SECTION AT LINE D | 9/4/2007 |
| | 28 | EAST ELEVATION | 9/4/2007 |
| | 29 | WEST STAIR PLANS | 9/4/2007 |
| | 30 | WEST STAIR PLANS | 9/4/2007 |
| | 31 | WEST STAIR PLANS | 9/4/2007 |
| | 32 | WEST STAIR SECTIONS | 9/4/2007 |
| | 33 | WEST STAIR ELEVATIONS | 9/4/2007 |
| | 34 | WEST STAIR ELEVATIONS | 9/4/2007 |
| | 35 | EAST STAIR PLANS | 9/4/2007 |
| | 36 | EAST STAIR PLANS | 9/4/2007 |
| | 37 | EAST STAIR PLANS | 9/4/2007 |
| | 38 | EAST STAIR PLANS | 9/4/2007 |
| | 39 | EAST STAIR PLAN AND SECTION | 9/4/2007 |
| | 40 | EAST STAIR ELEVATIONS | 9/4/2007 |

MECHANICAL:

| M1.0 | SYMBOLS AND ABBREVIATIONS | 10/10/2007 |
| M2.1 | GROUND FLOOR H.V.A.C PLAN | 10/10/2007 |
| M2.2 | SECOND FLOOR H.V.A.C PLAN | 10/10/2007 |
| M2.3 | THIRD FLOOR H.V.A.C PLAN | 10/10/2007 |
| M2.4 | FOURTH FLOOR H.V.A.C PLAN | 10/10/2007 |
| M2.5 | BASE 5TH, 7TH AND 9TH FLOOR H.V.A.C PLAN | 10/10/2007 |
| M2.6 | BASE 6TH, 8TH AND 10TH FLOOR H.V.A.C PLAN | 10/10/2007 |
| M2.7 | ELEVENTH FLOOR H.V.A.C. PLAN | 10/10/2007 |
| M2.8 | TWELFTH FLOOR H.V.A.C PLAN | 10/10/2007 |
| M2.9 | THIRTEENTH FLOOR H.V.A.C PLAN | 10/10/2007 |
| M2.10 | FOURTEENTH FLOOR H.V.A.C PLAN | 10/10/2007 |
| M2.11 | LOWER ROOF H.V.A.C PLAN | 10/10/2007 |
| M2.12 | UPPER ROOF H.V.A.C PLAN | 10/10/2007 |
| M3.0 | RISERS | 10/10/2007 |
| M3.1 | SCHEDULES | 10/10/2007 |
| M3.2 | SCHEDULES AND GENERAL NOTES | 10/10/2007 |
| M3.3 | SECTIONS | 10/10/2007 |
| M3.4 | DETAILS AND SHAFT DETAILS | 10/10/2007 |
| M3.5 | SECTIONS | 10/10/2007 |
| M3.6 | SPECIFICATIONS, DIAGRAMS & DETAILS | 10/10/2007 |

| M3.7 | VENTILATION SCHEDULES | 10/10/2007 |

**PLUMBING:**

| P1.0 | SYMBOLS AND ABBREVIATIONS | 10/10/2007 |
| P2.0 | BASEMENT PLUMBING PLAN | 10/10/2007 |
| P2.1 | GROUND FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.2 | SECOND FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.3 | THIRD FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.4 | FOURTH FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.5 | TYPICAL FIFTH, SEVENTH AND NINTH FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.6 | SIXTH, EIGHTH AND TENTH FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.7 | ELEVENTH FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.8 | TWELFTH FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.9 | THIRTEENTH FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.10 | FOURTEENTH FLOOR PLUMBING PLAN | 10/10/2007 |
| P2.11 | ROOF PLUMBING PLAN | 10/10/2007 |
| P2.12 | UPPER ROOF PLUMBING PLAN | 10/10/2007 |
| P3.0 | SCHEDULES, NOTES AND DETAILS | 10/10/2007 |
| P3.1 | SCHEDULES, NOTES AND DETAILS | 10/10/2007 |
| P3.2 | WATER ISOMETRIC RISER DIAGRAM BASEMENT AND FIRST FLOOR | 10/10/2007 |
| P3.3 | WATER ISOMETRIC RISER DIAGRAM 4TH THRU 9TH FLOOR | 10/10/2007 |
| P3.4 | WATER ISOMETRIC RISER DIAGRAM 10TH THRU 14TH FLOOR | 10/10/2007 |
| P3.5 | SANITARY AND VENT ISOMETRIC RISER DIAGRAM BSMT. THRU 2ND FLOOR | 10/10/2007 |
| P3.6 | SANITARY AND VENT ISOMETRIC RISER DIAGRAM 3RD FLOOR | 10/10/2007 |
| P3.7 | SANITARY AND VENT ISOMETRIC RISER DIAGRAM 4TH THRU 14TH FLOOR | 10/10/2007 |
| P3.8 | SANITARY AND VENT ISOMETRIC RISER DIAGRAM 4TH THRU 14TH FLOOR | 10/10/2007 |

**ELECTRICAL:**

| E1.0 | SYMBOLS AND ABBREVIATIONS | 10/10/2007 |
| E2.1 | GROUND FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.2 | SECOND FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.3 | THIRD FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.4 | FOURTH FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.5 | TYPICAL 5TH, 7TH AND 9TH FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.6 | TYPICAL 6TH, 8TH AND 10TH FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.7 | ELEVENTH FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.8 | TWELFTH FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.9 | THIRTEENTH FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.10 | FOURTEENTH FLOOR ELECTRICAL PLAN | 10/10/2007 |
| E2.11 | LOWER ROOF ELECTRICAL PLAN | 10/10/2007 |
| E2.12 | UPPER ROOF ELECTRICAL PLAN | 10/10/2007 |
| E3.1 | HOTEL TYPICAL STUDIO TYPE 1-4, ELECTRICAL PLAN | 10/10/2007 |
| E3.2 | HOTEL TYPICAL ONE BEDROOM TYPE 5 DELUXE CONFERENCE, ELECTRICAL PLAN | 10/10/2007 |
| E3.3 | CONDO ONE BEDROOM UNIT TYPE 1-4, ELECTRICAL PLAN | 10/10/2007 |
| E3.4 | CONDO TWO BEDROOM UNIT TYPE 1 & 2 DELUXE 1, ELECTRICAL PLAN | 10/10/2007 |
| E3.5 | CONDO TYPICAL THREE BEDROOM UNITS TYPE 1 & 2, ELECTRICAL PLAN | 10/10/2007 |
| E3.6 | CONDO TYPICAL THREE BEDROOM UNITS TYPE 3, ELECTRICAL PLAN | 10/10/2007 |
| E5.1 | SINGLE LINE RISER DIAGRAM | 10/10/2007 |
| E5.2 | NOTES & DETAILS | 10/10/2007 |
| E6.1 | SCHEDULES | 10/10/2007 |
| E6.2 | SCHEDULES | 10/10/2007 |
| E6.3 | SCHEDULES | 10/10/2007 |
| E6.4 | SCHEDULES | 10/10/2007 |
| E6.5 | SCHEDULES | 10/10/2007 |
| E7.1 | SCHEDULES, NOTES AND DETAILS | 10/10/2007 |

**FIRE PROTECTION:**

| FP2.1 | GROUND FLOOR FIRE PROTECTION PLAN | 10/10/2007 |
| FP2.2 | SECOND FLOOR FIRE PROTECTION PLAN | 10/10/2007 |
| FP2.3 | THIRD FLOOR FIRE PROTECTION PLAN | 10/10/2007 |
| FP2.4 | FOURTH FLOOR FIRE PROTECTION PLAN | 10/10/2007 |
| FP2.5 | TYPICAL FIFTH - TENTH FLOOR FIRE PROTECTION PLAN | 10/10/2007 |
| FP2.6 | ELEVENTH FLOOR FIRE PROTECTION PLAN | 10/10/2007 |
| FP2.7 | TWELFTH FLOOR FIRE PROTECTION PLAN | 10/10/2007 |
| FP2.8 | THIRTEENTH FLOOR FIRE PROTECTION PLAN | 10/10/2007 |
| FP2.9 | FOURTEENTH FLOOR FIRE PROTECTION PLAN | 10/10/2007 |
| FP3.0 | NOTES & DETAILS | 10/10/2007 |
| FP3.1 | RISER DIAGRAM | 10/10/2007 |

**EXHIBIT "C"**

**COST BREAKDOWN**

**See attached**

1654953 v03

Staybridge Suites, Private Residence and Retail Mixed-Use Project
Preliminary Development Matrix
12-01-06

| Estimated Figures | Component | Floor Level | Parking | SF Total | SF Public/Service | SF Market | PSF Cost | Construction Cost | Total Units | Deeded Parking Units | PSF Lease Rate | On/Off Site Parking Revenue | Net Operating Income | Total Condo & Deeded Parking Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Project Cost** | | | | | | | | | | | | | | |
| Demolition and Site Preparation | | grade | | 26,216 | | | $1 | $26,216 | | | | | | |
| Environmental Remediation/Spoils Removal | | grade | | 26,216 | | | $3 | $78,648 | | | | | | |
| Off-Site Parking | | off-site | 80 | | | | | $0 | | | | | | |
| Sub-Grade Services | 1 | sub-level | | 8,392 | | | $40 | $335,680 | | | | | | |
| Ground Floor Services | 2 | 1 | | 3,405 | 3,405 | | $70 | $238,350 | | | | | $260,000 | |
| Ground Floor Retail | 3 | 1 | | 13,400 | | 13,400 | $40 | $536,000 | | | | | $428,800 | |
| *Total On-Site Parking Capacity:* | 4 | | | 38,964 | | 36,200 | | | | | | | | |
| On Site Parking Income $10.50/day net per stall | 4 | 2 | 76 | 19,482 | | | $40 | $779,280 | | | | $43,800 | $43,800 | |
| On Site Parking Income $10.50/day net per stall | 4 | 3 | 10 | 19,482 | | | $40 | $779,280 | | | | $166,440 | $166,440 | |
| Staybridge Suites Extended Stay Hotel | 5 | 4 -10 | 38 | 114,128 | 17,119 | 97,009 | $70 | $7,988,960 | 130 | | | | $2,450,000 | |
| Private Residence Condominiums (see detail) | 6 | 11- 14th | | 63,028 | 14,028 | 49,000 | $100 | $6,302,800 | 28 | 28 | $32 | | | $15,051,840 |
| Green Roof | 7 | roof | | 9,460 | | | $30 | $283,800 | | | | | | |
| Walks/Pavers/Streetscape | 8 | 4 | | 1,776 | 1,776 | | $13 | $23,088 | | | | | | |
| Landscape Area | 8 | grade | | 3,500 | 3,500 | | $2 | $7,000 | | | | | | |
| Sub-Total Construction Cost | | | | | | | | $17,379,102 | | | | | | |
| Contingency (5% of Construction Cost) | | | | | | | | $868,955 | | | | | | |
| **Totals:** | | | 156 | 250,777 | 39,828 | 195,609 | | $18,248,057 | 158 | 28 | | $210,240 | $3,349,040 | $15,051,840 |

| | |
|---|---|
| Design/Engineering | $790,000 |
| Project and Construction Management | $1,750,000 |
| F.F.& E and Exterior Signage | $2,450,000 |
| Financing and Interest Carry | $1,450,000 |
| Real Estate Tax | $100,000 |
| Pre-Opening Cost | $225,000 |
| Land Value [$87/sf] (25,635) | $2,230,245 |
| Other Soft Cost | $650,000 |
| Sub - Project Cost: | $9,645,245 |
| Total Project Cost: | $27,893,302 |

| | |
|---|---|
| Condo and Parking Sales | $15,051,840 |
| Total Sales: | $15,051,840 |
| Net Project Liability (equity / debt): | -$12,841,462 |
| Total Net Rental Operating Income (NOI) | $3,349,040 |
| Hotel/Retail Asset Valuation - Fully Stabilized 10% (CAP) | $33,490,400 |

Milwaukee, WI

## EXHIBIT "D"

[Add Form]

CERTIFICATE FOR PAYMENT
Dated: _____
For Period Ending: _____

TO:        Specialty Finance Group LLC
              Three Ravinia Drive, Suite 230
              Atlanta, Georgia 30346
              Attn: Dilip R. Petigara

              Broadlands Financial Group, LLC
              Construction Risk Management Department
              789 East Lancaster Avenue
              Suite 200
              Villanova, PA 19085
              Attn: _____

FROM:      _____
              _____
              _____
              Attn: _____

In accordance with the Loan Agreement between DOC Milwaukee, LP ("Borrower") and Specialty Finance Group LLC ("SFG"), dated _____ __, 2007 ("the Loan Agreement"), Borrower does hereby request that $_____ be advanced and credited Borrower. The amount requested above is determined as follows:

    1.     Current payment due [Contractor]      $

    2.     Current payment due for [Development
           Costs]                      $

    3.     Total amount requested          $

The undersigned Borrower does hereby certify that, as of the date hereof: all items for which previous certificates were issued and advances received have been paid; and that all labor and materials for which this advance will pay, and for which previous advances have been paid, have gone into the construction of or other approved expenses for the Improvements (as defined in the Loan Agreement); and that the warranties and representations of Borrower in the Loan Agreement are hereby ratified and confirmed; and that there is no Event of Default under the

Loan Agreement; and that there are no offsets, counterclaims or defenses against the indebtedness which is the subject of the Loan Agreement or any instrument evidencing, securing or otherwise concerning such indebtedness; and that there are no liens of record against the Premises (as defined in the Loan Agreement) and arising out of the supplying of labor, material and/or services in connection with the construction thereon, other than Contested Liens (as defined in the Loan Agreement); and that no party other than Borrower and SFG owns or claims, or has a right to claim, any interest in or lien or encumbrance on, the Project (except for ad valorem taxes not due and payable and liens or rights to liens to be dissolved upon payment of the advance hereby requested).

Signed, sealed and delivered in the presence of the undersigned this __ day of _____, _____.

BORROWER:

DOC MILWAUKEE, LP, a Delaware limited partnership

_____

Official Witness

By: DOC Milwaukee II, LLC, a Delaware
limited liability company, its general
partner

_____

Notary Public

[NOTARIAL SEAL]

By: Development Opportunity Corporation,
a Delaware corporation, its manager

By: _____

Name:_____

Title:_____

## EXHIBIT "E"

## ADDITIONAL STIPULATIONS TO LOAN AGREEMENT

NONE

1659953 v03

**EXHIBIT "F"**

**LEASES**

NONE

## EXHIBIT "G"

### COMMITMENT LETTER

(SEE ATTACHED)

Specialty Finance Group LLC
Three Ravinia Drive, Suite 230
Atlanta, GA 30346



Sent via electronic mail: phillhugh@doc-corp.com, bwrick@dochotelsinc.com, ofriedman@bankersbank.com

March 29, 2007.

Mr. Phillip E. Hugh
President
DOC Corp.
2222 Second Street
Fort Myers, Florida 33901

Re:    Loan not-to-exceed $20,900,000 to be secured by a first priority mortgage
       and security interest in land, building, and improvements known as the
       Staybridge Suites Hotel and The Residences on Water Condominiums
       located at Water Street & Juneau Avenue in Milwaukee, WI and assignment
       and of all security deposits, rents and leases.

Dear Mr. Hugh:

This letter (together with all exhibits and attachments hereto, the "Commitment") is a commitment by Specialty
Finance Group LLC, a Georgia limited liability company, or its designee ("Lender") to make available loan
financing to you in a total cumulative amount not to exceed $20,900,000 (one or more loans herein the "Loan")
on the following terms and conditions:

1.  **BORROWER:**                   DOC Milwaukee LP ("Borrower").

2.  **LOAN AMOUNT AND**             The Loan will be evidenced by one or more secured promissory notes
    **USE OF PROCEEDS:**            (singularly and collectively referred to as the "Note") in a total
                                    cumulative amount not to exceed $20,900,000. The proceeds from
                                    the Loan shall be used solely for the purpose of the construction of a
                                    mixed-use property to be known as the Staybridge Suites Hotel and
                                    The Residences on Water Condominiums and associated retail space
                                    located at Water Street & Juneau Avenue in Milwaukee, WI ("Subject
                                    Property").

3.  **MANDATORY LOAN**              The Loan will be reduced to $12,500,000 prior to the conversion to the
    **REDUCTION:**                  Permanent Period.

4.  **INTEREST RATE:**              Construction Period:
                                    Prior to an event of default, the aggregate sum of advances under the
                                    credit facility or Loan Amount shall bear and accrue interest at an
                                    annual rate equal to the 30-day LIBOR, as published in the Federal
                                    Reserve Bank H15 Statistical Releases, in effect from time to time,
                                    plus three hundred and thirty-five (335) basis points. Each change in
                                    the published LIBOR will become effective on the first day of the
                                    month following the day of such change.

                                    Permanent Period:
                                    Prior to an event of default, the aggregate sum of advances under the

DOC Milwaukee LP
Pipeline #60232



04/02/2007  10:30AM

From: DOC CORP                    239 334 2147          04/02/2007 09:21     #029 P.003/017

credit facility or Loan Amount shall bear and accrue interest at an annual rate equal to the 30-day LIBOR, as published in the Federal Reserve Bank H15 Statistical Releases, in effect from time to time, plus three hundred and thirty-five (335) basis points. Each change in the published LIBOR will become effective on the first day of the month following the day of such change.

**5. MATURITY – CONSTRUCTION PERIOD:**

30 months from loan closing.

**6. MATURITY – PERMANENT PERIOD:**

30 months from the end of the Construction Period.

**7. LOAN AMORTIZATION OR REPAYMENT:**

- Construction Period: Interest shall be payable monthly in arrears following closing and continuing on the last day of each month thereafter calculated upon the then outstanding principal balance under the credit facility.

- Permanent Period: Principal and interest shall be payable monthly in arrears, beginning one month following the conversion from the Construction Period. The principal shall be equal to an amount necessary to amortize the then outstanding principal balance at the interest rate as determined under paragraph 4 for the permanent period based on an amortization of twenty-five (25) years. At Maturity, a final installment of all unpaid principal plus accrued unpaid interest shall be due and payable.

**8. COLLATERAL:**

The Loans will be secured by a first mortgage and security interest in the land, building and improvements located at Water Street and Juneau Avenue in Milwaukee, WI to house the Staybridge Suites Hotel, the Residences on Water Condominiums and associated retail space.

**9. ADDITIONAL COLLATERAL:**

The Loans will be secured by additional collateral in the form of a Letter of Credit ("LOC") drawn on immediately available funds of a U.S. investment grade institution in the amount of $8,000,000. Lender reserves the right to draw on the LOC in the event that the Borrower fails to reduce the loan amount to $12,500,000 as stipulated under paragraph 3, or fails to secure an executed lease for the retail portions of the Improvements satisfactory to the Lender.

**10. GUARANTEES:**

Phillip E. Hugh, John W. Economou and Steve J. Economou will jointly and severally guarantee the loan 100% during its entire term. All guarantors shall individually be referred to as "Guarantor" and collectively as "Guarantors" under this Commitment Letter.

**11. PREPAYMENT:**

The Loan may be prepaid during the first 24 months of the Construction Period with a 1% prepayment fee of the outstanding principal balance. Following this period, the loan may be prepaid, in whole or not in part without a prepayment fee.

The Mandatory Loan Reduction to $12,500,000 is not subject to a prepayment fee.

**12. REQUIRED DEBT SERVICE COVERAGE**

The Borrower and the property is obligated to achieve the following financial test:

DOC Milwaukee LP
Pipeline #50232

04/02/2007   10:30AM

From: DOC CORP                    239 334 2147          04/02/2007 09:22    #028 P.004/017

**RATIO
AND COMMITMENT
CONDITIONS:**

(A) A minimum debt service coverage ratio ("DSCR"), which shall be measured on a rolling four-quarter basis commencing the end of the 24th month following the opening of the hotel (beginning of the "Testing Period") and shall be tested and listed on a compliance certificate by the Borrower with each financial report submission. Each Testing Period (each quarter end following the first Testing Period shall test the trailing twelve months) shall meet the following minimum DSCR requirement:

| Testing Period | Minimum DSCR Requirement |
|---|---|
| 1-3 | 1.15x |
| 4-6 | 1.25x |
| 7-9 | 1.35x |

DSCR means, for the trailing twelve (12) month period means the ratio of (a) Cash Flow for such period to (b) Debt Service for such period. The terms *"Cash Flow"* and *"Debt Service"* shall have the following meaning: Cash Flow means, for any period, an amount equal to (a) the sum of (i) pro tax income, (ii) interest expense, (iii) all non-cash amounts in respect of depreciation and amortization, (iv) Non-Recurring Expenses, as deemed acceptable to Lender in Lender's sole and absolute discretion, (v) extraordinary management fees, as deemed acceptable to Lender in Lender's sole and absolute discretion, and (vi) all operating lease or rent expense less (b) all Non-Recurring Income, all as reflected on the Borrower's financial statement. *"Debt Service"* means all of the (i) interest, (ii) current portion of principal on any loans, (iii) current portion of any capital lease obligations, and (iv) all operating lease or rent expense. Measurement will be on a rolling four-quarter basis.  In the event that the DSCR requirements are not met for any Testing Period, Borrower shall be required within five (5) days from receiving notice of such from Lender to, do one of the following:

    i.    Pay down the principal amount of the Loan so that the remaining outstanding balance and amortization schedule shall meet the required DSCR for the current Testing Period; or

    ii.    Escrow funds with Lender, or a depository designated by Lender in Lender's sole discretion, equal to the amount that would be required so that the remaining outstanding balance and amortization schedule would meet the required DSCR for the current Testing Period.  Funds will be applied to the principal if loan does not meet required DSCR at the end of the next reporting cycle.

Said funds shall be held by Lender for the benefit of Lender until such time as the DSCR requirements have been met at a subsequent Testing Period.

(B) Borrower will fund two percent (2.0%) and three percent (3.0%) of gross revenues in years 1 and 2 respectively and four percent (4.0%) thereafter into an FF&E Reserve through monthly deposits each year beginning the opening of the hotel through the Maturity of the Loan.

All such FF&E Deposits:

(i) shall be held by SFG or a depository designated by SFG in SFG's sole discretion, in trust, with no obligation to segregate such payments;

DOC Milwaukee LP
Pipeline #00232

04/02/2007   10:30AM

From:DOC CORP                    239 334 2147        04/02/2007 09:24    #028 P.005/017

(ii) shall be held in trust to be applied by SFG for the purposes for which made (as hereinabove provided) subject, however, to the security interest granted SFG therein pursuant to the Security Instrument; and

(iii) shall not be subject to the direction or control of Borrower.

Monies will be released to Borrower for reimbursement of repair or replacement of any items that would normally qualify as long-term capital improvements in a normal GAAP accounting method. No funds will be disbursed from the FF&E Reserve for normal repair and maintenance items. The Borrower, at Lender's sole discretion, shall have the ability to draw upon the account for qualified items to include the replacement of furniture, fixtures and equipment (excluding any expenses related to normal repair and maintenance of these items) until the balance of the FF&E Reserve reaches a zero balance. Examples of qualified items include but are not limited to beds, televisions, dressers, desks, etc.

(C) No condition of default exists or has existed with any other Lenders.

**13. COMMITMENT FEE OR LOAN FEE:**

Upon issuance of this Commitment Letter, the Good Faith Deposit of $75,000 shall be credited to the Commitment Fee of $156,750. Upon acceptance and execution of this Commitment Letter, the Borrower shall submit an additional Commitment Fee payment of $81,750 to Lender. Upon issuance of this Commitment Letter, the Commitment Fee shall be deemed fully earned by Lender. If any Loan does not close because of a default of Lender, the Commitment Fee shall be returned to Borrower less any applicable expenses.

**14. DOCUMENTATION OF LOAN:**

The documents used to evidence and to secure the Loan shall be those documents customarily used by Lender in connection with loan transactions of the type, character, and size contemplated herein and/or such other documents in form and substance as Lender and its attorneys, in their sole discretion, may deem necessary or desirable for Lender's protection (collectively, the Loan Documents) and shall include, but not be limited to, the following Loan Documents executed by Borrower:

(a)  Promissory Note(s);
(b)  Commercial Mortgage(s), Deed(s) of Trust, or Leasehold Mortgage as applicable (the "Mortgage");
(c)  Loan Agreement (the "Loan Agreement");
(d)  Such UCC financing statements as Lender may require;
(e)  Guaranty Agreements, joint and several;
(f)  Such assignments of warranties, management agreement(s), subordination agreement(s) and other contracts and/or permits related to the Secured Property as Lender may require; and
(g)  All other Loan Documents required by the Lender, including, without limitation (i) such attorney's opinions as Lender may deem necessary opining as to the enforceability of and Borrower's qualifications and ability to enter into the Loans contemplated herein in the jurisdiction in which the Secured Property is located.

**15. CROSS-DEFAULT:**

An event of default in the Loan contemplated by this Commitment shall constitute an event of default in all of Borrower's other loans with Lender. An event of default in any of Borrower's other loans with Lender or its affiliates or under any commitment shall constitute an event of default in

DOC Milwaukee LP
Pipeline #50232

04/02/2007   10:30AM

the Loan contemplated by this Commitment.

**16. THIRD-PARTY CONSTRUCTION MANAGEMENT COMPANY:**

A third-party construction management company shall be engaged by the Lender, paid for by the Borrower, to do a plan and cost review, to review and approve the plans and specifications, and all change orders, the Budget, all permits, the Construction Contract, all subcontracts, the Architect's contract, the Engineer's contract, all requests for loan disbursements, the construction of the Improvements, and all other aspects of the construction of the Improvements through the end of the Construction Period. As of the date of this Commitment Letter, the third-party management company engaged by Lender is Broadlands Financial Group. To assist in Borrower's estimation of costs for the above-mentioned services, a quote from Broadlands financial Group has been obtained for and provided to Borrower by the Lender.

**17. INTEREST RESERVE:**

The project budget shall contain an adequate interest reserve to be estimated by Lender prior to loan closing and to be maintained by Lender or designee of Lender. The loan documents shall provide that, upon terms and conditions specified by the Lender, in the Lender's sole discretion and provided no default has occurred under the Loan Documents, Lender may make disbursements of loan proceeds from this Interest Reserve line item on a monthly basis directly to Lender to pay the interest accrued on the loan; provided, however, if Lender elects not to pay interest with Loan Proceeds allocated to the Interest Reserve, Borrower shall pay all interest accrued on the loan as and when due from Borrower's funds other than Loan Proceeds. Interest on the funds in the Interest Reserve account shall accrue to the benefit of Borrower.

**18. HAZARDOUS AND REGULATED SUBSTANCES; ENVIRONMENTAL SITE ASSESSMENT STANDARDS:**

Upon acceptance of this Commitment by Borrower, Borrower shall complete and return to Lender a Customer Environmental Questionnaire ("CEQ") in the form attached hereto for each parcel comprising all, or a portion, of the Secured Property.

**19. COSTS AND EXPENSES:**

Lender shall not be put to any expense whatsoever in connection with the issuance of this Commitment or the closing of the Loan contemplated hereby. Borrower shall pay directly or reimburse Lender on demand for all costs and expenses incurred in connection with the preparation for and the closing of the Loan, including reasonable attorneys' fees, whether the Loan is closed or not, including any additional costs relating to the transaction, including all third-party reports and consulting services, which are subsequently determined to be due.

**20. COMPLIANCE WITH LAWS:**

The Loan contemplated hereunder, as well as the Secured Property and the proposed and actual use thereof, must comply with all laws, statutes, ordinances, rules and regulations of all governmental authorities having jurisdiction over such matters and Borrower certifies that the Secured Property is in compliance and will comply with all applicable laws, ordinances, rules and regulations, and with all covenants, conditions, easements and restrictions to which the Secured Property is subject. As of the date hereof and at the time of the Closing and at the time of any disbursement by Lender, there must be no action or proceeding pending before any court, quasi-judicial or administrative body or regulatory agency or unexpired right to appeal any decision relating to the validity of the Loan, the Secured Property or Borrower's proposed or actual use of the Secured Property or proceeding, investigation, condemnation or other action of any nature commenced, pending, or, to the knowledge of Borrower, threatened against or affecting the Secured Property or

DOC Milwaukee LP
Pipeline #00232

04/02/2007   10:30AM

Borrower which has not been disclosed in detail in writing to Lender and which may involve the possibility of any judgment or liability not fully covered by insurance, or materially or adversely affect Borrower's interest in the Secured Property or any of the assets of Borrower or Borrower's right to carry on business as now conducted, or affect the continued employment of any officer, or director of Borrower.

**21. PROHIBITION AGAINST SECONDARY FINANCING:**

This Commitment is conditioned upon there existing at the time of the Loan, and during the term of the Loan, except as explicitly approved by Lender, no secondary or supplementary financing, no other lien, charge, or security interest upon or affecting the Secured Property and no agreement to grant any such interest other than liens or charges which will be discharged from the proceeds of the Loan.

**22. NON-ASSIGNABILITY AND THIRD PARTY BENEFICIARY RIGHTS:**

Neither this Commitment nor the proceeds of the Loan contemplated herein shall be assignable by Borrower without the prior written consent of Lender and any attempt at such assignment without Lender's prior written consent shall be void. All third-party beneficiary rights of Borrower are expressly negated.

**23. ASSIGNMENT AND/OR PARTICIPATION BY LENDER:**

Lender reserves the right to assign, transfer, participate, pledge, hypothecate or encumber, or any combination thereof, all or any part of Lender's interest in this Commitment or any of the collateral and security instruments and documents mentioned herein without Borrower's consent. Without limiting the generality of the foregoing, Borrower acknowledges that the Loan offered by Lender may subsequently be a part of Lender's Loan assignment, participation or securitization program. Borrower agrees to cooperate in good faith with Lender's reasonable requests relating to the assignment, participation or securitization program process and requirements and agrees and acknowledges that all information relating to Borrower and the Loan may be made available by Lender to the other participants in any such loan assignment, participation or securitization and Borrower agrees to assist Lender in completing any documents necessary to accomplish any such transfer and/or assignment, participation or securitization transaction. Borrower hereby authorizes Lender to provide any information regarding Borrower in all reports required as part of a loan assignment, participation or securitization program or by any governmental body-regulating Lender.

**24. SEVERABILITY AND WAIVER OF RIGHTS OF LENDER:**

If Lender chooses to waive any covenant, paragraph, or provision of this Commitment, or if any covenant, paragraph, or provision of this Commitment is construed by a court of competent jurisdiction to be invalid or unenforceable, it shall not affect the applicability, validity, or enforceability of the remaining covenants, paragraphs, or provisions. The failure or delay of Lender to insist upon strict performance of any term, condition, or requirement of this Commitment, or to exercise any right herein conferred in any one or more instances shall not be deemed a waiver or relinquishment of any term, condition, requirement, or right that Lender may have and shall not be deemed a waiver of any subsequent term, condition, requirement, or right.

**25. MISCELLANEOUS:**

a) All of the agreements, terms and conditions set forth herein shall be binding upon and inure to the benefit of each of the parties hereto, their respective successors, heirs, legal representatives and assigns.

b) Any notice required or permitted to be given shall be deemed to have been duly given when addressed, mailed and delivered by a nationally recognized overnight courier, to Lender at the address on the letterhead of this

Commitment and to the attention of the individual signing this Commitment on behalf of Lender, or to Borrower at the address to which this Commitment is addressed, or to such other place as either of the parties may for themselves designate in writing for the purposes of receiving notices.

c)  Guarantor(s) shall have joint and several liability for all obligations imposed upon Borrower(s) under this Commitment.

d)  This Commitment is conditioned upon there being no material adverse changes in the condition of the Secured Property, or the Borrower prior to the closing of a Loan.

e)  At the time Lender closes the Loan, Borrower's obligations either under this Commitment or under any existing security instrument affecting the Secured Property shall not be in default in any respect, and no event shall have occurred which, subject to either the passage of time or the giving of notice, or both, would result in such a default.

f)  Lender may upon receipt of consent from Borrower announce and publicize the source of the financing contemplated hereunder, by means and media selected by Lender.

g)  In the event Lender is named in any legal action brought against Borrower(s), Borrower(s) shall, jointly and severally, defend all claims, losses or liabilities, including attorneys' fees, paralegal fees, and all related legal costs and expenses arising out of this Commitment and/or the Loan contemplated by the Commitment and shall indemnify and hold Lender harmless from and against any act or omission of Borrower or of Borrower's agents resulting in any loss or damage because of a claim by anyone for a brokerage fee, commission, or finder's fee alleged to be due as a result of the issuance of this Commitment or making of the Loan.

h)  Borrower hereby warrants to Lender that all representations, circumstances, accounts, reports, and all other information supplied to Lender in connection with the Loan are true and accurate. Borrower agrees that each separate warranty shall survive the closing of the Loan and further agrees to notify Lender of any material change in any of the information submitted to Lender.

i)  This letter supersedes any and all prior commitments, agreements, provisions, offers and statements, whether written or oral, made by Lender or anyone acting with its authorization. No change, amendment, or modification hereof shall be valid unless made in writing and signed by a duly authorized officer of Lender. Borrower hereunder, may not assign this letter, and the rights to any other party.

**26. CANCELLATION, TERMINATION, AND EXPIRATION OF COMMITMENT BY LENDER:**

Lender reserves the right to cancel this Commitment and to terminate its obligations hereunder at any time in any of the following circumstances: (i) Borrower's failure to meet the requirements (including timely payment of fees or expenses) of the Commitment; (ii) insufficiency of title or reasonable failure of Lender to approve either the state of title to the Secured Property or any Loan Documents delivered to it; (iii) damage to existing improvements which has not been repaired or restored, or for which satisfactory provisions for repair or restoration have not been made, to the satisfaction of Lender; (iv) the filing by or against any Borrower (or its general and limited partners), Guarantor or other persons required to execute any of the Loan Documents of: any petition in bankruptcy, trusteeship, insolvency, or reorganization; any action for the appointment of a receiver or trustee; or an assignment or arrangement for the

benefit of creditors, which petition, appointment, assignment, or arrangement is not withdrawn, dismissed, canceled, or terminated prior to the expiration of this Commitment; (v) if Borrower's business is discontinued or suspended for any reason or if Borrower is in default under the terms of any applicable Franchise Agreement; (vi) if there have been any material misrepresentations, material errors, or the withholding of material information incident to the Loan contemplated by this Commitment or if any previously-submitted information proves to be false; (vii) any change subsequent to the date of this Commitment deemed by Lender to be a material or substantial adverse change in the assets, liquidity, net worth, condition or credit standing of any Borrower, Guarantor, or other person who shall become obligated in any way to Lender under this Commitment or the Loan contemplated by this Commitment; (viii) if Borrower or any Guarantor defaults on any other obligation to Lender; (ix) in the event the Secured Property (a) has suffered a material adverse change, (b) is or becomes contaminated with hazardous materials, chemicals, substances or toxic wastes, or (c) is not in compliance with applicable environmental statutes, laws, or regulations, or Lender is not satisfied with any environmental assessment report or any further investigations, tests, results, findings, recommendations, and /or conclusions; (x) the death of any Borrower or Guarantor or (xi) there being an unanticipated disruption in Lender's commercial paper conduit or a material adverse change in Lender's capital market funding sources.

This Commitment Letter will expire on April 6, 2007.

**27. WAIVER OF JURY TRIAL:**   BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY WITH REGARDS TO ANY LITIGATION BASED ON THIS LETTER, THE LOAN CONTEMPLATED HEREBY AND ANY OBLIGATION RESULTING FROM OR RELATED TO ANY LOAN OR GUARANTY RELATING TO THIS COMMITMENT, OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF DEALING, COURSE OF CONDUCT, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF BORROWER OR LENDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER OFFERING THE LOAN CONTEMPLATED HEREBY.

**28. GOVERNING LAW:**   The terms and conditions of this Commitment shall survive the closing of the Loan contemplated by the Commitment. In the event of a conflict between the terms and conditions of this Commitment and the Loan Documents used to close the Loan, the Loan Documents used to close the Loan shall prevail. This Commitment shall be construed according to and governed by the laws of the State of Georgia, and any dispute arising out of this Commitment shall be subject to the jurisdiction of both the state and federal courts in Georgia. In addition, Lender may choose to avail itself of any applicable Federal law. Borrower hereby submits to the jurisdiction of the state and federal courts of Georgia. Borrower further agrees to accept service of process in any such dispute by registered or certified mail addressed to Borrower. Nothing herein contained, however, shall prevent Lender from bringing any action or exercising any rights against Borrower or any security within any other state or jurisdiction.

**29. CONDITIONS TO ACCEPTANCE:**   This offer is subject to the following additional conditions:

a)   This offer to enter into a loan commitment will expire unless, on or before April 6, 2007, Borrower signs, dates and returns the enclosed copy of this letter along with an additional payment toward the remaining Commitment Fee of $81,750.

b)   Lender's counsel must be satisfied with the documentation, title condition, proceedings and legal opinions, engineering conditions and environmental conditions incident to this transaction. Borrower shall satisfy all the standard loan terms and conditions as set forth herein.

c)   Once all parties execute this letter and as long as all conditions set forth herein are met, Lender's commitment extends to May 31, 2007.

**30. SPECIAL CONDITIONS:**   Additional conditions and/or requirements, or permitted variations from Lender's standard loan conditions and requirements, if any, are as follows:

A.   Loan will be closed by SFG approved legal counsel.

B. . Any payments to related parties shall be subordinate to the payments under this Loan. Unless otherwise set forth herein, such payments to related parties shall be permitted as long as there is no default or Event of Default, as defined under the Loan Documents, associated with the Loan.

C.   At Lender's discretion, this Loan shall become due and payable upon the deaths of all Principals/Guarantors in this transaction.

D.   All Guarantors will be U.S. citizens or entities formed in the United States.

E.   Closing will be subject to presales of at least 9 condominium units before closing, with the customary deposit requirements as applicable under Wisconsin state laws. All presale and subsequent sales contracts will be arm-length transactions with bona-fide third parties, and no more than one unit can be sold to the same buyer.

F.   The release provision for the condominium units will be equal to 100% of sales, net of closing and marketing costs, until the Loan is reduced to $12,500,000, as stipulated under paragraph 3 of this Commitment.

G.   Subject to a 1st priority assignment of all rents, security deposits, leases and similar or related rights and interest pertaining to the subject property, which would include the ground floor retail space (s) and all parking revenues accruing to Borrower whether at or outside the premises.

H.   Assignment of all condo unit sale and reservation documents including sales contracts, related guarantees, and amendments. Loan documents prepared and closed by counsel.

I.   Satisfactory review of relevant documents pertaining to condo units, retail space and parking spaces by SFG counsel.

J.   Minimum cash equity contribution in an amount greater of $6,993,302 or twenty-five percent (25%) of the total project cost, including the actual and verifiable acquisition price of land, but excluding the LOC mentioned in paragraph 9 of this Commitment.

K.   Closing will be subject to a satisfactory appraisal review by a reviewer engaged by Lender and the Loan shall not exceed 75% LTV based on the reviewed appraised value. Condominium units discount bulk-sale value based on reviewed appraisal shall be satisfactory to Lender.

L.   Loan not to exceed that amount supported by a minimum DSCR of 1.35x based on reviewed appraisal's calculation of NOI in stabilized year.

M.   Receipt and satisfactory review of operating agreements and formation documents for all general and limited partners of the borrowing entity.

N.  Receipt and review of interim and fiscal year-end 2006 financial statements of Sjova and its parent organization.

O.  Receipt and review of executed document (s) from Sjova attesting to the fact that SJ Properties Suites BuyCo EHF is indeed a wholly-owned subsidiary of Sjova and confirming the equity injection in the subject property and project.

P.  Broadlands Financial Group, LLC to perform the initial plan, cost review and inspections throughout the construction period.

Q.  Receipt and review of a disbursement/draw schedule with adequate reserve for construction period interest as calculated by Lender.

R.  Acceptable environmental conditions for the project site or acceptable environmental insurance in lieu of environmental due diligence.

S.  Subject to receipt, acceptable review and assignment of all third party contracts.

T.  Lender to receive an acceptable commitment for title insurance and an acceptable survey prior to closing

U.  Subject to a 1st priority security interest and lien on all machinery, equipment, furniture, fixtures or other personal property of Borrower located on, used or intended to be used in connection with, or used or held for use in the subject property.

V.  Subject to proof of adequate zoning and utility availability prior to closing.

W.  Flood hazard determination (insurance required if within 100-year flood zone).

X.  Receipt and review of executed Management Agreement. Management fee shall not by greater than 5.0% and shall be subordinate to the Lender.

Y.  Receipt and review of construction contract.

Z.  Subject to proof of acceptable builder's risk, if applicable, workmen's compensation and liability insurance prior to closing. Also, evidence of adequate property, liability and business interruption insurance at adequate amounts.

AA. Executed franchise agreement with a minimum of 10 years and assignment thereof. Receipt and review of 'Franchise Comfort Letter'.

BB. Satisfactory Contractor Qualifications Analysis by third-party construction management company engaged by Lender.

If this letter and the proposed Loan are acceptable to Borrower on the terms and conditions provided herein, **please have an original counterpart properly executed in the space provided below by an authorized signatory and return a fully executed counterpart to us** at the address noted above on or before the outside acceptance date provided above.  If Borrower has any questions about the proposed Loan, please feel free to contact Greg Friedman at (770) 805-2385.

Sincerely,
Specialty Finance Group LLC

By: _____
Jon S. Wright
Managing Partner

(Borrower and Guarantor Execution Pages on Next Page)

**Borrower's Acceptance**
By execution hereof as provided below, Borrower accepts the offer for the Loan as set forth in this Commitment and agrees to all terms and conditions to such Loan as described above.

Borrower: DOC Milwaukee, LP

By: _Phillip E. Hugh_

Name: _Phillip E. Hugh_

Title: _MANAGER OF DOC Milwaukee, LLC ITS GENERAL PARTNER_

Date: _04/02/07_

Guarantor: Mr. Phillip E. Hugh

By: _Phillip E. Hugh_

Date: _04/02/07_

Guarantor: Mr. John W. Economou

By: _John W. Econ_

Date: _4/5/07_

Guarantor: Mr. Steve J. Economou

By: _____

Date: _4/5/07_

DOC Milwaukee LP
Pipeline #50232

### Specialty Finance Group LLC
### STANDARD LOAN TERMS AND CONDITIONS

To the extent not already provided to, and approved by Lender, as soon as practicable, and in any event, prior to the Closing, Borrower shall furnish to Lender or satisfy the following conditions described as follows:

1.  **TITLE INSURANCE:**
    Borrower, at Borrower's cost and expense, shall obtain a satisfactory ALTA Mortgagee Title Insurance Commitment ("Title Commitment") from the national title insurance company offices approved by Lender, in an amount equal to the full amount of the Loan contemplated by this Commitment naming "Specialty Finance Group LLC, a Georgia limited liability company, and its successors and/or assigns", as the proposed insured. The title insurance company and the form must be satisfactory to Lender. In addition to any affirmative coverages, special endorsements, or affirmative insurance coverages required by Lender or its counsel, a Form 9 (Comprehensive) Endorsement (Restrictions, Easements, Minerals) or its equivalent shall be required for all Secured Property. Lender shall receive a marked-up Title Commitment at the closing of the Loan at Borrower's sole cost and expense.

    After the closing of the Loan, Borrower, at its sole cost and expense, shall furnish Lender with such title endorsements or updates to said ALTA Title Insurance Policy or any other title documentation as Lender may require, from time to time, to insure Lender that no other matters of record affect the condition of title or the priority of Lender's lien.

    Prior to closing, and at any time thereafter upon request by Lender, Lender, at Borrower's cost and expense, shall obtain UCC (Financing Statement), judgment and tax lien searches and reports for the Secured Property and Borrower.

2.  **SURVEYS AND FLOOD HAZARD CERTIFICATION:**
    At least ten (10) days prior to the closing of the Loan, Borrower shall furnish to Lender two (2) sealed copies of a current survey (done within sixty (60) days of closing) of the Secured Property, including all adjoining alleys and appurtenant easements, prepared by a registered surveyor or licensed professional civil engineer. All surveys shall be ALTA surveys certified to "Specialty Finance Group LLC, a Georgia limited liability company, and its successors and/or assigns", and the title insurance company insuring the lien of Lender's mortgage in accordance with Lender's standard Survey Requirements.

3.  **INSURANCE REQUIREMENTS:**
    Borrower, subject to applicable rules and regulations of the State (or States) in which the Secured Property is located (herein, as to each separate site, the "State"), has the right to contract insurance with an insurance agent or company of Borrower's choice, provided the company or companies meet Lender's reasonable requirements.

    A.  Borrower shall strictly comply in all respects with Lender's standard Insurance Requirements in connection with the hazard, liability and other insurance required by Lender, as follows:

        i.  "All-Risk," Special Cause of Loss Form (including Builder's Risk and worker's compensation loans) including Vandalism and Malicious Mischief, without co-insurance, in an amount equal to at least 100% of the replacement cost of the improvements existing on the real property described in the Loan Documents contemplated by this Commitment. The deductible clause, if any, may not exceed the lesser of (i) one percent (1.0%) of the face amount of the policy, (ii) $25,000.00 and (iii) unless included in a blanket policy for all of the Properties, five percent (5.0%) of the gross annual income of or revenues from the Property. If Borrower leases any portion of the Secured Property, or any interest therein, to a third party, Rental Loss Insurance should be required if any lease provides for the abatement of rent. Business Interruption Insurance shall be required. Either type of insurance must cover debt service, rental payments, real estate taxes, and insurance premiums for a period of at least twelve (12) months.

DOC Mtge doc I B

ii.   If any improvements on the Secured Property is or will be located in an area identified by the U.S. Department of Housing and Urban Development (H.U.D.) as an area having "special flood hazards" (zones beginning with "A" or "V"), flood insurance must be purchased and maintained in the amount equal to the product of (a) the amount of the Note and (b) a fraction, the numerator of which is the number of buildings located in such flood hazard area and the denominator of which is the number of buildings located on the Property, but in no event less than the maximum limit of coverage available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, and the Housing and Community Development Acts of 1974 and 1977, all as amended, whichever is less. Further, if the Secured Property is located in a high earthquake risk area and earthquake insurance is available, Borrower shall purchase and maintain earthquake insurance in an amount equal to at least 100% of the replacement cost of the improvements existing on the real property described in the Loan Documents contemplated by this Commitment.

iii.   Borrower shall also maintain employer's liability and workers' compensation insurance, commercial general liability, and, if Borrower serves alcoholic beverages on the Secured Property, liquor liability, for not less than one million dollars ($1,000,000.00) per occurrence and two million dollars ($2,000,000.00) aggregate, against claims and liability for bodily injury or property damage to persons or property occurring on each site constituting the Secured Property with umbrella liability coverage of not less than five million dollars ($5,000,000.00) per occurrence (including liquor liability, if applicable). Evidence of such coverage shall be provided to Lender in the form of a certified copy of the policy or an insurance certificate.

B.   All policies must be issued by insurance companies and agencies licensed or authorized by the Insurance Commissioner of the State in which the Secured Property is located to conduct business in the State.

C.   All policies shall be in the amounts, form and content (including mortgagee clauses) as are acceptable to Lender and issued by insurance carriers which have a long-term debt rating of claims paying in the category "A-" or better as rated by Best's Insurance Rating Agency.

D.   Lender, upon request, may require paid receipts of policy premiums for all coverages (including personal property if given as security).

E.   In the event the terms of Borrower's franchise agreement require that the amount of insurance be greater than that set forth above, Borrower shall provide evidence acceptable to Lender of its compliance with the insurance requirements of the Franchise Agreement.

F.   Specialty Finance Group LLC, a Georgia limited liability company, and its successors and/or assigns, shall be named as an "additional insured" under the general liability and umbrella policies and as "mortgagee/loss payee" under the property policies ATIMA (as their interests may appear).

4   **ENVIRONMENTAL ASSESSMENTS:**
At its sole discretion, Lender shall determine whether it will require further investigation, including, but not limited to, the preparation of a Phase I Environmental Site Assessment Report or Phase II Environmental Site Assessment Report for each Secured Property to serve as collateral for the Loan; provided however, that Lender shall obtain Borrower's prior written consent to any such further investigation. All reports shall be prepared at Borrower's sole cost and expense, in accordance with Lender's environmental risk management standards and shall be certified to Lender.

Borrower shall furnish evidence satisfactory to Lender that the Secured Property and operations at the Secured Property are in compliance with all applicable Federal, State, and local environmental statutes, laws, and regulations. Borrower agrees to forward a copy of any such notices received after this date to Lender within five (5) days of their receipt. Borrower acknowledges that Lender

From:DDC CORP                    239 334 2147            04/02/2007 09:37    #029 P.016/017

shall not be obligated to proceed to closing or settlement or to make any disbursements if, in Lender's sole discretion, an environmental regulatory violation or other environmental problem presents a material risk to Borrower's financial condition or to the value or marketability of the Secured Property.

5.  **TAXES:**
    All taxes and assessments payable in connection with the Secured Property must be paid to the time of closing if due. Before the closing of the Loan, Borrower must furnish evidence satisfactory to Lender that the Secured Property is separately assessed for real estate taxation purposes. Borrower shall provide Lender with evidence satisfactory to Lender that all real estate taxes are paid in a timely fashion. The Loan Documents will contain a provision requiring Borrower to keep all taxes and assessments against the Secured Property fully paid before the same become delinquent, and the failure to do so will be an event of default under the Loan.

6.  **GOVERNMENTAL AUTHORITY:**
    At least ten (10) days prior to closing, upon Lender's request, Borrower shall provide Lender with any or all of the following governmental documentation:

    A.  A letter describing the land-use classification, the permitted uses in that land-use classification, the zoning classification, and the uses permitted in that zoning classification for the Secured Property (described therein by legal description), which property shall be the same as the property described in the survey and Title Commitment described herein; and

    B.  A certificate of occupancy for the entire project or as otherwise designated by Lender; and

    C.  Any and all licenses and permits necessary for the use, development and operation of the Secured Property, including those licenses and permits required to serve food, beer, wine and liquor, if applicable.

7.  **LEASES:**
    The following provisions shall apply if the Secured Property is leased to any third party: (i) all leases must be provided to Lender for its review and approval prior to closing or execution thereof; (ii) all rents, leases and profits involving any portion of the Secured Property shall be assigned to Lender as additional collateral; (iii) Lender reserves the right to review and approve any and all leases of any portion of the Secured Property; (iv) after approval by Lender, no such lease can be modified in any material aspect or canceled without the prior written consent of Lender; (v) Lender may require that all tenants must agree in writing to give Lender both a written notice of any default by landlord(s) under the lease(s) and a reasonable opportunity to cure the same; (vi) Lender shall require all tenants to execute a Subordination, Non-Disturbance and Attornment Agreement pursuant to which each tenant shall (a) agree to subordinate its lease to the lien of Lender's Mortgage, (b) agree to recognize Lender or its assigns as the landlord under the lease in the event that Lender or its assigns becomes owner of the Secured Property, and (c) acknowledge that tenant shall be permitted to occupy the Secured Property so long as tenant is not in default under the lease, subject to the terms and conditions of its lease and the Subordination, Non-Disturbance and Attornment Agreement; (vii) prior to closing, Lender may require that Borrower furnish tenant estoppel certificates and other proof satisfactory to Lender that the leases of the Secured Property is in force and effect in accordance with their respective terms and no defaults presently exist or are contemplated by any party to the leases and (viii) the terms of all leases must be at least ten years.

8.  **REPORTING:**
    A.  Borrower shall keep books and records reflecting its financial condition including, but not limited to, the operation of the Secured Property in accordance with generally accepted accounting principles consistently applied. Lender shall have the right, from time to time of all times during normal business hours, to examine such books, records and accounts at the offices of the Borrower or other entity maintaining such books, records and accounts and to make such copies or extracts thereof as the Lender shall desire.

Initial Here

From:DOC CORP  239 334 2147  04/02/2007 09:37  #029 P. 017/017

B. During the term of the Loan, the Borrower (including all Co-Borrowers, if applicable) must furnish or cause to be furnished to the Lender within one hundred twenty (120) days of the close of each of their respective fiscal years, fiscal year end audited current signed financial statements (including an annual balance sheet, a profit/loss statement, statement of cash flow and footnotes) on a consolidated or combined basis, and an income and expense statement of the operation of the Secured Property, all which must be "Presented To" Specialty Finance Group LLC, a Georgia limited liability company, and its successors and/or assigns. All Borrowers and Guarantors, if applicable, shall also annually furnish to Lender: (i) annual U.S. Income Tax Returns, (ii) a statement disclosing all contingent liabilities and (iii) such interim statements as may reasonably be required by Lender, from time to time. Borrower and Guarantor, if applicable, shall advise Lender of its respective fiscal year-end dates and shall notify Lender, in writing, of any change in such year-end dates. Borrower shall also furnish to Lender current signed rent rolls or lease digests prior to the Closing and annually thereafter, no later than one hundred twenty (120) days after the close of Borrower's fiscal year, certified to be correct by Borrower.

Initial Here

C. During the term of the Loan, the Borrower shall furnish to Lender within ninety (90) days after the end of each calendar year of Borrower an unaudited, management prepared financial statement of Borrower and a statement of income and expenses of the Secured Property.

Initial Here

D. During the term of the Loan, the Borrower shall furnish to Lender within twenty (20) days after the end of each fiscal quarter of Borrower an unaudited, management prepared financial statement of Borrower and a statement of income and expenses of the Secured Property.

Initial Here

E. During the term of the Loan while the Guaranty Agreement(s) remains in effect, Guarantors shall provide annual personal financial statements within ninety (90) days of the end of each calendar year and annual guarantor tax returns, including all schedules, within thirty (30) days of filing of said tax return.

Initial Here

F. All reports and statements required above shall be made and presented in accordance with generally acceptable industry standards and format.

Initial Here

## AMENDMENT AND EXCEPTION FORM

### GENERAL INFORMATION

| | |
|---|---|
| Borrower (Original Name) | DOC Milwaukee, LP |
| Regional Lender | Greg Friedman |
| Office | SFG - Atlanta |
| Outstanding Balance | N/A |
| Original Loan Amount | $20,900,000 (to be paid down to $12,500,000 after sale of condo units) |
| Account Type | Commercial Loan Single Disbursement |

| | Class | Commercial RE Income Producing |
|---|---|---|

| | |
|---|---|
| Original Date of Approval | March 20, 2007 |
| Today's Date | January 8, 2008 |

### LOAN OVERVIEW (ORIGINAL)

| Loan-to-Cost (LTC) | 75.0% | Loan-to-Value (LTV) | At Completion[1]: 62.6% At Stabilization[2]: 56.8%; Max LTV: 67.7% |
|---|---|---|---|
| DSCR at Stabilization Per Appraisal | 1.33x (Based on a 25-yr amortization and $20.9MM Loan Amount) 1.60x (Based upon a $12.5MM Loan Amount) | Guarantor's Net Worth | $8.6MM |

### AMENDMENTS

| Proposed Amendment | Currently, the $20.9MM loan request is additionally secured by a $6MM Letter of Credit. The Borrower requests that the loan amount be decreased by $6MM to $14.9MM (still to be paid down to $12.5MM upon condo sales) and that the Letter of Credit requirement be eliminated. In lieu of the Letter of Credit, the borrower will inject an additional $6MM of cash equity into the project.

All other terms of the loan will remain the same. |
|---|---|
| Reason for Request | The majority (i.e. 60%) limited partner in the borrowing entity is SJ Properties Suites Buyco EHF ("SJ"), a wholly owned subsidiary of the Icelandic insurance company Sjova Almennar Tryggingar hf. ("Sjova"). In addition to injecting approximately $7MM equity in the project in the beginning, SJ was supposed to provide the borrowing entity with the $6MM standby letter of credit ("LOC") through Glitnir Bank, a major Icelandic financial institution. However, in order to expedite the current project, SJ is injecting an additional $6MM of cash equity into the project, thereby eliminating the need for a LOC. The new loan amount will be $14.9MM.

**APPROVAL RATIONALE:**

By decreasing the loan amount to $14.9MM, the revised loan overview is given below:

**Revised Loan Amount:** $14,900,000 (to be paid down to $12,500,000 after sale of condo units)
**Revised LTC:** 53.4%
**Revised LTV:**
- At Completion: 44.6% ($14.9MM Loan against value of $33.4MM for hotel and condo units)
- At Stabilization: 56.8% %$12.5MM loan, after paydown against $22MM value of hotel only) |

---

[1] Debt-to-value based upon $20.9MM Loan Amount and a value of $33.4MM for the hotel and condo units
[2] Debt-to-value based upon $12.5MM Loan Amount (after paydown) and a value of $22MM for the hotel only. Max LTV based upon $14.9MM Loan Amount (no paydown, but draw down on $6MM LOC) and a value of $22MM for hotel.

| | |
|---|---|
| | • Max LTV: 67.7% ($14.9MM loan , assuming no paydown, against $22 MM value)<br><br>**Revised DSCR:**<br>• 1.38x (Worst-case: $14.9MM Loan amount at Stabilization with no paydown)<br>• 1.66X ($12.5MM Loan Amount at stabilization after paydown) |
| Requirements | 1) SFG will require the Borrower to provide necessary documentation from SJ prior to closing, confirming the additional $6MM equity injection<br>2) All equity must be injected into the project prior to any funding by SFG.<br>3) All equity injection shall be supported by documentation acceptable to SFG in its sole discretion. |

## POLICY EXCEPTIONS UNDER PROPOSED AMENDMENTS:

| | |
|---|---|
| Describe Exception | N/A |
| Justification | N/A |

## APPROVALS:

| Required Approvals | Signature | Date |
|---|---|---|
| Brock Fredette | | |
| Stephen Benson | | |
| Jon Wright | | |
| Dilip Petigara | | |

----- Forwarded by Kajori Mitra/bankersbank on 01/08/2008 03:51 PM -----

**Jon Wright/bankersbank**

01/08/2008 03:50 PM

To   Dilip Petigara/bankersbank@bankersbank

cc   kmitra@silvertonbank.com

Subject   Re: Fw: Specialty Finance/Milwaukee Staybridge Loan"

Approved

Jon S. Wright
Managing Partner
Specialty Finance Group LLC
A subsidiary of Silverton Bank
Three Ravinia Drive
Suite 230
Atlanta, GA 30346
770-805-2350
770-805-6539 (fax)
jwright@silvertonbank.com
www.specialtyfinancegroup.com
www.silvertonbank.com

DOC Milwaukee, LP
Pipeline #50232

2

Dilip Petigara/bankersbank

01/08/2008 03:25 PM

To jwright@silvertonbank.com
cc kmitra@silvertonbank.com
Subject Fw: Specialty Finance/Milwaukee Staybridge Loan

Approved.  By copy of this email, I am asking Jon for his approval of this A&E which reduces our exposure by $6MM and requires the Borrower to replace the originally intended $6MM LOC with $6MM in additonal cash equity prior to SFG funding (outside of any loan closing expenses).

Thanks.
Dilip

Dilip R. Petigara
Senior Vice President
Specialty Finance Group LLC
A subsidiary of Silverton Bank
200 Barr Harbor Drive
Four Tower Bridge
Suite 400
West Conshohocken, PA 19428
610-941-2970
770-805-3570 (fax)
215-327-9960 (cell)
dpetigara@silvertonbank.com

Website:  www.specialtyfinancegroup.com

----- Forwarded by Dilip Petigara/bankersbank on 01/08/2008 03:23 PM -----
Kajorl Mitra/bankersbank

01/08/2008 02:08 PM

To Dilip Petigara/bankersbank@bankersbank
cc "Greg Friedman" <gfriedman@bankersbank.com>
Subject Fw: Specialty Finance/Milwaukee Staybridge Loan

Dilip,

This is the A&E. Upon your approval, I will send out the revised commitment letter with the new loan amount.  Thanks.

DOC Milwaukee, LP
Pipeline #50232

3

Kajori Mitra
Specialty Finance Group LLC
A subsidiary of Silverton Bank
Three Ravinia Drive, Suite 230
Atlanta, GA 30346

Phone: (770) 805-2392
Fax:    (770) 805-3627
Email: kmitra@silvertonbank.com

Please Note: The Bankers Bank has changed its name to Silverton Bank effective January 2, 2008.  Please also note that
we will be relocating our headquarters to 3284 Northside Parkway NW, Atlanta, GA 30327 effective February 15, 2008.
All telephone and fax numbers will remain the same.

--------------------------------------------------------------------------------
(1) -
Notes:///85256F6600707387/38D46BF5E8F08834852564B500129B2C/9C4073CBF1415D90852573CA0070
0315

.

# EXHIBIT "H"

## CONDOMINIUM MINIMUM SALES PRICES

| Unit Type | Unit Count | Floor | Unit SF | Balcony SF | Roof Deck | Deeded Parking | PSF $ | Minimum Sales Price |
|---|---|---|---|---|---|---|---|---|
| Two Bedroom Den w/Balcony | 1 | 11th | 2,170 | 90 | | 1 | 330.00 | $716,100 |
| One Bedroom | 1 | 11th | 820 | | | 1 | 310.00 | $254,200 |
| One Bedroom | 1 | 11th | 757 | | | 1 | 310.00 | $234,670 |
| One Bedroom w/ Balcony | 1 | 11th | 936 | 180 | | 1 | 320.00 | $299,520 |
| One Bedroom w/Dinette | 1 | 11th | 1,100 | | . | 1 | 310.00 | $341,000 |
| Two Bedroom w/ Balcony | 1 | 11th | 1,284 | 180 | | 1 | 320.00 | $410,880 |
| Two Bedroom w/ Balcony | 1 | 11th | 1,284 | 180 | | 1 | 320.00 | $410,880 |
| Two Bedroom w/ Balcony | 1 | 11th | 1,284 | 180 | | 1 | 320.00 | $410,880 |
| Two Bedroom | 1 | 11th | 1,426 | | | 1 | 310.00 | $442,060 |
| Two Bedroom Den w/Balcony | 1 | 12th | 2,170 | 90 | | 1 | 335.00 | $726,950 |
| One Bedroom | 1 | 12th | 820 | | | 1 | 315.00 | $258,300 |
| One Bedroom | 1 | 12th | 757 | | | 1 | 315.00 | $238,455 |
| One Bedroom w/ Balcony | 1 | 12th | 936 | 180 | | 1 | 325.00 | $304,200 |
| One Bedroom w/Dinette | 1 | 12th | 1,100 | | | 1 | 315.00 | $346,500 |
| Two Bedroom w/ Balcony | 1 | 12th | 1,284 | 180 | | 1 | 325.00 | $417,300 |
| Two Bedroom w/ Balcony | 1 | 12th | 1,284 | 180 | | 1 | 325.00 | $417,300 |
| Two Bedroom w/ Balcony | 1 | 12th | 1,284 | 180 | | 1 | 325.00 | $417,300 |
| Two Bedroom | 1 | 12th | 1,426 | | | 1 | 315.00 | $449,190 |
| Two Bedroom Den w/Balcony | 1 | 13th | 2,170 | 90 | | 1 | 340.00 | $737,800 |
| One Bedroom | 1 | 13th | 820 | | | 1 | 320.00 | $262,400 |
| One Bedroom | 1 | 13th | 757 | | | 1 | 320.00 | $242,240 |
| One Bedroom w/ Balcony | 1 | 13th | 936 | 180 | | 1 | 330.00 | $308,880 |
| One Bedroom w/Dinette | 1 | 13th | 1,100 | | | 1 | 320.00 | $352,000 |
| Two Bedroom w/ Balcony | 1 | 13th | 1,284 | 180 | | 1 | 330.00 | $423,720 |
| Two Bedroom w/ Balcony | 1 | 13th | 1,284 | 180 | | 1 | 330.00 | $423,720 |
| Two Bedroom w/ Balcony | 1 | 13th | 1,284 | 180 | | 1 | 330.00 | $423,720 |
| Two Bedroom | 1 | 13th | 1,426 | | | 1 | 320.00 | $456,320 |
| Private Residence - Penthouse 1 w/Balcony | 1 | 14th | 2,886 | 1080 | access | 1 | 440.00 | $1,269,840 |

| | | | | | | | $ | |
|---|---|---|---|---|---|---|---|---|
| Private Residence - Penthouse 2 w/Balcony | 1 | 14th | 2,886 | 1080 | access | 1 | 420.00 | $1,212,120 |
| Private Residence - Penthouse 3 w/Balcony | 1 | 14th | 2,204 | 360 | access | 1 | 440.00 | $969,760 |
| Private Residence - Penthouse 4 w/Balcony | 1 | 14th | 3,634 | 410 | 2400 | 1 | 650.00 | $2,362,100 |
| Totals: | 31 | | 44,793 | | | 31 | | $16,540,305 |

## EXHIBIT "I"

## EARNEST MONEY ESCROW AGREEMENT

(SEE ATTACHED)

 **Earnest Money Escrow Agreement**

Commitment No: _____ ___ ___

THIS AGREEMENT made this ___ day of _____ by and among _____ ("Buyer") and DOC Corp. ("Seller"), and ("Escrowee").

WHEREAS, the parties acknowledge that Buyer is depositing with Escrowee Funds in the sum of $ _____ ("Funds") called for by the attached Offer to Purchase dated ___ as amended if amended (the "Offer"), which amount shall be held in escrow by Escrowee in a (non-interest) (interest) [STRIKE ONE]bearing account. All earnings and risk of loss for said account shall accrue in favor of Buyer.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1 The Funds deposited are to be held by Escrowee until the occurrence of one of the following:

    a. On closing of the sale of real estate, as described in the Offer, Escrowee shall deliver the Funds to Seller as part of Buyer's purchase money.

    b. On receipt of a joint notice signed by both Buyer and Seller directing Escrowee to disburse the Funds as set forth in such notice. Upon disbursement, Escrowee shall have no further liability hereunder. In the event Escrowee does not receive a joint instruction on or before the date for closing, as described in the Offer, Escrowee shall continue to hold the Funds until the happening of one of the following:

        i. Receipt by Escrowee of joint instructions from Buyer and Seller to deliver the Funds to a named party; or

        ii. Delivery of the Funds by Escrowee, at Escrowee's sole discretion, to a court of competent jurisdiction. Such delivery may be by interpleader or other writ or petition. Buyer and Seller agree that, after the Funds are delivered to court under this paragraph, Escrowee shall have no further liability hereunder and shall not be a necessary or permitted party in any action brought regarding the Funds; or

        iii. Entry and receipt by Escrowee of an order of a court of competent jurisdiction ordering Escrowee to deliver the Funds.

2. Escrowee shall not be liable for any acts or omissions done in good faith. Buyer and Seller hereby agree to, jointly and severally, hold Escrowee harmless for all reasonable actions taken by Escrowee in accordance with this Agreement. In addition, Buyer and Seller further agree to pay all expenses of Escrowee, including reasonable attorneys' fees, which may arise pursuant to or out of a dispute with reference to the rights of anyone claiming an interest in the Funds deposited hereunder.

3. This Agreement may be executed by the parties hereto in counterpart. When each party has executed a copy of this Agreement, the executed copies taken together shall have the same force and effect as if executed in one document. Facsimile signatures on this agreement shall be deemed original signatures.

4. Any notices required under this Agreement shall be given in writing by regular or certified mail, postage prepaid at the addresses set forth at the end of this Agreement.

5. The terms, covenants and conditions of this Agreement shall bind the parties hereto and their successors and/or assigns.

Seller

_____

DOC Corp.
PO Box 511040
Milwaukee, WI 53203-0183

414-223-0033

Buyer

_____
(Signed)

_____
(Print)

_____
Address

_____
City          State

_____
Phone

Escrowee
Knight-Barry Title, Inc.

_____
By:

## EXHIBIT "J"

## BASE CONDOMINIUM UPGRADES

To be forwarded
upon reciept

# Exhibit
# B

# PROMISSORY NOTE

$14,900,000.00                                        January **9**, 2008

FOR VALUE RECEIVED, the undersigned, **DOC MILWAUKEE, LP**, a Delaware limited partnership ("Maker"), promises to pay to the order of **SPECIALTY FINANCE GROUP LLC**, a Georgia limited liability company, its successors or assigns ("SFG"), the principal sum of FOURTEEN MILLION NINE HUNDRED THOUSAND AND NO/100 DOLLARS (U.S. $14,900,000.00), or so much thereof as may be advanced (each advance shall be referred to as an "Advance" and all such advances shall collectively be referred to as the "Advances") pursuant to the terms and conditions of that certain Loan Agreement (hereinafter, as amended and in effect from time to time, referred to as the "Loan Agreement") of even date herewith made between Maker and SFG, together with interest on the unpaid principal balance outstanding from the date hereof until paid at the rate set forth in Schedule A attached hereto and by this reference made a part hereof ("Note Rate"). Principal and interest accrued thereon, together with all other sums which may be at any time due, owing or required to be paid by the terms of the Security Instrument (hereinafter defined) and other Loan Documents (as defined in the Security Instrument) are hereinafter collectively called the "Indebtedness."

I.      **Payments.**

        A.      An interest only installment shall be due and payable on the date hereof for interest accruing hereon from and including the date hereof to and including January 31, 2008.

        B.      Thereafter, monthly installments of interest only calculated using the Note Rate shall be due and payable in arrears on the first (1st) day of each month (the "Regular Payment Date") commencing on March 1, 2008 and on the first (1st) day of each and every month thereafter, through and including the first (1st) day of August 1, 2010 (such period, the "Construction Period"). Notwithstanding anything to the contrary in the foregoing, Maker shall pay the Loan (as defined in the Loan Agreement) down pursuant to the terms of this Paragraph and, if necessary, the terms of Paragraph IV (A), so that the outstanding principal balance of the Loan is equal to or less than $12,500,000.00 (the "Mandatory Loan Reduction") on or before August 1, 2010, the last day of the Construction Period.

        C.      Thereafter, monthly installments of principal and interest shall be due and payable in arrears on the first (1st) day of each month commencing on September 1, 2010 and on the first (1st) day of each and every month thereafter, through and including the first (1st) day of January, 2013 (such period, the "Permanent Period"). The principal portion of the monthly installment of principal and interest shall be the amount which would have been due on such monthly installment payment date if the outstanding principal balance of this Note at the beginning of the Permanent Period were being amortized in equal monthly installments of principal and interest over a term of twenty five (25) years, with the amortization period commencing at the beginning

of the Permanent Period, and with interest calculated at the rate equal to the then applicable Note Rate.

     **D.**    The entire remaining outstanding principal hereof, together with all accrued but unpaid interest thereon, shall be due and payable in full on January 31, 2013 (the "Maturity Date").

     **E.**    All required payments are to be made no later than 2:00 p.m. (Atlanta time) on the date when due in immediately available funds in lawful money of the United States of America which is legal tender for public and private debts, by ACH automatic debit.

     **F.**    The outstanding amount of the Advances as reflected on SFG's records from time to time shall be presumed to be correct and binding on the Maker (absent manifest error) unless within thirty (30) Domestic Business Days after receipt by Maker of any notice from SFG of such outstanding amount, Maker notifies SFG to the contrary.

     **G.**    Each determination of the Note Rate by SFG pursuant to this Note shall be conclusive and binding on Maker in the absence of manifest error.

     **H.**    Whenever any payment to be made hereunder shall be stated to be due on a day other than a Domestic Business Day, such payment shall be made on the next succeeding Domestic Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

     **I.**    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement and on <u>Schedule A</u> attached hereto.

## II.    <u>Events of Default.</u>

     **A.**    It shall constitute an event of default ("Event of Default") of and under this Promissory Note ("Note") if any of the following events shall occur:

     **1.**    Maker shall fail to pay any installment of interest or principal when due under this Note. However, monthly payments received by SFG within ten (10) days of the Regular Payment Date shall be considered made as required. If payment is not received by SFG by such tenth (10th) day of the month when due, the Default Rate shall apply from the first day of the month. In addition, the holder hereof may assess a late charge in the amount of five percent (5%) of the unpaid amount or the highest rate allowed by Applicable Law, whichever is less. Notwithstanding the foregoing, upon the occurrence of a payment default, SFG shall not exercise any remedies other than the application of the Default Rate and the assessment of a late charge as set forth above until SFG has provided the Maker with notice of the payment default and ten (10) days from the date of such notice to cure such payment default.

     **2.**    Maker shall fail to perform or observe any of the covenants, agreements or conditions of this Note within thirty (30) days after notice and opportunity to cure or an Event of

Default shall occur under any of the other Loan Documents now or hereafter evidencing or securing the Indebtedness.

B.      While any Event of Default exists, the Note Rate shall be increased to five percent (5%) per annum above the original Note Rate ("Default Rate"). The Default Rate shall accrue from the date of the Event of Default until the date upon which the Event of Default is cured. It is a condition precedent to the cure of any Event of Default that Maker shall pay all principal and accrued interest required under this Note (i.e. that would have been paid but for the Event of Default) to the most current Regular Payment Date, and the difference between the Default Rate and the Note Rate from the date of the first occurrence of the Event of Default to the date upon which the Event of Default is cured.

C.      Prior to an Event of Default, payments received by SFG shall be applied first to interest and the remainder to principal. After an Event of Default, SFG may, at its option, apply any payments or other amounts received first to the payment of SFG's expenses incurred in accordance with the provisions of the Loan Documents, then to interest, and the remainder to principal.

D.      In case of an Event of Default by Maker in the performance or observance of any of the covenants, agreements or conditions of this Note or the other Loan Documents and the expiration of any applicable cure periods, SFG, at its option and without further notice, may declare the Indebtedness, including the entire principal balance, together with all interest accrued and unpaid thereon, to be immediately due and payable. Failure to exercise this option for a particular Event of Default shall not constitute a waiver of the right to exercise same in case of any subsequent Event of Default.

## III.    Security.

This Note is secured by, among other Loan Documents, (i) a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Maker to and in favor of SFG of even date with this Note ("Security Instrument") which encumbers and constitutes a lien upon and security interest in certain real property and fixtures located in Milwaukee County, in the State of Wisconsin, and certain other properties, rights and interests, all as more fully described in the Security Instrument (the "Premises"), and (ii) an Assignment of Leases and Rents executed by Maker to and in favor of SFG of even date herewith (the "Assignment of Leases and Rents") in which Rents (as defined therein) and Leases (as defined therein) are absolutely and unconditionally assigned by Maker to SFG, the terms and provisions of which Security Instrument and Assignment of Leases and Rents are incorporated herein by reference and made a part hereof.

## IV.    Prepayment.

A.      During the first twenty-four (24) months of the Construction Period, Maker may prepay the Loan in whole, but not in part, with a Prepayment Fee (as defined herein), provided that, in addition to the amount prepaid, the undersigned shall pay all accrued and unpaid interest

thereon. During the first twenty-four (24) months of the Construction Period, the prepayment fee shall be one percent (1.0%) of the outstanding principal balance of the Loan (the "Prepayment Fee"). Following the first twenty-four (24) months of the Construction Period, the Loan may be prepaid in whole, but not in part (except in the case of the Mandatory Loan Reduction) without being subject to the Prepayment Fee. Prepayments made hereunder to comply with the Mandatory Loan Reduction shall not be subject to the Prepayment Fee.

## V.     Non-Usurious Loan.

A.     It is the intention of Maker and SFG that this Note and all other Loan Documents shall comply with any Applicable Law.  To that end, the parties stipulate and agree that none of the terms and provisions of this Note or the Loan Documents shall ever be construed to create a contract that violates any Applicable Law or exceeds the limits imposed or provided by law for the use or detention of money or for forbearance in seeking its collection.

B.     In the event that interest paid or received under this Note or the other Loan Documents shall result, because of any reduction of principal or any other reason, in an effective rate of interest which for any period is in excess of applicable usury limits, such excess interest for the period in question shall, at SFG's option, be refunded to Maker or be applied upon the outstanding principal of the Note.

C.     The term "Applicable Law", as such term is used in this Note shall mean any Federal or Georgia statute or other law, including, but not limited to, the applicable usury laws of the State of Georgia or the United States (whichever allows the greater rate of interest), as such Applicable Law now exists, is amended or is enacted during the term of this Note.

D.     The Maker represents and agrees that the Indebtedness evidenced by this Note constitutes a commercial business loan and the proceeds thereof shall not be used for household or consumer purposes.

## VI.    SFG's Attorney Fees.

Should the Indebtedness evidenced by this Note or any part thereof be:  (i) collected at law or in equity or through any legal, bankruptcy, receivership, probate or other court proceedings; (ii) placed in the hands of attorneys for collection after the occurrence of an Event of Default; or (iii) the subject of any court proceeding involving the lien of the Security Instrument or its priority, Maker and all endorsers, guarantors and sureties of such Indebtedness jointly and severally agree to pay to SFG, in addition to the principal and interest due and payable hereunder, reasonable attorneys' and paralegals' fees and actual collection costs, and all other obligations due pursuant to the terms of the Loan Documents including those incurred by SFG on any appeal.

## VII.   Maker's Waivers.

Maker and all endorsers, guarantors and sureties of the Indebtedness evidenced by this Note and any other persons liable or to become liable on or for such Indebtedness hereby severally waive presentment for payment, demand and notice of demand, dishonor and notice of dishonor, protest and notice of protest, and nonpayment and notice of nonpayment of this Note, and all other notices and demands, including without limitation, notice of intention to accelerate the maturity of this Note, notice of acceleration of the maturity of the Note, diligence in collection and the bringing of suit against any other party and hereby further agree to all renewals, extensions, modifications, partial payments, releases or substitutions of security, in whole or in part, with or without notice, whether before or after maturity. Maker hereby further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of the State of Georgia, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents.

## VIII.  Payment of Taxes and Fees.

Maker agrees to pay all costs, expenses, fees and taxes on or with respect to the execution, delivery, recordation, existence or possession of this Note, the Security Instrument and other Loan Documents, including, without limitation, all recording fees and any documentary stamp tax or intangible personal property tax now or hereafter required by Applicable Law to be affixed or paid with respect to this Note, the Security Instrument or the other Loan Documents.

## IX.     Waiver of Trial by Jury.

Maker hereby waives, to the fullest extent permitted by Applicable Law, the right to trial by jury in any action, proceeding or counterclaim filed by any party, whether in contract, tort or otherwise relating directly or indirectly to this Note or any acts or omissions of the Maker in connection therewith or contemplated thereby.

## X.      Releases; No Waiver; Amendment.

SFG may, without notice, and without regard to the consideration, if any, given or paid therefor, release or substitute any part of the Premises given as security for the repayment of the Indebtedness evidenced and represented by this Note without releasing any other property given as security for such Indebtedness, or may release any party obligated on or liable for the payment of the Indebtedness evidenced and represented by this Note without releasing any other party obligated on or liable for such Indebtedness, or may agree with any party obligated or liable for the repayment of the Indebtedness evidenced and represented by this Note to extend the time for payment of any part or all of such Indebtedness without releasing any party obligated on or liable for such Indebtedness. No failure to accelerate the debt evidenced hereby by reason of default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the Indebtedness

evidenced hereby or as a waiver of such right of acceleration or of the right of SFG thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by any Applicable Laws; and Maker hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.  No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Maker under this Note, either in whole or in part unless SFG agrees otherwise in writing.  This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

XI.     Governing Law.

        This Note and the rights, duties, obligations and liabilities of the parties hereunder and/or arising from or relating in any way to the Indebtedness evidenced by this Note or the loan transaction of which such Indebtedness and this Note are a part shall be governed by and construed for all purposes under the law of the State of Georgia.

XII.    Miscellaneous.

        Time is of the essence of this Note.  As used herein, the terms "Maker" and "SFG" shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law.  All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.  Titles of articles and sections are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provisions hereof.

        [Remainder of page intentionally left blank]

IN WITNESS WHEREOF, Maker has executed, or caused these presents to be executed under seal, as of the day and year first above written.

MAKER:

**DOC MILWAUKEE, LP,** a Delaware limited partnership

By:  DOC Milwaukee II, LLC,
      a Delaware limited liability company,
      its general partner

    By:  Development Opportunity
        Corporation, a Delaware corporation,
        its manager

        By: _____
        Name: _Phillip E Hugh_____
        Title: _President_____

## SCHEDULE A

This Schedule A is attached to and made a part of that certain Promissory Note dated as of January **9**, 2008, executed by DOC MILWAUKEE, L.P, a Delaware limited partnership ("Maker" or "the undersigned"), and payable to SPECIALTY FINANCE GROUP LLC ("SFG") in the original principal amount of $14,900,000.00.

(a)     As used herein, the following definitions shall apply:

"Domestic Business Day" shall mean any day during which the offices of SFG are scheduled to be open for the conduct of its banking business in Atlanta, Georgia.

"LIBOR Business Day" shall mean any day on which banks are scheduled to be open for business and quoting interest rates for dollar deposits on the London Interbank Market and which is also a Domestic Business Day.

"LIBOR Rate" shall mean, for any calendar month, the rate equal to the per annum offered rate of interest for one month deposits in U.S. dollars of amounts comparable to the outstanding balance of the Note, which rate appears in the Wall Street Journal, or such similar service as determined by SFG, that displays British Banking Association interest settlement rates for deposits in U. S. dollars, as of 11:00 a.m. (London, England time) two (2) LIBOR Business Days prior to the first day of such calendar month; provided, that if no such offered rate appears on such page, the rate used for such calendar month shall be the rate of interest determined by SFG to be the per annum rate at which U.S. dollar deposits for such calendar month in an amount comparable to the outstanding balance of this Note are offered to SFG on the London Inter-Bank Market as of 11:00 a.m. (London, England time) on the day which is two (2) LIBOR Business Days prior to the first day of such calendar month.

"Prime Rate" shall mean that annual rate of interest publicly announced by SFG from time to time as its prime rate. Such prime rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.

(b)     The Note Rate hereunder will be the LIBOR Rate, as the LIBOR Rate may change from time (any adjustment in the Note Rate resulting therefrom to take effect on the first (1st) day of each calendar month) plus three hundred thirty-five basis points (335 bps). Interest shall be computed on the outstanding daily balance of the Note on the basis of a 360 day year for the actual number of days elapsed in the period for which such interest is payable.

(c)     In the event that SFG shall have determined (which determination shall be conclusive and binding upon the undersigned) that by reason of circumstances affecting the interbank LIBOR market, adequate and reasonable means do not exist for ascertaining the

LIBOR Rate, SFG shall forthwith give notice by telephone of such determination, confirmed in writing, to undersigned. If such notice is given, any outstanding LIBOR Rate basis borrowing shall be converted, on the last day of the then current calendar month, to a variable rate equal to the Prime Rate, as such rate may change from time to time, plus an alternate rate spread (the "Alternate Rate Spread") equal to the positive or negative difference, stated as a percentage, between (i) the effective interest rate on this Note as of the last day on which interest on this Note accrues on a LIBOR Rate basis, and (ii) the Prime Rate as of such day. For example, if on such date the effective rate of interest is 6.75% on the LIBOR Rate basis and the Prime Rate is 6.25%, then the Alternate Rate Spread will be 0.50% or, if on such date the Prime Rate is 7.50%, then the Alternate Rate Spread will be -0.75%. Until such notice has been withdrawn by SFG, no further LIBOR Rate basis borrowing shall be made.

(d)     All payments made by undersigned hereunder shall be made free and clear of, and without reduction for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, or withholdings now or hereafter imposed, levied, collected, withheld or assessed by any regulations of the Board of Governors of the Federal Reserve System or any nation or government, any state or other political subdivision thereof or entity exercising executive, legislative, regulatory, or administrative functions of or pertaining to government (an "Authority") having jurisdiction with respect thereto, excluding income and franchise taxes of the United States of America or any political subdivision or taxing authority thereof or therein (including Puerto Rico) and excluding any tax due as a result of SFG's failure to maintain the situs of this Note in the State of Georgia (such nonexcluded taxes being called "Foreign Taxes"). If any Foreign Taxes are required to be withheld from any amounts payable to SFG hereunder, the amounts so payable to SFG shall be increased to the extent necessary to yield to SFG (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any Foreign Tax is payable by the undersigned, as promptly as possible thereafter the undersigned shall send to SFG a certified copy of an original official receipt showing payment thereof. If the undersigned fails to pay any Foreign Tax when due to the appropriate taxing authority or fails to remit to SFG the required receipts or other required documentary evidence, the undersigned shall indemnify SFG for any incremental taxes, interest or penalties that may become payable by SFG as a result of any such failure.

(e)     Notwithstanding any other provision herein, if any law, treaty, rule or regulation or determination of an arbitrator of a court or other Authority, in each case applicable to or binding upon SFG or any other party ("Requirement of Law"), or any change therein or in the interpretation or application thereof, shall make it unlawful for SFG to make or maintain a LIBOR Rate basis borrowing as contemplated hereunder, or shall materially restrict the authority of SFG to purchase or sell, or take deposits of, LIBORs in the manner required to enable SFG to make or maintain a LIBOR Rate basis loan as contemplated hereunder, (i) the commitment of SFG hereunder to convert to a LIBOR Rate basis shall be canceled forthwith and (ii) any outstanding LIBOR Rate basis borrowings shall be converted automatically to a borrowing on the Prime Rate basis on the next succeeding interest payment date or within such earlier period as required by law. The undersigned hereby agrees promptly to pay SFG, upon SFG's demand, any additional amounts necessary to compensate SFG for any costs incurred by SFG in making

any conversion in accordance with this paragraph, including, but not limited to, any interest or fees payable by SFG to lenders of funds obtained by it in order to make or maintain its LIBOR Rate basis borrowings hereunder. SFG's notice of such costs, as certified to the undersigned, shall be conclusive and binding upon the undersigned absent manifest error.

(f)     With respect to LIBOR Rate basis borrowings, in the event that any Requirement of Law or any change therein or in the interpretation or administration thereof or compliance by SFG with any request or directive (whether or not having the force of law) from any central bank or other Authority:

(i)     does or shall subject SFG to any tax of any kind whatsoever with respect to this Note or any advances made by it, other than a tax on the overall income of SFG, or change the basis of taxation of payments to SFG of principal, commitment fee, interest or any other amount payable hereunder;

(ii)     does or shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of SFG or another bank, which is not otherwise included in the determination of the LIBOR Rate hereunder; or

(iii)     does or shall impose on SFG any other condition;

and the result of any of the foregoing is to increase the cost to SFG of making, renewing or maintaining advances or extensions of credit or to reduce any amount receivable hereunder, then, in any such case, the undersigned shall promptly pay SFG, within fifteen (15) calendar days after its demand, any additional amounts necessary to compensate SFG for such additional cost or reduced amount receivable which SFG deems to be material as determined by SFG. If SFG becomes entitled to claim any additional amounts pursuant to this subparagraph (f) it shall notify the undersigned promptly of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by SFG to undersigned shall be conclusive and binding upon the undersigned in the absence of manifest error. This covenant shall survive payment of this Note.

[End of Schedule A]

# Exhibit C

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT ("Guaranty") made and executed this 9th day of January, 2008 by **PHILLIP E. HUGH**, an individual resident of the State of Florida, whose address is 2797 First Street, Unit 1001, Fort Myers, Florida 33916, **JOHN W. ECONOMOU**, an individual resident of the State of Illinois, whose address is 1480 Golden Bell Court, Downers Grove, Illinois 60515, **STEVE J. ECONOMOU**, an individual resident of the State of Illinois, whose address is 1141 Sherman Avenue, Evanston, Illinois 60202 (individually referred to as "Guarantor" and collectively referred to as the "Guarantors"), to and in favor of **SPECIALTY FINANCE GROUP LLC**, a Georgia limited liability company ("SFG");

## WITNESSETH:

**WHEREAS**, SFG has agreed to make a mortgage loan to **DOC MILWAUKEE, LP**, a Delaware limited partnership ("Borrower") in the principal amount of FOURTEEN MILLION NINE HUNDRED THOUSAND AND NO/100 DOLLARS ($14,900,000.00) pursuant to that certain Loan Agreement between SFG and Borrower dated as of even date herewith; and

**WHEREAS**, SFG has approved and agreed to make a mortgage loan in that amount to Borrower ("Loan") on those terms and subject to those conditions set forth with particularity in that certain Commitment Letter dated March 29, 2007, as same may have been amended (the "Commitment") including, among others, the condition that Guarantor execute and deliver this Guaranty to and in favor of SFG; and

**WHEREAS**, the Loan is evidenced by a certain Promissory Note executed by Borrower to and in favor of SFG in the principal sum of FOURTEEN MILLION NINE HUNDRED THOUSAND AND NO/100 DOLLARS ($14,900,000.00) of even date herewith ("Note") and is secured by, among other documents and instruments, a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Borrower to and in favor of SFG of even date herewith ("Security Instrument") encumbering certain property, rights and interests more particularly described therein ("Premises"); and

**WHEREAS**, SFG is unwilling to make the Loan unless the Guarantors jointly and severally guarantee certain obligations as hereinafter provided; and

**WHEREAS**, Phillip E. Hugh and John W. Economu are each principals of DOC Milwaukee II, LLC, the general partner of the Borrower; and

**WHEREAS**, Steve J. Economu is the principal of Economu Partners, the architect and construction manager for the Property; and

**WHEREAS**, the Guarantors recognize and acknowledge that the financial success of the Borrower will directly benefit the Guarantors and, therefore, deem it to be to the business and financial advantage and benefit of the Guarantors to execute and deliver this Guaranty;

NOW THEREFORE, for and in consideration of the premises hereof, and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged by the Guarantors, the Guarantors do hereby jointly and severally, for the benefit of SFG, covenant, stipulate and agree as follows, to wit:

1.      **Recitals**. The recitals hereinabove set forth in the premises of this Guaranty are true and correct and are by this reference thereto incorporated in this Guaranty.

2.      **Definition of Terms**. Those capitalized terms not otherwise defined herein shall have those definitions and meanings ascribed to such terms in the Security Instrument and other Loan Documents (as defined in the Security Instrument).

3.      **Guaranteed Obligations**. The Guarantors do hereby jointly, severally, unconditionally and absolutely guarantee to SFG the full and prompt payment to SFG of the Note when due, whether by acceleration or otherwise, with such interest as may accrue thereon and such prepayment premiums and other charges as may be due in connection therewith, either before or after maturity thereof, and the full and prompt payment and performance of any and all other obligations due under the Note, Loan Agreement or Loan Documents, whether such obligations now exist or arise hereafter (the "Guaranteed Obligations").

The Guarantors hereby agree that the Guaranteed Obligations shall be paid by the Guarantors to SFG upon demand of SFG in lawful money of the United States of America in accordance with the terms and provisions of this Guaranty.

4.      **Consents**. The Guarantors hereby consent and agree that SFG may at any time, and from time to time, without notice to or further consent from the Guarantors, either with or without consideration: release and surrender any property or other security of any kind or nature whatsoever now or hereafter held by it or by any person or entity on its behalf or for its account, securing any indebtedness or liability hereby guaranteed (the "Collateral"); substitute for any Collateral held by or on behalf of SFG other collateral of like kind, or of any kind; agree to modify the terms of any one or more of the Note, Loan Agreement or other Loan Documents, extend or renew the Note for any period; grant releases, compromises and indulgences with respect to any one or more of the Loan Documents and to any persons or entities now or hereafter liable thereunder or hereunder; release any Guarantor or endorser of or other person or entity liable upon the Note or any other of the Loan Documents; or take or fail to take any action of any type whatsoever. No such action which SFG shall take or fail to take in connection with the Loan Documents or any Collateral, nor any course of dealing with Borrower or any other person, shall limit, impair or release the Guarantors' obligations hereunder, affect this Guaranty in any way or afford the Guarantors any recourse against SFG. Nothing contained in this section shall be construed to require SFG to take or refrain from taking any action referred to herein.

5.      **Waiver and Subordination**. The Guarantors hereby expressly waive any right of contribution from or indemnity against Borrower, whether at law or in equity, arising from any payments made by the Guarantors pursuant to the terms of this Guaranty, and the Guarantors acknowledge that the Guarantors' have no right whatsoever to proceed against Borrower for

reimbursement of any such payments until such time as the Guaranteed Obligations have been fully and completely satisfied.  In connection with the foregoing, the Guarantors expressly waive any and all rights of subrogation to SFG against Borrower until the Guaranteed Obligations are paid in full, and the Guarantors hereby waive any rights to enforce any remedy which SFG may have against Borrower and any rights to participate in any Collateral.  In addition to and without in any way limiting the foregoing, the Guarantors hereby subordinate any and all indebtedness of Borrower now or hereafter owed to the Guarantors to all indebtedness of Borrower to SFG, and agrees with SFG that the Guarantors shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of the Guarantors' obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the Collateral.

6.    **Waiver of Defenses**.   The Guarantors hereby waive and agree not to assert or take advantage of any defense based upon: (a) any incapacity, lack of authority, death or disability of the Guarantors or any other person or entity; (b) any failure of SFG to commence an action against Borrower or any other person or entity, or to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceeding) of Borrower or any other person or entity, whether or not demand is made upon SFG to file or enforce such claim; (c) any failure of SFG to give notice of the existence, creation or incurring of any new or additional indebtedness or other obligation or of any action or nonaction on the part of any other person or entity, in connection with the Loan Documents or any obligation hereby guaranteed; (d) any failure on the part of SFG to ascertain the extent or nature of the Collateral or any insurance or other rights with respect thereto, or the liability of any party liable for the Loan Documents or the obligations evidenced or secured thereby, or any failure on the part of SFG to disclose to the Guarantors any facts it may now or hereafter know regarding Borrower, the Collateral, or such other parties; (e) any lack of acceptance or notice of acceptance of this Guaranty by SFG; (f) any lack of presentment, demand, protest, or notice of demand, protest or nonpayment with respect to any indebtedness or obligations under any of the Loan Documents; (g) any lack of notice of disposition or of manner of disposition of any Collateral; (h) any lack of other notices to which the Guarantors might otherwise be entitled; (i) failure to properly record any document or any other lack of due diligence by SFG in creating or perfecting a security interest in or collection, protection or realization upon any Collateral or  in obtaining reimbursement or performance from any person or entity now or hereafter liable for the Loan Documents or any obligation secured thereby; (j) any invalidity, irregularity or unenforceability, in whole or in part, of any one or more of the Loan Documents; (k) the inaccuracy of any representation or other provision contained in any Loan Document; (l) any sale or assignment of the Loan Documents, in whole or in part; (m) any sale or assignment by Borrower of the Collateral, or any portion thereof, whether or not consented to by SFG; (n) any deficiencies in the Collateral or any deficiency in the ability of SFG to collect or obtain performance from any persons or entities now or hereafter liable for the payment or performance of any obligation hereby guaranteed; (o) an assertion or claim that the automatic stay provided by 11 U.S.C. §362 (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower), or any other stay provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of SFG to enforce

any of its rights, whether now or hereafter acquired, which SFG may have against the Guarantors or the Collateral; (p) any modifications of the Loan Documents or any obligation of Borrower relating to the Loan by operation of law or by action of any court, whether pursuant to the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, or otherwise; (q) any action, occurrence, event or matter consented to by the Guarantors under Section 4 hereof, under any other provision hereof, or otherwise.

7.    **Liability of The Guarantors**.  This is a guaranty of payment and performance and not of collection.  The liability of the Guarantors under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Borrower or any other person, nor against the Collateral.  Guarantors waive any right to require that an action be brought against Borrower or any other person or to require that resort be had to any Collateral or to any balance of any deposit account or credit on the books of SFG in favor of Borrower or any other person.  In the event that, on account of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, Borrower shall be relieved of or fail to incur any debt, obligation or liability as provided in the Loan Documents, the Guarantors shall nevertheless be fully liable therefor.  In the event of a default under the Loan Documents, SFG shall have the right to enforce its rights, powers and remedies (including, without limitation, foreclosure of all or any portion of the Collateral) thereunder or hereunder, in any order, and all rights, powers and remedies available to SFG in such event shall be nonexclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity.  If the indebtedness guaranteed hereby is partially paid by reason of the election of SFG to pursue any of the remedies available to SFG, or is otherwise partially paid, this Guaranty shall nevertheless remain in full force and effect, and the Guarantors shall remain liable for the entire remaining unpaid balance of the indebtedness guaranteed hereby, even though any rights which the Guarantors may have against Borrower may be destroyed or diminished by the exercise of any such remedy.  The Guarantors covenant and agree that, upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower, the Guarantors shall not seek or cause Borrower or any other person or entity to seek a supplemental stay or other relief, whether injunctive or otherwise, pursuant to 11 U.S.C. §105 or any other provision of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of SFG to enforce any rights of SFG against the Guarantors or the Collateral by virtue of this Guaranty or otherwise.

8.    **Security Interest and Setoff**.  Without implying any waiver by SFG of any rights or remedies (including, without limitation, any right of setoff) to which SFG may be entitled, the Guarantors hereby grant to SFG, as security for the liabilities and obligations of the Guarantors hereunder, a lien upon, security title to and a security interest in all of the Guarantors' balances, credits, deposits, accounts, instruments, items, moneys or other property of every kind and description now or hereafter in the possession or control of or otherwise with SFG for any reason, including all dividends and distributions on or other rights in  connection therewith.  SFG may,

without demand or notice of any kind, at any time, or from time to time, and without exercising any rights or remedies against Borrower, any other person or the Collateral, when any amount shall be due and payable hereunder by the Guarantors, exercise any remedy available under law, including the appropriation and application toward the payment of such amount, and in such order of application as SFG may from time to time elect, any such balances, credits, deposits, accounts, instruments, items, moneys or other property of the Guarantors. The proceeds of any such disposition may be applied to reasonable attorney's fees and other expenses incurred by SFG. The Guarantors hereby designate, appoint and empower SFG irrevocably as its attorney-in-fact, at the Guarantors' cost and expense, to do in the name of the Guarantors any and all actions which SFG may deem necessary or advisable to carry out the terms hereof upon the failure, refusal or inability of the Guarantors to do so and to transfer to SFG's name or any third party's name any property of the Guarantors as to which SFG desires to exercise its rights and remedies hereunder. The obligations of the Guarantors and the rights of SFG hereunder are in addition to the obligations of the Guarantors and the rights of SFG under any other guaranty or indemnity agreement given by the Guarantors to SFG in connection with the Loan, and payments made hereunder shall not reduce the liabilities and obligations of the Guarantors under any other such guaranty or indemnity agreement.

9. **Application of Payments**. The Guarantors hereby authorize SFG, without notice to the Guarantors, to apply all payments and credits received from Borrower or from the Guarantors or realized from any security to the indebtedness, obligations and undertakings of Borrower (whether or not the same are the subject of this Guaranty) in such manner and in such priority as SFG in its sole judgment shall determine.

10. **Financial Statements**. The Guarantors acknowledges that the Loan Documents require that Borrower provide or cause to be provided to SFG certain financial statements of the Guarantors. The Guarantors hereby agrees to provide to SFG all such financial statements in such form and at such times as is required under the provisions of the Loan Documents.

11. **Warranties**. The Guarantors warrant and represent (a) that the execution and delivery of this Guaranty does not violate or constitute a breach of any agreement to which the Guarantors are a party or any applicable laws, and (b) that there is no litigation, claim, action or proceeding, pending or threatened against the Guarantors which would adversely affect the financial condition of the Guarantors or the ability of the Guarantors to fulfill all obligations of the Guarantors hereunder, and (c) that all financial statements heretofore delivered by the Guarantors to SFG are true and correct in all respects as of the date thereof, and no material change has occurred in the financial condition of the Guarantors since the date thereof.

12. **Condition of Borrower**. The Guarantors warrant and represent that the Guarantors are fully aware of the financial condition of Borrower and are executing and delivering this Guaranty based solely upon the Guarantors' own independent investigation of all matters pertinent hereto, and that the Guarantors are not relying in any manner upon any representation or statement of SFG. The Guarantors warrant, represent and agree that the Guarantors are in a position to obtain, and the Guarantors hereby assume full responsibility for obtaining, any additional information concerning

the financial condition of Borrower and any other matter pertinent hereto, and that the Guarantors are not relying upon SFG to furnish, and shall have no right to require SFG to obtain or disclose, any information with respect to the indebtedness or obligations guaranteed hereby, the financial condition or character of Borrower or the ability of Borrower to pay the indebtedness or perform the obligations guaranteed hereby, the existence of any collateral or security for any or all of such indebtedness or obligations, the existence or nonexistence of any other guaranties of all or any part of such indebtedness or obligations, any actions or non-action on the part of SFG, Borrower or any other person or entity, or any other matter, fact or occurrence whatsoever.  By executing this Guaranty, the Guarantors acknowledge and knowingly accept the full range of risks encompassed within a contract of guaranty.

13.     **Service of Process**.  The Guarantors hereby (a) submit to personal jurisdiction in the State of Georgia for the enforcement of this Guaranty, and (b) waive any and all rights under the law of any state to object to jurisdiction within the State of Georgia for the purposes of litigation to enforce this Guaranty.  In the event that such litigation is commenced, the Guarantors agree that service of process may be made and personal jurisdiction over the Guarantors obtained, by the serving of a copy of the summons and complaint upon each of the Guarantors' Agent for service of process in the State of Georgia, each Guarantor's Agent address is as follows:

Phillip E. Hugh:        2797 First Street, Unit 1001, Fort Myers, Florida 33916
John W. Economou:   1480 Golden Bell Court, Downers Grove, Illinois 60515
Steve J. Economou:   1141 Sherman Avenue, Evanston, Illinois 60202

Nothing contained herein, however, shall prevent SFG from bringing any action or exercising any rights against any security or against the Guarantors personally, or against any property of the Guarantors, within any other state.  Initiating such proceeding or taking such action in any other state shall in no event constitute a waiver of the agreement contained herein that the law of the State of Georgia shall govern the rights and obligations of the Guarantors and SFG hereunder or of the submission herein made by the Guarantors to personal jurisdiction within the State of Georgia. The aforesaid means of obtaining personal jurisdiction and perfecting service of process are not intended to be exclusive but are cumulative and in addition to all other means of obtaining personal jurisdiction and perfecting service of process now or hereafter provided by the law of the State of Georgia.

14.     **Waiver of Rights**.  The Guarantors hereby waive and renounce, to the fullest extent permitted by law, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Guaranty.

15.     **Changes of Status**. The Guarantors hereby acknowledge and agree that this Guaranty and the obligations of the Guarantors hereunder shall not be affected and shall not be discharged by reason of any change in the status of Borrower, including, without limitation, changes in name or

structure of Borrower; merger or consolidation of Borrower with any other entity or entities, or the transfer of all or any part of Borrower's assets to another entity; termination or dissolution of Borrower; the filing of a petition by or against Borrower under the bankruptcy laws of the United States, or the voluntary or involuntary takeover of Borrower by Borrower's creditors; additions or losses of partners of Borrower by death, succession or otherwise; any change in the status of any Guarantor with respect to Borrower or any partner of Borrower, including, without limitation, termination, transfer or conveyance of any Guarantor's ownership interest in Borrower or in any partner of Borrower, or termination or resignation of any Guarantor as an officer, director or agent of Borrower or any partner of Borrower; or changes in operating procedures, management or in the nature or location of Borrower's business.

16.     **Guaranty Irrevocable**. Unless otherwise set forth herein, this Guaranty shall, be irrevocable by the Guarantors until all indebtedness of Borrower to SFG shall have been completely repaid and all obligations and undertakings of Borrower under, by reason of, or pursuant to the Loan Documents, including, without limitation, the Environmental Indemnification Agreement, shall have been fully and completely performed.

17.     **Remedies**. In the enforcement of this Guaranty, SFG shall have and be entitled to exercise any and all remedies provided herein and otherwise provided by law. All rights, powers and remedies of SFG under this Guaranty and under any agreement between Borrower and SFG or between the Guarantors and SFG, now, or at any time hereafter enforced, shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies provided and available to SFG by law. No exercise of, delay in exercising, or omission to exercise, any rights, powers or remedies by SFG shall be deemed a waiver thereof, and every such right, power and remedy may be exercised by SFG any one or more times or on any one or more occasions without exhaustion.

18.     **Attorneys' Fees**. If this Guaranty is placed in the hands of an attorney for enforcement on behalf of SFG, the Guarantors hereby agree to pay all costs thereof, including, without limitation, the reasonable fees and disbursements of such attorney.

19.     **Modifications; Releases**. This Guaranty may not be changed, amended or modified and no obligation of the Guarantors may be released or waived by SFG or any officer or agent of SFG, except in writing signed by a duly authorized officer of SFG and the Guarantors.

20.     **Claims**. Any claim or claims which SFG may have against Guarantor under this Guaranty at any time or time hereafter shall be asserted by SFG against Guarantor by written notice directed to Guarantor at the address of Guarantor set forth in the preamble to this Guaranty.

21.     **Notices**. All notices required or permitted to be given by either party hereto shall be sent by registered or certified mail, return receipt requested or by nationally recognized overnight courier (e.g., Federal Express) to the party intended to receive such notice at the address shown in the preamble to this Guaranty.

22.     **Governing Law**. This Guaranty shall be governed by, construed and enforced in accordance with the laws of the State of Georgia.

1653117 v05

23.  **Consent of Jurisdiction.** THE GUARANTORS AGREE THAT ANY SUIT FOR THE ENFORCEMENT OF THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF GEORGIA OR ANY FEDERAL COURT SITTING THEREIN AND CONSENT TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT.  THE GUARANTORS HEREBY WAIVE ANY OBJECTION THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.

24.  **Binding Effect.** This Guaranty is and shall be binding upon the Guarantors and their respective heirs, personal representatives, successors and assigns and shall inure to the benefit of any successor to or assignee of SFG.

1853117 v05

 

 

 

 

 

**IN WITNESS WHEREOF,** each Guarantor has executed this Guaranty under seal in manner and form sufficient to legally bind him in accordance with the terms hereof on and as of the day and year first above written.

_____(SEAL)
PHILLIP E. HUGH

_____(SEAL)
JOHN W. ECONOMOU

_____(SEAL)
STEVE J. ECONOMOU

IN WITNESS WHEREOF, each Guarantor has executed this Guaranty under seal in manner and form sufficient to legally bind him in accordance with the terms hereof on and as of the day and year first above written.

_____ (SEAL)
PHILLIP E. HUGH


_____ (SEAL)
JOHN V. ECONOMOU


_____ (SEAL)
STEVE J. ECONOMOU

1653117 v02

# Exhibit
# D

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT, made as of October _8_, 2008, by and between **SPECIALTY FINANCE GROUP LLC**, a Georgia limited liability company, (the "Lender") and **DOC MILWAUKEE, LP**, a Delaware limited partnership (the "Company").

## BACKGROUND

A. **The Loan**.

(a) On January 9, 2008, the Company entered into a loan agreement with the Lender (the "Loan Agreement"). Under the terms of the Loan Agreement, the Lender made available to the Company a construction loan in the maximum principal amount of $14,900,000.00.

(b) On January 9, 2008, the Company executed and delivered to the Lender a promissory note in the original principal amount of $14,900,000.00 evidencing the Loan (the "Note").

(c) On January 9, 2008, the Company executed and delivered to the Lender a Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, which was filed in the Register's Office, Milwaukee County, Wisconsin, on January 11, 2008 as Document #09545343 (the "Mortgage") pursuant to which the Company granted the Lender a first priority lien and security interest in, _inter alia_, land and improvements located at Water Street and Juneau Avenue, Milwaukee, Wisconsin (the "Premises"), its rents and leases, chattel paper, accounts, equipment, general intangibles and fixtures (the "Collateral") to secure all of the Company's obligations to the Lender.

(d) The Lender perfected it security interest in the Collateral by filing UCC-1 financing statements (the "Financing Statements") in the appropriate government offices.

(e) The Loan is jointly and severally guaranteed by Phillip E. Hugh, John W. Economou, and Steve J. Economou pursuant to a Guaranty Agreement dated January 9, 2008 (the "Guaranty").

(f) The Loan Agreement, Note, Mortgage, Guaranty and Financing Statements shall be referred to collectively as the "Loan Documents". The Company's obligations under the Note and other Loan Documents shall be referred to as the "Debt."

B. **The Events of Defaults.**

The Company has committed events of default under the terms of the Note and the other Loan Documents. SFG was first notified by Borrower in April, 2008, of unauthorized Budget over-runs for hard costs as set forth on Exhibit A attached hereto. The defaults include, but are not limited to, unauthorized over-runs to the Construction Budget as set forth on Exhibit A and the failure to fund the sum set forth on Exhibit B attached hereto ("Budget Shortfall") as required by SFG in its judgment and opinion, pursuant to Section 3.25 of the Loan Agreement, to fund the deficiency between Borrower's Equity Contribution and the Loan and the amount required to fully complete the Improvements in accordance with the Plans, and to pay all interest projected by SFG to accrue under the Note, and to pay all other costs for which proceeds of the Loan have been allocated as shown on the Cost Breakdown.

C. **The Agreement.**

The Company and the Lender have reached certain understandings and agreements regarding the forbearance by Lender from exercising its rights and remedies under the Loan Documents. Accordingly, the parties hereto desire to enter into this Agreement to carry out these understandings and agreements.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties hereto, intending to be legally bound, agree as follows:

1. **Background.** The Background set forth above is hereby incorporated into this Agreement and is made a part hereof.

2. **Definitions.** Unless the context clearly requires otherwise, capitalized terms used but not defined herein shall have the meanings set forth in the Loan Documents:

3. **Confirmation of Security Interest.**

(a) The Company hereby ratifies and confirms the Lender's lien and security interest in the Collateral.

(b) The Company shall immediately execute and deliver to the Lender any documents necessary, in the sole determination of the Lender and its counsel, to effectuate and perfect the Lender's security interest in the Collateral.

- 2 -

2283678 v03

**4. Confirmation of Debt.** The Company hereby acknowledges, agrees and confirms without condition or reservation that it is indebted to the Lender on account of the Note and the Loan Documents in the following amounts and that such amounts are due and owing without offset, defense, claims or counterclaim or any kind or nature:

| | |
|---|---|
| Principal | $7,605,866.98 |
| Interest as of September 1, 2008 (the "Accrued Interest") | $38,077.40 |
| Costs and fees incurred (the "Accrued Costs") | $1,500.00 |
| TOTAL | $7,645,444.38 |

plus interest from and after September 1, 2008, plus costs and fees (including Lender's attorney's fees) incurred after August 1, 2008.

**5. Acknowledgments.** The Company hereby acknowledges:

(a) The Debt is validly evidenced by the Note and secured by the Collateral, and the Company has defaulted on its obligations under the Loan Documents.

(b) The Note and the other Loan Documents all remain in full force and effect and the Company has no defense to enforcement by the Lender of any of its rights under the Loan Documents.

(c) The Loan Documents and this Agreement grant to the Lender a fully perfected and first-priority lien against and security interest in all of the Collateral, except as permitted by the Loan Documents, and all accounts and the proceeds thereof, whether existing before or after the commencement of any proceeding under the Bankruptcy Code involving the Company, and such proceeds constitute cash collateral of the Lender within the meaning of Bankruptcy Code Section 363(a).

(d) Except as provided in this Forbearance Agreement, Lender has no obligation to disburse any further proceeds of the Loan unless and until the end of the Forbearance Period (hereinafter defined) and all conditions and requirements set forth in the Loan Documents have been satisfied and met and there exists no Event of Default.

**6. Agreements of Company.** The Company hereby agrees that:

(a) During the week of August 17, 2008, Borrower increased its Equity Contribution in the Project by $2,000,000.00; and during the week of August 24, 2008, Borrower increased its Equity Contribution in the Project by an additional $2,000,000.00 (the "Prior Equity Contributions").

(b) No later than December 1, 2008, the Company shall fund the balance of the Budget Shortfall as set forth on Exhibit B (less the prior Equity Contribution of $4,000,000.00) as required pursuant to Section 3.25 of the Loan Agreement (the "Required Equity Contribution").

- 3 -

2283678 v03

(c) If a bankruptcy order for relief is entered against the Company or if an involuntary bankruptcy petition is filed against the Company, the Lender shall be entitled to obtain upon ex parte application, and without further notice or action of any kind: (i) an order from the Bankruptcy Court prohibiting the use of the Bank's cash collateral and (ii) an order from the Bankruptcy Court granting immediate relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code to permit the Bank to exercise all of its rights and remedies pursuant to the Loan Documents and this Agreement at law and in equity and that the occurrence or existence of any default under the Loan Documents, including the existing Defaults, shall in and of itself constitute "cause" for relief from the automatic stay pursuant to the provisions of Section 362(d) of the Bankruptcy Code.

(d) It will not directly or indirectly oppose or otherwise defend against the Bank's effort to gain relief from the automatic stay provisions of the Bankruptcy Code pursuant to Section 362(d) of the Bankruptcy Code, and covenants and agrees that the Bank shall be entitled to termination of the stay, without the necessity of an evidentiary hearing and without the necessity or requirement that the Bank establish or prove the lack of adequate protection of the Bank's interest in the Collateral or the Company's lack of equity in the Collateral.

7. **Certain Representations and Warranties of the Company**. To induce the Lender to enter into this Agreement, the Company represents and warrants to the Lender as follows:

(a) The Company has all requisite power, authority and capacity to execute, deliver and perform this Agreement. The Company has taken all necessary corporate or other action, under its partnership agreement or other organizational documents, to authorize the execution, delivery and performance of this Agreement and all other instruments or documents provided for herein.

(b) This Agreement and all other instruments and documents provided for herein, when executed and delivered to the Lender, shall each constitute valid obligations, legally binding upon and enforceable against the Company.

(c) The Company has no set-off, counterclaim, or defense to or against payment of the full amount of the Debt; execution of this Agreement shall in no way affect or impair the Company's obligations to the Lender except as expressly provided in this Agreement.

(d) The terms and conditions of the Loan Documents, as heretofore amended, apply and remain in full force and effect except to the extent said Loan Documents are inconsistent with the express terms of this Agreement.

(e) The Company does not have and never has had any claim, right, or cause of action whatsoever, in law or equity, against the Lender; the Lender has not caused the Company to suffer any damage, loss, liability, expense, or obligation of any nature whatsoever.

- 4 -

(f)  The Company is entering into this Agreement in consideration of the mutual premises contained herein and that no officer, employee, representative or agent of the Lender has made any representations, warranties, promises or inducements other than those expressly contained herein; the Company has sought and has received counsel from its attorneys relating to the terms and conditions of this Agreement.

### 8.  Forbearance by Lender.

(a)  Provided no default, other than the existing defaults, specifically identified in Background paragraph B above (the "Identified Defaults") have occurred under the Loan Documents or hereunder, further provided that, in the Lender's reasonable determination, neither the Company's financial condition nor creditworthiness have declined materially from the date hereof, the Lender shall forbear from exercising its rights and remedies under the Loan Documents until December 1, 2008 at which time this Agreement shall terminate unless terminated earlier by Lender under Section 14..

(b)  The Company acknowledges and agrees that the Lender's forbearance hereunder shall not constitute: (1) a continuing or future waiver of, bar to, or agreement to forbear or refrain from proceeding with respect to any Default other than an Identified Default, or (ii) a waiver of, or forbearance with respect to, any Default arising out of any misrepresentation or concealment, or (iii) a waiver of the Lender's rights or remedies after expiration of the Forbearance Period.

(c)  Provided no default, other than the Identified Defaults, have occurred under the Loan Documents or hereunder, and further provided that, in Lender's reasonable determination, neither the Company's financial condition nor creditworthiness have declined materially from the date hereof, Lender shall disburse to Borrower Loan Proceeds in accordance with the amended Cost Breakdown in the amount of the balance of the Draw Requests for May and June, 2008, set forth on Exhibit B, after payment of the $4,000,000.00 Equity Contribution; and the full amount of the Draw Requests for July, August, and September, 2008. Commencing October, 2008, Borrower will fund the October, 2008 Draw Request, and following Draw Requests, out of Borrower's Required Equity Contribution until Borrower has met the full Required Borrower's Equity Contribution as set forth in Paragraph 6(a) and (b).

### 9.  No Additional Loans by the Lender.
Except as provided herein, nothing contained in this Agreement shall be construed in any manner as creating any obligation of the Lender to make any loans to or other advances of any monies to or for the account of the Company.

### 10.  No Obligation Regarding Disposal of Proceeds.
Nothing contained in this Agreement shall be construed in any manner as creating any obligation for the Lender to allow the Company to use any of the proceeds from the sale, collection, or other disposition of the Collateral.

### 11.  No Control.
The Company hereby acknowledges and agrees that any requirement hereunder or under the Loan Documents that the Lender approve or accept

- 5 -

2283678 v03

any action, engagement of service providers, or any other matter by the Company shall not constitute control by the Lender over such matters and that the Company assumes full responsibility for its actions, even if such actions are approved by the Lender. Such approval or acceptance by the Lender shall not create privity of contract between the Lender and any such third party. Moreover, the Company agrees not to raise the issue of control by the Lender in any proceeding now or hereafter instituted or maintained in any court of law or equity and shall indemnify and hold harmless the Lender for any and all liability or damages arising hereunder or related hereto, whether to the Company or to a third party.

12. **Release of the Lender**. For and in consideration of the Lender's entering into this Agreement, the Company, releases and discharges the Lender, the Lender's officers, directors, Lender holding companies, employees, agents, and attorneys, and their agents, heirs, executors, administrators, successors, and assigns (the "Released Parties") from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, whatsoever in law, admiralty or equity, whether known or unknown, which against the Released Parties the Company ever had, now has, or hereafter can, shall, or may have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Agreement. This release shall survive termination of this Agreement, shall pertain to all matters, whether known or unknown, and shall retain its full force and effect regardless of what transpires in the future among the Company and the Lender.

13. **Defaults**. The occurrence of any of the following shall constitute a default ("Default") hereunder:

(a) The occurrence of a default under the Loan Documents, except an Identified Default.

(b) The failure of the Company to perform any of its obligations or covenants in this Agreement.

(c) Any of the Representations and Warranties of the Company herein is discovered to be false as of either the date on which made or the date of this Agreement or any statement, certificate, or data furnished by the Company to the Lender is discovered to be false as of the date on which the facts therein set forth were stated or certified.

(d) The failure of the Company to fund the Budget Shortfall by the end of the Forbearance Period.

(e) The determination by the Lender, in its reasonable discretion, that the Company's financial condition or creditworthiness has declined materially from the date hereof.

- 6 -

2283678 v03

14. **Remedies**. Upon the occurrence of a Default, the Lender shall have the immediate and lasting right to:

(a) exercise any and all remedies it may have under the Loan Documents, or this Agreement, as well as any and all other instruments and agreements relating to the Debt or any part thereof or otherwise existing at law or equity, all of which remedies shall be cumulative and in addition to the remedies expressly provided in this Agreement;

(b) determine, in its sole discretion, which rights, security, liens, security interests, or remedies the Lender shall at any time pursue, relinquish, modify, waive, subordinate, or take any other action with respect thereto;

(c) determine, in its sole discretion, the order or priority of exercising any of its rights or remedies, all without in any way modifying or affecting any of its Collateral or any of the Lender's rights under Loan Documents, this Agreement or under any and all other instruments and agreements relating to the Debt or any part thereof or otherwise existing at law or equity;

(d) terminate this Agreement or any part hereof.

15. **Reimbursement of Lender**. The Company agrees to reimburse the Lender for all reasonable expenses incurred by the Lender, whether before or after any Default hereunder, in connection with the negotiation, review of documents, preparation, execution, delivery, administration, monitoring and enforcement of this Agreement, including, without limitation, attorneys' fees, notary fees, photocopy and telephone expenses, recording or filing costs and the audit reimbursement. The Company agrees that the Lender may reduce the amount of any further Advances under the Loan for such expenses.

16. **Termination**. The Lender's obligations under this Agreement shall terminate upon the earlier of (a) a Default; or (b) the end of the Forbearance Period. All acknowledgements, agreements, releases, representations, warranties and obligations of the Company under this Agreement shall survive termination of this Agreement and be binding upon the Company and its successors, heirs, executors, administrators and assigns.

17. **Notices and Other Communications**. All notices, requests, approvals, consents and other communications required, made or given in connection with this Agreement shall be in writing and delivered pursuant to the procedures stated in the Loan Documents.

18. **Governing Law**. This Agreement shall be governed by the domestic internal laws (but not the law of conflict of laws) of the State of Georgia.

19. **Binding Agreement**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs, executors, administrators and assigns. This Agreement may not be assigned by the Company without the prior written consent of the Lender. This Agreement may be assigned by the

- 7 -

Lender without notice to or the consent of any other party. The parties do not intend the provisions hereof to benefit any person or entity not a party to this Agreement except to the extent specifically stated herein. This Agreement may be amended only by a writing signed by all of the parties hereto and not by oral statements of or courses of dealing between the parties. This Agreement is supplemental and complementary to all existing Loan Documents and, except as expressly stated herein, does not waive, terminate, or change in any manner whatsoever the Company's obligations or the Lender's rights under any such Loan Documents, all of which Loan Documents are hereby ratified and confirmed. To the extent that the terms and conditions of any such other Loan Documents are expressly inconsistent with the terms and conditions hereof, then the terms and conditions of this Agreement shall control.This Agreement shall not be effective until executed and delivered by both parties hereto the Endorsement has been delivered and the other liens have been released as provided by Section 6 hereof.

20. **Delay or Omission Not a Waiver.** No delay or omission on the part of the Lender to exercise any right provided it by this Agreement or any other instrument or agreement shall impair any such right or be construed to be a waiver of any such right or any acquiescence to the state of facts giving rise to such right. No waiver of any Default hereunder shall affect any later Default or impair any right of the Lender. No single, partial or full exercise of any right by the Lender shall preclude further or other exercise thereof.

21. **Captions.** The captions in this Agreement are inserted for convenience of reference only and shall not be construed as a part of this Agreement.

22. **Gender and Number.** The use of the masculine gender in this Agreement shall be deemed to refer to the feminine gender and the use of the singular shall be deemed to refer to the plural, and vice versa, whenever the context so requires.

23. **Partial Invalidity.** If any portion of this Agreement is held to be illegal, invalid or unenforceable by a court, the remainder of this Agreement shall remain in effect as written.

2283678 v03

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

SPECIALTY FINANCE GROUP LLC

By: _____

Name: _DILIP R. PATEL_____

Title: _SVP_____

DOC MILWAUKEE, LP, a Delaware limited partnership

By: DOC Milwaukee II, LLC, a Delaware limited liability company, its general partner

By: Development Opportunity Corporation, a Delaware corporation, its manager

By: _Phillip E. Hugh_____

Name: _Phillip Hugh_____

Title: _President_____

## ACKNOWLEDGMENT

STATE OF _Florida_ )
COUNTY OF _Lee_ ) SS.

Personally came before me this _7th_ day of ~~August~~ October?, 2008, the above named _Phillip E. Hugh_, the _President_ of Development Opportunity Corporation, a Delaware corporation and the manager of DOC Milwaukee II, LLC, a Delaware limited liability company and the general partner of DOC Milwaukee, LP, a Delaware limited partnership, to me known to be the person who executed the foregoing instrument and acknowledged the same.

_____
Signature

_Kathleen K Nevans_
Printed Name

Notary Public, _Lee_ County, State of _Florida_
My Commission Expires: _Oct 13, 2009_

KATHLEEN K NEVANS
Notary Public - State of Florida
My Commission Expires Oct 13, 2009
Commission # DD 481462
Bonded By National Notary Assn.

- 10 -

2213678 v0503

ACCEPTED AND AGREED TO:

GUARANTORS:

_____
PHILLIP E. HUGH

_____
JOHN W. ECONOMOU

_____
STEVE J. ECONOMOU

2283671 v6201

ACCEPTED AND AGREED TO:

GUARANTORS:

PHILLIP F. HUGH

JOHN W. ECONOMOU

STEVE J. ECONOMOU

2283678 v03

## EXHIBIT A

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| LOAN AMOUNT: | $ 14,400,000.00 | | | | | | | | |
| REQUIRED EQUITY CONTRIBUTION: | $ 12,383,302.00 | 83.47% | | | | | | | |
| Number of Units: | 121 | Cost per Unit: | | $ | 304,804.13 | | | | |
| Building Area (sq. feet): | 16,839 | Cost per sq. ft.: | | $ | 1,822.35 | | | | |
| TOTAL PROJECT BUDGET AT LOAN APPROVAL: | $ 27,399,302.00 | Fixed cost per sq. ft.: | | $ | 1,366.18 | | | | |
| TOTAL DEVELOPMENT COSTS AT COMMENCEMENT DATE: | $ 27,899,302.00 | | | | | | | | |

| Project Scope | Budget Description | Budget Amount at Closing | UPDATED Budget 10/27/08 | Owner Equity Paid (per TCP) | Owner Equity Paid (5/21/08 to equivalent) | Total Loan Amounts Disbursed | Available Budget after pending draws | Current Overages over Current Budget |
|---|---|---|---|---|---|---|---|---|
| **FIXED CONSTRUCTION COSTS** | | | | | | | | |
| Division 1 - General Requirements & Conditions | | 1,131,362.45 | 1,191,486.48 | 663,744.29 | 16,343.36 | 426,378.36 | 1,402,445.36 | - |
| Division 2 - Site Construction | | 545,808.36 | 907,866.68 | 352,484.21 | 176,307.89 | 254,166.41 | 36,622.80 | - |
| Division 3 - Concrete | | 8,138,397.36 | 11,306,388.88 | 4,948,732.45 | 577,163.89 | 3,612,540.71 | 100,857.48 | - |
| Division 4 - Masonry | | - | 21,394.60 | - | 92,885.88 | - | 35,125.89 | - |
| Division 5 - Metals | | 71,850.80 | 291,787.80 | 24,383.00 | 51,527.30 | 36,588.20 | 74,538.30 | - |
| Division 6 - Wood & Plastic (inc Routing Drywall Conversion) | | 808,886.80 | 1,096,661.30 | - | 423,803.60 | 308,528.00 | 638,946.60 | - |
| Division 7 - Thermal and Moisture Protection | | 193,808.60 | 369,482.38 | - | 143,865.70 | 93,803.00 | 90,712.80 | - |
| Division 8 - Doors and Windows | | 1,225,902.00 | 1,737,448.80 | 361,523.80 | 208,866.70 | 652,500.00 | 366,884.86 | - |
| Division 9 - Plaster | | - | 265,500.80 | - | 1,462.00 | - | 265,540.80 | - |
| Division 10 - Specialties | | - | - | - | - | - | - | - |
| Division 11 - Equipment | | - | - | - | - | - | - | - |
| Division 12 - Furnishings (Retail only) | | - | - | - | - | - | - | - |
| Division 13 - Special Construction | | - | - | - | - | - | - | - |
| Division 14 - Conveying Systems (Elevator & Overhead Door) | | 518,800.00 | 794,584.80 | - | 274,060.80 | 196,574.20 | 316,386.36 | - |
| Division 15 - Mechanical | | 2,808,521.80 | 3,545,560.80 | 97,726.88 | 1,228,388.12 | 692,716.44 | 328,634.42 | - |
| Division 16 - Electrical | | 975,980.80 | 1,604,324.88 | 24,462.30 | 426,782.38 | 302,867.38 | 596,157.80 | - |
| **Subtotal Hard Construction Costs** | | 14,367,814.86 | 27,343,131.06 | 6,725,980.88 | 3,779,843.48 | 6,892,674.44 | 1,962,413.34 | - |
| | | | | | | | | |
| **CONSTRUCTION/HARDCOST CONTINGENCY** | | | | | | | | |
| Construction Project Contingency | | 908,903.80 | - | 1,172,613.39 | - | - | (1,172,613.39) | (1,172,613.39) |
| Cost Variance to Approved Budget | | 1,522,148.86 | 835,738.72 | - | - | - | 635,739.26 | - |
| **Subtotal Contingency** | | 2,343,847.86 | 836,718.72 | 1,172,613.39 | - | - | (547,864.06) | (1,172,613.39) |
| | | | | | | | | |
| **CHANGE ORDERS** | | | | | | | | |
| Approved Change Orders | | - | 38,877,748.57 | - | - | - | 38,877,748.57 | - |
| Change Orders (incse Increases to Div 1-16) | | - | (38,694,116.15) | - | - | - | (38,694,116.15) | - |
| CO #3 | | - | - | - | - | - | - | - |
| CO #4 | | - | - | - | - | - | - | - |
| CO #5 | | - | - | - | - | - | - | - |
| **Subtotal Change Orders** | | - | 183,736.53 | - | - | - | 183,736.53 | - |
| | | | | | | | | |
| **TOTAL FIXED CONSTRUCTION COSTS** | 4.47% | 23,048,674.90 | 28,692,500.73 | 7,483,391.37 | 3,775,843.48 | 6,833,474.44 | 3,946,263.10 | (1,172,613.39) |
| | | | | | | | | |
| **PROJECT SOFT COSTS** | | | | | | | | |
| Development Fees | | - | - | - | - | 183,252.80 | (185,252.88) | (183,252.08) |
| Project Mgt Reimbursmt Fees (inc Construction Mgmt Fee & Preliminary Mgmt Fee) | | - | 1,718,920.80 | 1,364,620.25 | 91,125.80 | 36,448.38 | 391,384.36 | - |
| Architect, Design, Engineering & Environmental | | 795,803.80 | 798,622.80 | 363,340.38 | - | 45,798.88 | (139,387.26) | (138,387.26) |
| Lender, Appraisal, Legal & Closing Cost | | 361,100.80 | 527,361.39 | 298,454.14 | 15,885.80 | 252,488.88 | 388.34 | - |
| Insurance & Taxes | | 349,800.80 | 226,648.80 | 127,845.74 | 3,842.43 | 81,234.33 | 72,694.80 | - |
| Construction Period Interest | | 1,498,603.80 | 1,350,603.80 | - | - | 38,877.14 | 1,223,389.38 | - |
| Pre-Opening Expenses (marketing/miscellaneous) | | 394,303.80 | 575,803.80 | 221,277.38 | 34,748.88 | 90,121.14 | 65,468.57 | - |
| Working Capital | | 58,103.80 | 403,803.80 | - | - | - | 38,746.35 | - |
| Misc. Soft Costs | | 673,381.19 | 298,600.80 | 71,952.07 | 6,488.80 | 21,462.14 | 81,461.35 | - |
| **PERMITS AND FEES** | | | | | | | | |
| Public Permits and Fees | | 303,801.80 | 131,803.80 | 36,823.80 | - | - | 181,023.80 | - |
| Pre-Development Expenses (pre & sw tax) | | - | - | - | - | - | - | - |
| Participating Public Contributions | | - | - | - | - | - | - | - |
| **FIXTURES, FURNITURE AND EQUIPMENT** | | | | | | | | |
| FF&E/signage (include Retail, demountable tax, pos & telephone sw) | | 1,303,400.80 | 1,446,808.80 | 738,803.58 | 87,800.30 | 14,846.57 | 1,304,880.34 | - |
| Childcare | | 100,888.80 | 188,303.80 | - | - | - | 98,781.57 | - |
| Freight (8.3%) & Tax (9%) | | 153,888.30 | 226,188.89 | - | - | - | 253,348.80 | - |
| **LAND ACQUISITION** | | | | | | | | |
| Land/Building | | 2,228,245.80 | 2,728,282.80 | 2,338,818.36 | - | - | (79,599.10) | (90,799.10) |
| | | | | | | | | |
| **TOTAL SOFT COSTS (Excl Land)** | | 8,644,438.18 | 10,480,347.38 | 8,660,198.40 | 381,864.38 | 773,197.34 | 3,763,894.29 | (362,494.13) |
| | | | | | | | | |
| **TOTAL DEVELOPMENT COSTS** | | 27,893,862.87 | 38,797,748.38 | 13,443,144.77 | 4,138,897.89 | 7,606,840.90 | 7,563,329.87 | (1,536,112.87) |
| | | | | | | | | |
| **DEVELOPMENT SOURCES** | | | | | | | | |
| SFG Loan | | 14,988,800.80 | 14,982,480.80 | - | - | 7,600,864.38 | 2,541,262.37 | - |
| SFG Loan - Amount Reserved for Retainage | | - | - | - | - | - | (1,342,225.45) | - |
| Equity from Land Contribution | | 2,228,245.80 | 3,306,808.88 | 3,306,808.36 | - | - | (0.02) | (0.02) |
| Equity (Cash and uninstalled loss) | | 10,743,052.80 | 14,757,905.80 | 10,787,445.38 | - | - | - | - |
| Deferred Equity (to be contributed as participants) | | - | 14,754,983.88 | - | 4,138,977.83 | - | 1,885,708.80 | - |
| **TOTAL** | | 27,865,380.38 | 38,757,784.73 | 13,383,344.77 | 4,138,977.83 | 7,600,864.80 | 3,738,361.87 | (0.20) |
| **SURPLUS / GAP** | | - | - | (1,666,388.00) | - | - | (1,536,112.67) | |
| | | | | | $ | 17,143,522.39 | | 1,885,289.60 | |
| | | | | | | | 1,353,812.40 | |
| | | | | | | | 8,234,630.43 | |

EXHIBIT B

Borrower's Budget
Modification

Budget Modification

| | | Tab # |
|---|---|---|
| Construction Budget as of: 12-1-08 | $ 18,248,087.00 | 1 |
| **Budget Increase Analysis 7-1-08** | **Expected Cost Impact** | |
| **Design** | | |
| Building Area Increase: | $ 286,427.00 | 2 |
| Change in 2006 vs 2008 – RS Means Estimating Data. Construction Data for 2008 increases cost by $6.61 psf @ 237,523 = | $ 1,570,027.00 | 3 |
| Curtain Wall: enhanced curtain wall exterior closure in lieu of storefront material upgraded low colored glass, spandrel panels and clip system | $ 615,200.00 | 4 |
| Building Height / Interior Ceiling Height from 9'-0" clear to 10'-0" clear added 14'-0" to overall height of building impact all systems | $ 415,000.00 | 5 |
| HVAC Re-Design: complete redesign of original PTAC through wall heating and cooling system to a central chiller system with more effective heat and cooling capabilities, better aesthetics, marketability and service. | $ 1,345,000.00 | 6 |
| **Site Conditions** | | |
| Poor Soils - Unusable "contaminated top 13" of soil | $ 53,625.00 | |
| Hauling fee to remove "contaminated soils" | $ 2,406.00 | |
| Additional equipment trucking costs | $ 1,422.00 | |
| Mud slide required | $ 6,368.00 | |
| Greater excavation due to unsafe slopes b/c of poor soils | $ 1,670.00 | |
| Added Road Restoration | $ 34,895.00 | |
| Crane Matting for Road Repair | $ 30,000.00 | |
| Crane Matting - Phase 2 | $ 158,041.00 | |
| Soldier Piles for Street/Sidewalk Support/Underpinning Bar Louie Property | $ 346,426.00 | 8 |
| **Unforeseen Conditions** | | |
| Sidewalk / Street permits for access / safety | $ 500.00 | |
| Canopy permit and Marketing Signage on Water Street | | |
| Signage on canopy / scaffold at Water St. | $ 7,968.00 | |
| WE Energies fee to relocate existing power lines | $ 76,158.00 | |
| Generator and additional precautionary electrical to support Bar Louie during WE energies power line shut down / relocation | $ 5,000.00 | |
| | $ 89,626.00 | 7 |
| **City Requirements** | | |
| City Design Requirement in order to obtain appearance approval: balcony/facade/design | $ 325,000.00 | |
| City of Milwaukee to add Windows/Screening at garage levels | $ 25,000.00 | |
| Additional mechanical required for exhaust / fresh air intake | $ 31,000.00 | |
| | $ 381,000.00 | 9 |

Staybridge Suites/Residences on Water
Milwaukee, Wisconsin

Budget Modification

**Time / Schedule**

Material price increases anticipated 2008 (5.4% on remaining contracts based on current trends)         $    164,000.00
Labor price increases anticipated 2008 (6.4% on remaining contracts based on current trends)             $    164,000.00
Winter condition costs ref most site                                                                      $     66,000.00
Weather & Tight Schedule                                                                                  $      6,800.00
                                                                                                          $    641,800.00

While continuing to drill caissons during rain we needed to reexcavate our
mass excavation due to "unloading" caisson spoils on site. (No dumps were open
so we were forced to dump our caisson spoils in an already excavated hole)

**Caissons - Midwest Drilled Foundations**

Original Caisson budget based on 50' belled caisson instead of 100' straight shaft ($510,000)

Additional caisson testing - originally negotiated 2 test caissons down to 1.                             $     22,000.00
   When this test failed we needed 2 additional tests.
   With the failed caisson more time was spent to redesign and await test results
Additional Scope and Obstruction Delays in ground at 30'-0" and 90'-0" below grade                        $    873,000.00
Due to obstruction delays
   Additional time for Engineering testing and reporting was incurred                                     $     20,000.00
                                                                                                          $    915,000.00
                                                                                                                        9

Site Office; on site office in lieu of job trailer adding $1100 per month for project duration            $     19,800.00

Total Modification from Budget 12-21-06 to Present (7-1-08)                                                $  7,161,943.00

Staybridge Suites/Residences on Water
Milwaukee, Wisconsin

# Exhibit
# E

## SECOND FORBEARANCE AGREEMENT

THIS SECOND FORBEARANCE AGREEMENT (the "Agreement"), made as of April __, 2009, by and between **SPECIALTY FINANCE GROUP LLC**, a Georgia limited liability company, (the "Lender") and **DOC MILWAUKEE, LP**, a Delaware limited partnership (the "Company").

## BACKGROUND

A. **The Loan**.

(a) On January 9, 2008, the Company entered into a loan agreement with the Lender (the "Loan Agreement"). Under the terms of the Loan Agreement, the Lender made available to the Company a construction loan in the maximum principal amount of $14,900,000.00 (the "Loan).

(b) On January 9, 2008, the Company executed and delivered to the Lender a promissory note in the original principal amount of $14,900,000.00 evidencing the Loan (the "Note").

(c) On January 9, 2008, the Company executed and delivered to the Lender a Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, which was filed in the Register's Office, Milwaukee County, Wisconsin, on January 11, 2008 as Document #09545343 (the "Mortgage") pursuant to which the Company granted the Lender a first priority lien and security interest in, inter alia, land and improvements located at Water Street and Juneau Avenue, Milwaukee, Wisconsin (the "Premises"), its rents and leases, chattel paper, accounts, equipment, general intangibles and fixtures (the "Collateral") to secure all of the Company's obligations to the Lender.

(d) The Lender perfected it security interest in the Collateral by filing UCC-1 financing statements (the "Financing Statements") in the appropriate government offices.

(e) The Loan is jointly and severally guaranteed by Phillip E. Hugh, John W. Economou, and Steve J. Economou (the "Guarantors") pursuant to a Guaranty Agreement dated January 9, 2008 (the "Guaranty").

(f) The Loan Agreement, Note, Mortgage, Guaranty and Financing Statements shall be referred to collectively as the "Loan Documents". The Company's obligations under the Note and other Loan Documents shall be referred to as the "Debt."

(g) The Company is in default in the payment and/or performance of certain provisions of the Loan Documents. The Company, the Guarantors and the Lender entered into that certain Forbearance Agreement dated as of October 8, 2008 ("First Forbearance"). The Company failed to comply with certain terms of the First

2461622 v04

Forbearance and therefore is in default under the same. The Company and the Guarantors have requested that the Lender further forebear from exercising its rights and remedies under the Loan Documents for a period of time as specified herein in reliance upon the covenants, representations, and warranties of the Company and the Guarantors herein and for other consideration.

B. **The Events of Defaults.**

The Company has committed certain Events of Default under the terms of the Loan Agreement, the Note, the other Loan Documents and the First Forbearance as more particularly set forth in that certain letter dated March 2, 2009 from the Lender's attorney, Duncan W. Miller, to the Company (the "Letter"). A copy of the Letter is attached hereto as Exhibit A and by this reference made a part hereof.

C. **The Agreement.**

The Company and the Lender have reached certain understandings and agreements regarding the forbearance by Lender from exercising its rights and remedies under the Loan Documents. Accordingly, the parties hereto desire to enter into this Agreement to carry out these understandings and agreements.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties hereto, intending to be legally bound, agree as follows:

1. **Background**. The Background set forth above is hereby incorporated into this Agreement and is made a part hereof.

2. **Definitions**. Unless the context clearly requires otherwise, capitalized terms used but not defined herein shall have the meanings set forth in the Loan Agreement.

3. **Confirmation of Security Interest**.

(a) The Company hereby ratifies and confirms the Lender's lien and security interest in the Collateral.

(b) The Company shall immediately execute and deliver to the Lender any documents necessary, in the sole, but reasonable, determination of the Lender and its counsel, to effectuate and perfect the Lender's security interest in the Collateral.

4. **Confirmation of Debt**. The Company hereby acknowledges, agrees and confirms without condition or reservation that it is indebted to the Lender on account of the Note and the Loan Documents in the following amounts and that such amounts are due and owing without offset, defense, claims or counterclaim or any kind or nature:

| | |
|---|---|
| Principal | $13,385,048.74 |
| Interest as of March 31, 2009 (the "Accrued Interest") | $44,366.19 |
| Costs and fees incurred (the "Accrued Costs") | $1,958.49 |
| TOTAL | $13,431,373.42 |

plus interest from and after March 31, 2009, plus costs and fees (including Lender's attorney's fees) incurred after March 31, 2009, including, but not limited to, the cost of an updated appraisal that was ordered by Lender prior to March 31, 2009 but that Lender has not yet been billed for.

5. **Acknowledgments**. The Company hereby acknowledges:

(a) Upon the occurrence of a Default hereunder, Lender shall have the right to accelerate the maturity of the Debt and the entire Debt shall become due and payable in full.

(b) The Debt is validly evidenced by the Note and secured by the Collateral, and the Company has defaulted on its obligations under the Loan Documents.

(c) The Note and the other Loan Documents all remain in full force and effect and the Company has no defense to enforcement by the Lender of any of its rights under the Loan Documents.

(d) The Loan Documents and this Agreement grant to the Lender a fully perfected and first-priority lien against and security interest in all of the Collateral, except as permitted by the Loan Documents, and all accounts and the proceeds thereof, whether existing before or after the commencement of any proceeding under the Bankruptcy Code involving the Company, and such proceeds constitute cash collateral of the Lender within the meaning of Bankruptcy Code Section 363(a).

(e) Lender has no obligation to disburse any further proceeds of the Loan unless and until all conditions and requirements set forth in the Loan Documents and this Agreement have been satisfied and met and there exists no Event of Default.

6. **Agreements of Company**. The Company hereby agrees that:

(a) Commencing on the day that is seven (7) days after the date of this Agreement, and then on the same day of the week each week thereafter through the end of the Forbearance Period, the Company shall provide the Lender with a written report that shall update the Lender as to the Company's ability and plans for curing the Identified Defaults (the "Progress Reports"). The information in these Progress Reports shall include, but shall not be limited to, information regarding (i) the status of the Project, (ii) the amount of money that will be required for completion of the Project in accordance with the Loan Documents, and (iii) where any additional funds required to

2461622 .v04

complete the Project in accordance with the Loan Documents will be obtained from. Such Progress Reports must be reasonably satisfactory to the Lender in both form and substance. In addition, at least seven (7) days prior to the end of the Forbearance Period, the principals of the Company and the principals of the sources of the additional proceeds required to complete the Project in accordance with the Loan Documents, shall meet with the Lender (at a time and place agreeable to the Lender) to review the Company's ability to cure the Identified Defaults prior to the expiration of the Forbearance Period.

(b) If the Company files a voluntary bankruptcy petition or if a bankruptcy order for relief is entered against the Company or an involuntary bankruptcy petition is filed against the Company, the Lender shall be entitled to obtain upon ex parte application, and without further notice or action of any kind: (i) an order from the Bankruptcy Court prohibiting the use of the Bank's cash collateral and (ii) an order from the Bankruptcy Court granting immediate relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code to permit the Bank to exercise all of its rights and remedies pursuant to the Loan Documents and this Agreement at law and in equity and that the occurrence or existence of any default under the Loan Documents, including the existing Defaults, shall in and of itself constitute "cause" for relief from the automatic stay pursuant to the provisions of Section 362(d) of the Bankruptcy Code.

(c) It will not directly or indirectly oppose or otherwise defend against the Bank's effort to gain relief from the automatic stay provisions of the Bankruptcy Code pursuant to Section 362(d) of the Bankruptcy Code, and covenants and agrees that the Bank shall be entitled to termination of the stay, without the necessity of an evidentiary hearing and without the necessity or requirement that the Bank establish or prove the lack of adequate protection of the Bank's interest in the Collateral or the Company's lack of equity in the Collateral.

7. **Certain Representations and Warranties of the Company**. To induce the Lender to enter into this Agreement, the Company represents and warrants to the Lender as follows:

(a) The Company has all requisite power, authority and capacity to execute, deliver and perform this Agreement. The Company has taken all necessary corporate or other action, under its partnership agreement or other organizational documents, to authorize the execution, delivery and performance of this Agreement and all other instruments or documents provided for herein.

(b) This Agreement and all other instruments and documents provided for herein, when executed and delivered to the Lender, shall each constitute valid obligations, legally binding upon and enforceable against the Company.

(c) The Company has no set-off, counterclaim, or defense to or against payment of the full amount of the Debt; execution of this Agreement shall in no way affect or impair the Company's obligations to the Lender except as expressly provided in this Agreement.

- 4 -

(d) The terms and conditions of the Loan Documents, as heretofore amended, apply and remain in full force and effect except to the extent said Loan Documents are inconsistent with the express terms of this Agreement.

(e) The Company does not have and never has had any claim, right, or cause of action whatsoever, in law or equity, against the Lender; the Lender has not caused the Company to suffer any damage, loss, liability, expense, or obligation of any nature whatsoever.

(f) The Company is entering into this Agreement in consideration of the mutual premises contained herein and that no officer, employee, representative or agent of the Lender has made any representations, warranties, promises or inducements other than those expressly contained herein; the Company has sought and has received counsel from its attorneys relating to the terms and conditions of this Agreement.

## 8. Forbearance by Lender.

(a) Provided that (i) no default, other than the existing defaults, specifically identified in the Letter (the "Identified Defaults") have occurred under the Loan Documents or hereunder, (ii) in the Lender's reasonable determination, neither the Company's financial condition nor creditworthiness have declined materially from the date hereof, and (iii) in the Lender's reasonable determination, the Company has the financial ability to complete the Project pursuant to the terms of the Loan Documents, the Lender shall forbear from exercising its rights and remedies under the Loan Documents until May 1, 2009 (the "Forbearance Period") at which time this Agreement shall terminate unless terminated earlier by Lender under Section 15.

(b) The Company acknowledges and agrees that the Lender's forbearance hereunder shall not constitute: (i) a continuing or future waiver of, bar to, or agreement to forbear or refrain from proceeding with respect to any Event of Default other than an Identified Default, (ii) a waiver of, or forbearance with respect to, any Event of Default arising out of any misrepresentation or concealment, or (iii) a waiver of the Lender's rights or remedies after expiration of the Forbearance Period.

**9. Payment.** Contemporaneously with the execution of this Agreement, the Company shall make two payments to Lender: one in the amount of $44,366.19, which shall be for the interest payment on the Note due April 1, 2009 and one in the amount of $25,000.00, which shall be for the payment of Lender's legal fees related to the defaults under the Loan, the First Forbearance and this Agreement.

**10. No Additional Loans by the Lender.** Nothing contained in this Agreement shall be construed in any manner as creating any obligation of the Lender to make any loans to or other advances of any monies to or for the account of the Company.

**11. No Obligation Regarding Disposal of Proceeds.** Nothing contained in this Agreement shall be construed in any manner as creating any obligation for the Lender to allow the Company to use any of the proceeds from the sale, collection, or other disposition of the Collateral.

2461622 v04

12. **No Control**.  The Company hereby acknowledges and agrees that any requirement hereunder or under the Loan Documents that the Lender approve or accept any action, engagement of service providers, or any other matter by the Company shall not constitute control by the Lender over such matters and that the Company assumes full responsibility for its actions, even if such actions are approved by the Lender.  Such approval or acceptance by the Lender shall not create privity of contract between the Lender and any such third party.  Moreover, the Company agrees not to raise the issue of control by the Lender in any proceeding now or hereafter instituted or maintained in any court of law or equity and shall indemnify and hold harmless the Lender for any and all liability or damages arising hereunder or related hereto, whether to the Company or to a third party.

13. **Release of the Lender**.  For and in consideration of the Lender's entering into this Agreement, the Company, releases and discharges the Lender, the Lender's officers, directors, Lender holding companies, employees, agents, and attorneys, and their agents, heirs, executors, administrators, successors, and assigns (the "Released Parties") from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, whatsoever in law, admiralty or equity, whether known or unknown, which against the Released Parties the Company ever had, now has, or hereafter can, shall, or may have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Agreement.  This release shall survive termination of this Agreement, shall pertain to all matters, whether known or unknown, and shall retain its full force and effect regardless of what transpires in the future among the Company and the Lender.

14. **Defaults**.  The occurrence of any of the following shall constitute a default ("Default") hereunder:

    (a)  The failure of the Company to cure the Identified Defaults by the end of the Forbearance Period.

    (b)  The occurrence of a default under the Loan Documents, other than an Identified Default.

    (c)  The failure of the Company to perform any of its obligations or covenants under this Agreement.

    (d)  Any of the Representations and Warranties of the Company herein is discovered to be false as of either the date on which made or the date of this Agreement or any statement, certificate, or data furnished by the Company to the Lender is discovered to be false as of the date on which the facts therein set forth were stated or certified.

    (e)  The determination by the Lender, in its reasonable discretion, that the Company's financial condition or creditworthiness has declined materially from the date

- 6 -

hereof or that the Company does not have the financial ability to complete the Project pursuant to the terms of the Loan Documents.

**15. Remedies.** Upon the occurrence of a Default hereunder, the Lender shall have the immediate and lasting right to:

(a) exercise any and all remedies it may have under the Loan Documents, or this Agreement, as well as any and all other instruments and agreements relating to the Debt or any part thereof or otherwise existing at law or equity, all of which remedies shall be cumulative and in addition to the remedies expressly provided in this Agreement;

(b) determine, in its sole discretion, which rights, security, liens, security interests, or remedies the Lender shall at any time pursue, relinquish, modify, waive, subordinate, or take any other action with respect thereto;

(c) determine, in its sole discretion, the order or priority of exercising any of its rights or remedies, all without in any way modifying or affecting any of its Collateral or any of the Lender's rights under Loan Documents, this Agreement or under any and all other instruments and agreements relating to the Debt or any part thereof or otherwise existing at law or equity;

(d) terminate this Agreement or any part hereof.

**16. Reimbursement of Lender.** The Company agrees to reimburse the Lender for all reasonable expenses incurred by the Lender, whether before or after any Default hereunder, in connection with the negotiation, review of documents, preparation, execution, delivery, administration, monitoring and enforcement of this Agreement, including, without limitation, reasonable attorneys' fees, notary fees, photocopy and telephone expenses, recording or filing costs and the audit reimbursement. The Company agrees that the Lender may reduce the amount of any further Advances under the Loan for such expenses.

**17. Termination.** The Lender's obligations under this Agreement shall terminate upon the earlier of (a) a Default hereunder; or (b) the end of the Forbearance Period. All acknowledgements, agreements, releases, representations, warranties and obligations of the Company under this Agreement shall survive termination of this Agreement and be binding upon the Company and its successors, heirs, executors, administrators and assigns.

**18. Notices and Other Communications.** All notices, requests, approvals, consents and other communications required, made or given in connection with this Agreement shall be in writing and delivered pursuant to the procedures stated in the Loan Documents.

**19. Governing Law.** This Agreement shall be governed by the domestic internal laws (but not the law of conflict of laws) of the State of Georgia.

2461622 v04

**20. Binding Agreement**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs, executors, administrators and assigns. This Agreement may not be assigned by the Company without the prior written consent of the Lender. This Agreement may be assigned by the Lender without notice to or the consent of any other party. The parties do not intend the provisions hereof to benefit any person or entity not a party to this Agreement except to the extent specifically stated herein. This Agreement may be amended only by a writing signed by all of the parties hereto and not by oral statements of or courses of dealing between the parties. This Agreement is supplemental and complementary to all existing Loan Documents and, except as expressly stated herein, does not waive, terminate, or change in any manner whatsoever the Company's obligations or the Lender's rights under any such Loan Documents, all of which Loan Documents are hereby ratified and confirmed. To the extent that the terms and conditions of any such other Loan Documents are expressly inconsistent with the terms and conditions hereof, then the terms and conditions of this Agreement shall control.This Agreement shall not be effective until executed and delivered by both parties hereto the Endorsement has been delivered and the other liens have been released as provided by Section 6 hereof.

**21. Delay or Omission Not a Waiver**. No delay or omission on the part of the Lender to exercise any right provided it by this Agreement or any other instrument or agreement shall impair any such right or be construed to be a waiver of any such right or any acquiescence to the state of facts giving rise to such right. No waiver of any Default hereunder shall affect any later Default or impair any right of the Lender. No single, partial or full exercise of any right by the Lender shall preclude further or other exercise thereof.

**22. Captions**. The captions in this Agreement are inserted for convenience of reference only and shall not be construed as a part of this Agreement.

**23. Gender and Number**. The use of the masculine gender in this Agreement shall be deemed to refer to the feminine gender and the use of the singular shall be deemed to refer to the plural, and vice versa, whenever the context so requires.

**24. Partial Invalidity**. If any portion of this Agreement is held to be illegal, invalid or unenforceable by a court, the remainder of this Agreement shall remain in effect as written.

[Signatures Begin on the Following Page]

- 8 -

2461622 v04

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**SPECIALTY FINANCE GROUP LLC**

By:_____

Name:_____

Title:_____

**DOC MILWAUKEE, LP**, a Delaware limited partnership

By: _E P MILWAUKEE, LLC_; its general partner

By:_____

Name: _JOHN ECONOMOU_

Title: _MANAGER OF G.P. EP MILWAUKEE, LLC._

## ACKNOWLEDGMENT

STATE OF _ILLINOIS_ )

COUNTY OF _Cook/DuPage_ ) SS.

Personally came before me this _3rd_ day of April, 2009, the above named _JOHN ECONOMOU_ , the _MANAGER_ of _EP MILWAUKEE, LLC_ , an _Illinois limited liability company_ and the general partner of DOC Milwaukee, LP, a Delaware limited partnership, to me known to be the person who executed the foregoing instrument and acknowledged the same.

_____
Signature

_JOHN R. WIESER_
Printed Name

Notary Public, _DuPage_ County, State of _Illinois_

My Commission Expires: _1-13-13_

JOHN R WIESER
OFFICIAL SEAL
MY COMMISSION EXPIRES
JANUARY 13, 2013

- 9 -

2461622 v04

**ACCEPTED AND AGREED TO:**

**GUARANTORS:**

_____
PHILLIP E. HUGH

_____
JOHN W. ECONOMOU

_____
STEVE J. ECONOMOU

2461622 v04

**Exhibit A**

The Letter

2461622 v04

# Exhibit F


**MORRIS, MANNING & MARTIN, LLP**
ATTORNEYS AT LAW

July 13, 2009

Duncan W. Miller
404-504-5460
dmiller@mmmlaw.com
www.mmmlaw.com

**VIA FEDERAL EXPRESS AND
CERTIFIED MAIL**

DOC Milwaukee, LP
2222 Second Street
Fort Myers, Florida 33901
Attn: Phillip E. Hugh

RE:  Default Notice under that certain Loan Agreement ("Loan Agreement"), dated
     January 9, 2008, by and between Specialty Finance Group LLC, as lender ("SFG" or
     "Lender") and DOC Milwaukee, LP, a Delaware limited partnership ("Borrower").

Dear Mr. Hugh:

     This firm represents the Lender with respect to the above referenced matter.  All
capitalized terms used in this letter which are not defined herein shall have the meaning
ascribed to them in the Loan Agreement.

     This letter serves as official notice to Borrower and each Guarantor of Borrower's
default under certain provisions of the above-referenced Loan Agreement and that certain
Forbearance Agreement, between SFG and Borrower dated October 8, 2008 and that certain
Forbearance Agreement dated April 3, 2009 (the "Forbearance Agreement").  All capitalized
terms not otherwise defined herein will have the meanings ascribed to them in the Loan
Agreement.

     Borrower has breached numerous provisions of the Loan Documents, including, but
not limited to, Borrower's obligations under the Forbearance Agreement and as set forth in
detail in that certain Default Notice to Borrower, dated March 2, 2009.  Pursuant to
Paragraph 14(a) of the Forbearance Agreement, in the event of a breach of Borrower's
obligations under the Forbearance Agreement, SFG shall have the immediate and lasting
right to exercise any and all remedies it may have under the Loan Documents, or the
Forbearance Agreement, as well as any and all other instruments and agreements relating to
the Loan (which includes the Guaranty) or any part thereof or otherwise existing at law or in
equity, all of which remedies shall be cumulative.

Atlanta
404.233.7000

1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044
Fax: 404.365.9532

With offices in

Washington, D.C.
Charlotte, North Carolina

2553961 v01

MORRIS, MANNING & MARTIN, LLP

Doc Milwaukee, LP
Page 2

      As a result of such Events of Default, the maturity of the indebtedness evidenced by the Note has been accelerated and the entire indebtedness is now due and payable in full. By copy of this letter, Guarantor is hereby given notice of the Loan's acceleration and the following demand for payment.

      Lender hereby demands payment in full of the following amounts which are now due and payable under the Loan:

| | |
|---|---:|
| Principal: | $13,401,286.37 |
| Accrued Interest through June 24, 2009 (per diem interest of $1,366.19): | $31,835.67 |
| Late Fees: | $0.00 |
| Lender's costs and expenses (as of June 24, 2009): | |
|    HVS Appraisal: | $15,579.89 |
|    Appraisal Review: | $1,500.00 |
|    Broadlands: | $15,147.00 |
|    Site Visits (SFG): | $5,000.00 |
| Legal Fees ( Billed & WIP): | $22,454.50 |
| Default Interest: | $0.00 |

together with any interest that accrues subsequent to June 24, 2009, and prior to payment in full by the Borrower.

      Additionally, the license to collect and retain Rents as the same become due and payable under the Leases is hereby immediately and automatically revoked, and you are hereby instructed to pay the Rents directly to SFG, until further notice. SFG hereby reserves the further right to notify any and all parties to the Leases to pay the Rents directly to SFG.

      Please take notice that Lender intends to enforce the provisions of the Note relative to the payment of attorneys' fees. Pursuant to O.C.G.A. § 13-1-11, you have ten (10) days from date of receipt of this letter within which to pay the sums set forth above, as well as any additional interest or other charges which may accrue prior to the tender of payment in full by you without also being liable for attorneys' fees. You can avoid the obligation to pay attorneys' fees by paying the sums mentioned above owed under the Note and any other charges which may accrue prior to the tender of payment in full by you, within ten (10) days after receipt of this letter. If you fail to pay the indebtedness evidenced by the Note set forth above, as well as any additional interest or other charges which may accrue, within ten (10) days after receipt of this letter, you shall be liable for attorneys' fees in addition to the sums owed under the Note referenced above.

2553961 v01

MORRIS, MANNING & MARTIN, LLP

Doc Milwaukee, LP
Page 3

In the event that Borrower fails to pay the amounts set forth above in full, Lender, at its option, may exercise any of its rights and remedies under the Note, Security Instrument, Guaranty and any other Loan Documents, including any action to foreclose the lien of the Security Instrument, filing suit on the Note and/or Guaranty, or any other remedy provided by law.

To the extent Lender, in the course of performance or execution of the Loan Documents, has departed from the terms of the Loan Documents, or received money under such departure, notice is hereby given in accordance with O.C.G.A. § 13-4-4 of Lender's intent to rely on the exact terms of the above-referenced Loan Documents.

Yours very truly,

MORRIS, MANNING & MARTIN, LLP

Duncan W. Miller

DWM/sgs

cc: VIA FEDERAL EXPRESS AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED:

Brenda J. Yurick, Esq. (Yurick Law Office, P.C., 550 Brooktree Road, Suite 302, Wexford, PA 15090)
Philip E. Hugh (2797 First Street, Unit 1001, Fort Myers, FL 33916)
John W. Economou (1480 Golden Bell Court, Downers Grove, IL 60515)
Steve J. Economou (1141 Sherman Avenue, Evanston, IL 60202)
Intercontinental Hotels Group (Three Ravinia Drive, Suite 100, Atlanta, GA 303346 Attn: Vice President, Franchise Administration)

cc: VIA EMAIL:

Jon Wright (JWright@silvertonbank.com)
Dilip Petigara (DPetigara@silvertonbank.com)
Robert W. Reardon, Esq. (rreardon@mmmlaw.com)
Sharon E. Selk, Esq. (sselk@mmmlaw.com)
Joseph Fenzel, Esq. (jfenzel@fenzellaw.com)

2553961 v01

**U.S. Postal Service**
**CERTIFIED MAIL· RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

7-13-09
SES
Postmark
Here
16372-
59888

*Sent To*  **DOC Milwaukee, LP**
*Street, Apt. No.; or PO Box No.*  2222 Second Street
*City, State, ZIP+4*  Fort Myers, Florida 33901
Attn: Phillip E. Hugh

PS Form 3800, August 2006      See Reverse for Instructions

---

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

DOC Milwaukee, LP
2222 Second Street
Fort Myers, Florida 33901
Attn: Phillip E. Hugh

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
7-15-09

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
*(Transfer from service label)*
7008 1300 0000 1470 8928

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540